**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| SEISMIC WELLS, LLC, AND | § | |
| BARRY TRANCKINO | § | |
| | § | |
|     PLAINTIFFS, | § | CIVIL CASE NO: 5:15-cv-00148-C |
| | § | |
| V. | § | |
| | § | |
| ROSS B. MATTHEWS, SINCLAIR | § | |
| OIL CORPORATION, THE SINCLAIR | § | |
| COMPANIES, AND SINCLAIR OIL | § | |
| AND GAS COMPANY | § | JURY REQUESTED |
|     DEFENDANTS | | |

**<u>FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

**PAGE NO.**

I.  SUMMARY OF THE CASE ............................................................1

    A.  Defendants Defrauded Seismic Wells by Intentionally Making False Agreements in which a newly formed entity, Sinclair Oil and Gas Company, Purported to be a Party to, and to Have Rights Under, the Initial Participation Agreement, Entered Into By Sinclair Oil Corporation (which did Business as and owned the Co-Existing and Identical Trade Name  "Sinclair Oil and Gas Company" since 1986). 1

    B.  Defendants' Violated State Law and Tainted the Public Record, Including by Never Recording Assignments, in Furtherance of the Fraud.  Defendants had Exclusive Knowledge that does Not Exist in County Clerk, Texas Secretary of State, or Franchise Tax Board Records.  As a result, Defendants' fraud was undiscoverable. ......................................................................................7

    C.  Defendants' Fraud had an Improper Purpose Achieved through Wrongful Means. .10

    D.  Defendants' Fraud Prevented Seismic Wells from Enforcing its Rights under the Initial Participation Agreement and Induced Seismic Wells into Signing the binding Letter of Understanding and Replacement Participation Agreements. ........11

    E.  Defendants' Conspiracy to Defraud Seismic Wells Continued June 2014...............15

II.  JURISDICTION ........................................................................17

III.  VENUE ................................................................................18

IV.  PARTIES ..............................................................................18

    A.  Plaintiffs Seismic Wells and Barry Tranckino...........................................18

    B.  The Defendants. ......................................................................18

V.  FACTUAL BACKGROUND ...........................................................20

    A.  Seismic Wells Originates the 20 Year Primary Term Miller Ranch Lease through its Ownership of Valuable and Proprietary 3D Seismic Data....................................20

    B.  Seismic Wells Enters into a Participation Agreement (the "Initial Participation Agreement") with Sinclair Oil Corporation, ("SOC #1") also known since 1986 by its Trade Name – Sinclair Oil and Gas Company ("SOG #1")............................22

    C.  A Different Entity with the Duplicated Name of "Sinclair Oil and Gas Company" Solicits, Authors and Executes a Replacement Participation Agreement with Seismic Wells, misusing the Original Contracting Party's Tax ID Number. ............25

    D.  The Replacement Participation Agreement was Procured by Defendants' Fraudulent Misrepresentations and Omissions of Material Fact. ..............................28

    E.  Defendants Abused the Corporate Form to Carry Out the Scheme to Defraud Seismic Wells into Assigning Operations and a Controlling Interest in the Miller Ranch Lease to SOG. ..............................................................31

F.       In 2011, Seismic Wells Makes a Partial Assignment of its Interest in The Lease, Including Certain Non-Producing Acreage to M.R. Royalty, but Retains its Interest in Producing Acreage and Right to Operate the Miller Ranch Lease...........35

G.       Defendants Repudiate their Obligations in June 2014................................................36

H.       On June 26, 2014, Defendant SOG#2 Published Blatant Injurious Falsehoods about Plaintiffs to the Industry.   Therefore, Seismic Wells Conducts an Investigation and Eventually Discovers Defendants' Fraud.....................................37

VI.    CAUSES OF ACTION, TOLLING DOCTRINES, DERIVATIVE TORTS, AND OTHER REQUESTED RELIEF ...................................................................................38

Counts 1—3, Counts 5-6, and Fraudulent Concealment Doctrine: (1) Common Law Fraud; (2) Fraud by Non-Disclosure; (3) Statutory Fraud (Tex. Bus. & Comm. Code. §27.01); Fraudulent Concealment Doctrine; (5) Conspiracy to Defraud (Letter of Understanding and Replacement Participation Agreement); and (6) Breach of the Initial Participation Agreement. ..........................38

A.       Defendants Intentionally Breached the Initial Participation Agreement and Were Unwilling to Accept the Consequences of the Breach................................................38

B.       Defendants had Actual Knowledge of the Wrongful Affirmative Misrepresentations Fraudulently Concealing the Intentional Termination and Breach of the Initial Participation Agreement.   But for Defendants' Fraud, Seismic Wells Would have Retained Operations and Enforced the Initial Participation Agreement. ...................................................................................39

(Fraudulent Concealment Element #1 – Actual Knowledge of the Wrong Committed; Common Law Fraud Element #4 – Knowledge of the Falsity)................................39

C.       The Defendants formed a Combination of Two or More Persons to Achieve a Common, Improper Fixed Purpose by Unlawful Means ..........................................43

(Civil Conspiracy Elements # 1 and 2 – Combination of Two or More Persons, Object of the Combination was to Accomplish Unlawful Purpose or Lawful Purpose by Unlawful Means) (Fraudulent Concealment Element # 3 – Fixed Purpose to Conceal the Wrong) ...............................................................................43

D.       Defendants Used Wrongful Means of Deception to Achieve the Improper Purpose.....................................................................................................44

(Fraudulent Concealment Element # 2 – Misrepresentations Intended to Influence; Civil Conspiracy Element # 2 – Object of Combination was to Accomplish Unlawful Purpose) .....................................................................................44

E.       SOC #1's Breach and Termination of the Initial Participation Agreement..............45

(Breach of Contract Elements # 1-4 – Existence of a Contract; Plaintiff Tendered Performance; Defendant Breached; Plaintiff Damaged as a Result of the Breach) ..45

F.       Defendants had a Meeting of the Minds on the Object of their Conspiracy..............48

(Civil Conspiracy Elements # 3 and 4 – Meeting of the Minds and Unlawful Acts in Furtherance of the Conspiracy) (Fraudulent Concealment Element #2 – More Deception with Intent) ...............................................................................48

G.      Affirmative Misrepresentations and Material Omissions as Acts of Deception........49

(Common Law Fraud Elements #1-3 – False, Material Representations; Fraud by
        Nondisclosure Elements # 1, 3 – Concealment of Material Facts; Statutory Fraud
        Element #2 – False Representations of Fact, Fraudulent Concealment Element #2)49

H.      The Affirmative Misrepresentations and Omissions were False and Material..........50

I.      Defendants Use of Identical Corporate Names for Legally Separate Entities
        Tainted the Public Records. ...................................................................................55

J.      Defendants Violated Duties to Disclose. ...............................................................60

(Fraud by Nondisclosure Elements # 2, 4, 5 – Duty to Disclose, Knowledge that Plaintiff
        was Ignorant of the Facts, Deliberate Silence) ........................................................60

K.      Defendants Intended to Deceive and Carried Out that Intent with Willful
        Disregard for the Truth and the Law, including their Common Law Duty to Avoid
        Foreseeable Harm to Others..................................................................................61

(Common Law Fraud Element #5 – Intent; Fraud by Nondisclosure Element #6 – Intent;
        Statutory Fraud Element #4 - Intent) ....................................................................61

L.      Plaintiffs Justifiably Relied On the Material Misrepresentations and Omissions. ....62

(Common Law Fraud Element #6 – Reliance; Fraud by Nondisclosure Element #7 –
        Reliance; Statutory Fraud Element #4 – Reliance; Fraudulent Concealment
        Element #4 – Reliance)..........................................................................................62

M.      Defendants Final Acts in Conspiracy to Permanently Defraud Seismic Wells .........63

N.      Plaintiffs Suffer Actual Damages Proximately Caused by Defendants Fraud and
        Breach of Contract. ...............................................................................................64

        Counts 7, 8, and 10:  Fraud, Statutory Fraud, and Anticipatory Breach of Consent
        Agreement. ............................................................................................................68

        Count 11:  Fraud by Promises Made With No Intent to Perform. ............................74

        Count 12:    Breach and Anticipatory Breach of Replacement Participation
        Agreement. ............................................................................................................78

        Count 13: Tortious Interference with Prospective Business Relations.....................84

        Count 14: Tortious Interference with Contract. ......................................................90

        Count 15: Defamation Per Se and Statutory Libel...................................................93

S.      Count 16: Business Disparagement. .......................................................................95

T.      Summary of Accrual of Causes of Action. ..............................................................98

U.      The Discovery Rule. ............................................................................................102

V.      Fraudulent Concealment Doctrine. ......................................................................103

W.      Texas Civil Practice and Remedies Code § 16.063. ..............................................104

X.      Count 17: Declaratory Relief. ..............................................................................105

Y.      Requested Relief: Attorneys' Fees..........................................................................107

Z.      Requested Relief: Exemplary Damages...................................................................108

VII.    DEMAND FOR JURY TRIAL ............................................................................108

Pursuant to the Court's Orders of September 11, 2015 [Dkt.'s 40 and 41], Plaintiffs Seismic Wells, LLC and Barry Tranckino file this First Amended Complaint ("***First Amended Complaint***") against Defendants Ross B. Matthews, Sinclair Oil Corporation, The Sinclair Companies, and Sinclair Oil and Gas Company (collectively "***Defendants***").  In support of the First Amended Complaint, Plaintiffs allege the following:

## I.      SUMMARY OF THE CASE

**A.      Defendants Defrauded Seismic Wells by Intentionally Making False Agreements in which a newly formed entity, Sinclair Oil and Gas Company, Purported to be a Party to, and to Have Rights Under, the Initial Participation Agreement, Entered Into By Sinclair Oil Corporation (which did Business as and owned the Co-Existing and Identical Trade Name "Sinclair Oil and Gas Company" since 1986).**

1.      By conveying away the entirety of its interest in the Miller Ranch Lease and never recording the assignments, The Sinclair Companies (formerly Sinclair Oil Corporation) breached the Initial Participation Agreement[1] with Seismic Wells.  The breach allowed Defendants to obtain tax benefits in 1031 exchange(s), offsetting Defendants' income from the sale of Barnett Shale leases to Chesapeake Energy for $845 million.  Defendants were unwilling to accept the consequences of the breach, which resulted in The Sinclair Companies (formerly Sinclair Oil Corporation) losing its option to assume operations of the Miller Ranch Lease, without which it could not obtain a majority interest to exchange for those tax benefits.  Through their individual and concerted efforts, Defendants breached the Initial Participation Agreement; never recorded a series of assignments that constituted the breach; made intentionally false replacement agreements purporting on their face to be the agreements of the original contracting party (which they were not; and misused an identical name and the Tax ID number of the original contracting

---

[1] The Initial Participation Agreement, which was executed in late May of 2005, is attached as **Exhibit "A."**

party,[2] all resulting in damages to Seismic Wells by virtue of Defendants wrongfully obtaining operations of and a controlling interest in the 20 year primary term Miller Ranch Lease.

2.      Plaintiff Seismic Wells, LLC (*i.e.* "Party A" to the agreement) had an exclusive agreement (the "***Initial Participation Agreement***"), with Defendant The Sinclair Companies (then known as Sinclair Oil Corporation which owned and did business under its trade name[3] Sinclair Oil and Gas Company) (*i.e.* "Party B" to the agreement).   In order to obtain tax avoidance benefits, Party B intentionally breached the agreement by selling or disposing of the entirety of its interest in the contract area.   Party B's breach rendered Party B incapable of performing any of its promises, and the breach terminated Party B's option to assume operations of the Miller Ranch Lease under the Initial Participation Agreement.

3.      The deeds, assignments and/or bills of sale whereby Party B disposed of its interest were never recorded, and Seismic Wells (the operator of the oil and gas lease) was never notified, as if nothing ever changed.   At least 8 months later, "Non-Party C" – a newly formed entity with the duplicated and identical name as Party B ("Sinclair Oil and Gas Company") solicited, authored, and procured a binding Letter of Understanding[4] and Replacement Participation Agreement[5] from Seismic Wells, which on their face purport to be the agreements of "Party B" and claim the actions and rights of Party B under the Initial Participation Agreement.   "Non-Party C" was not even in existence at the time of the Initial Participation

---

[2] The misused Tax ID *****0188 is contained in the JOA of the Initial Participation Agreement.

[3] From December of 1986 through December 2006, the name "Sinclair Oil and Gas Company" was the registered trade name that legally referred to the Wyoming corporation that was the original contracting party.   *See* **Exhibit "D."**   The Defendants knew that appearance of the use of a registered trade name is reasonable and excludes suspicion, when using the trick and contrivance of a duplicated and co-existing identical name to claim the actions and rights of the Initial Participation Agreement. The Texas Business Organizations Code is designed to prevent this type of abuse, but cannot when it is violated as it was by Defendants.

[4] The Letter of Understanding, dated September 29, 2006, is attached as **Exhibit "B."**

[5] The Replacement Participation Agreement, executed October 25, 2006 is attached as **Exhibit "C."**

Agreement[6].  Through the Letter Agreement and Replacement Participation Agreement, "Party B," "Non-Party C," and the other Defendants defrauded Seismic Wells out of a controlling interest in and the valuable right to operate the 20 year primary term Miller Ranch Lease. Seismic Wells had the right to rely on the fact that the contracting party would not actively conceal information material to the transaction, which SOG did, in fact, conceal.

4.     Defendants solicited and procured from Seismic Wells a Letter of Understanding and Replacement Participation Agreement, which on their face purport to be the act of another. Specifically, the Letter of Understanding and Replacement Participation Agreements purport to be contracts made by the party to and having the rights under the Initial Participation Agreement – Defendant The Sinclair Companies (then known as Sinclair Oil Corporation) – when in fact those documents are contracts made by a non-party to the Initial Participation Agreement and that was not an intended beneficiary of the Initial Participation Agreement – Defendant Sinclair Oil and Gas Company.[7]  Defendants tricked Seismic Wells (including its principal, Barry Tranckino) by using a newly formed entity with the duplicated and co-existing identical name as the trade name of the original contracting party to the Initial Participation Agreement. Accordingly, the Letter of Understanding and Replacement Participation Agreement are void.

5.     Defendants intended for, and their conduct did fraudulently conceal Sinclair Oil Corporation's breach of the Initial Participation Agreement, and foreseeably damaged Seismic Wells by unlawfully taking the valuable operating rights of the 20 year primary term Miller Ranch Lease ("***The Lease***") from Seismic Wells.

---

[6] Sinclair Oil and Gas Company's Texas Certificate of Authority, signed by Matthews, is attached as **Exhibit "E."**
[7] Defendant Sinclair Oil and Gas Company did not even exist at the time of the Initial Participation Agreement. However, Defendant Sinclair Oil Corporation owned the trade name "Sinclair Oil and Gas Company," and did business with Seismic Wells using that trade name.

6.    Contract formation requires mutual assent to the same terms by the parties, which never happened in the case of the Letter of Understanding and Replacement Participation Agreement.[8]  The Replacement Participation Agreement purports to be a contract made by the party to the Initial Participation Agreement, but in effect, it discharged the liabilities of Sinclair Oil Corporation (now known as The Sinclair Companies) and transferred a controlling interest in real property and the valuable operations of the Miller Ranch Lease to a non-party that had no rights under the Initial Participation Agreement, including no right to enforce it.  Accordingly, there was no mutual assent to the same terms by the parties (which is required to form a valid contract) because the Defendants had actual knowledge that the contract was not by and between the parties to the Initial Participation Agreement, and they knew Seismic Wells would and did mistakenly believe that it was[9].

7.    Sinclair Oil and Gas Company falsely made the Letter of Understanding and Replacement Participation Agreement by purporting to be Sinclair Oil Corporation with the intent to defraud Seismic Wells.  Defendants The Sinclair Companies (then the Sinclair Oil Corporation) and Sinclair Oil and Gas Company, and separately The Sinclair Companies  and its then former director Ross B. Matthews ("***Matthews***") and as director of SOG#2, conspired to

---

[8] Under Texas law, the Replacement Participation Agreement may be deemed a forgery, since it recites it is being made by the party to the Initial Participation Agreement, when in fact, it was not.  *Nobles v. Marcus*, 533 S.W.2d 923, 926 (1976) ("Forgery, at common law, was the making or altering of a written instrument 'purporting to be the act of another'…Forgery is the making without authority of a false instrument in writing, purporting to be the act of another"); *Smith v. Dawson*, 234 S.W. 690 (Tex.Civ.App.—San Antonio 1921) ("Forgery is the making without authority of a false instrument in writing, purporting to be the act of another, in such manner that the false instrument so made would, if true, have created, increased, diminished, discharged, or defeated any pecuniary obligation.  The instrument must appear on its face to be, or must in fact be, one which, if true, would possess some legal validity, or be legally capable of effecting a fraud.") (internal citations omitted); *see also* TEX PEN. CODE ANN. § 32.21 (defining forgery).  Here, the Letter of Understanding and Replacement Participation Agreement purport to be the acts of another (Sinclair Oil Corporation) by stating that Sinclair Oil and Gas Company (SOG#2) purchased 37.5% from Seismic Wells under the Initial Participation Agreement, which was signed before SOG#2 even existed, and at a different time and place than when and where SOG#2 actually acquired the interest, which it acquired through Sinclair Oil Corporation's through the Breach of the Initial Participation Agreement.

[9] Seismic Wells mistaken belief was conveyed to SOG in its letter dated October 12, 2006, which is attached as **Exhibit "F."**

defraud Seismic Wells through the Replacement Participation Agreement, which is void *ab initio*. The assignments which are specifically attached to and made part of the Agreement are also void *ab initio*.[10]

8.      Defendants intentionally defrauded Seismic Wells by securing Seismic Wells' execution of a binding Letter Agreement and a Replacement Participation Agreement though written deceptions misrepresenting the contracting party's identity and condition precedent rights under the Initial Participation Agreement, which constitutes fraud in the execution by misuse of identical names, and which fraudulently concealed Defendant Sinclair Oil Corporation's ("**SOC #1**") termination of the enforceable Initial Participation Agreement, including SOC #1's option to assume operations of the Miller Ranch Lease. Defendants' conduct prevented Seismic Wells from exercising its right to mitigate and remedy its ongoing damages and allowed the Defendants to achieve their goals of permanently obtaining the operations of and a controlling interest in that real property (the Miller Ranch Lease) through fraud to obtain additional tax avoidance benefits by using the interest as replacement property in 1031 exchange(s), which personally benefited Matthews, who is married to Kathleen Holding, daughter of Sinclair's founder.

9.      The Defendants committed multiple acts of fraud and independent torts, both individually and through concerted efforts in a conspiracy to defraud Seismic Wells. In May 2005, the names "The Sinclair Companies," "Sinclair Oil Corporation" (SOC #1), and SOC #1's trade name "Sinclair Oil and Gas Company" (SOG #1) had existed for decades.[11] The latter names referred to a single Wyoming Corporation known as "Sinclair Oil Corporation" (also

---

[10] The distinction is that if the assignments were not attached to and made part of the agreement, they would be voidable since they were procured by fraud. But here they are actually part of an agreement that could have never legally come into effect and could not be ratified.

[11] Sinclair Oil Corporation referred to itself as "SOC" and "SOG" (an acronym for its trade name since 1986, Sinclair Oil and Gas Company) in various agreements. These names were later duplicated and used by entirely different entities with the identical names. The later entities are referred to herein as "**SOC #2**" and "**SOG #2**."

known as its trade name Sinclair Oil and Gas Company), which entered into "The Initial Participation Agreement" for the exclusive benefit of SOC #1 and Seismic Wells LLC.  At the same time, the same entity that signed the Initial Participation Agreement (SOC #1) was acquiring Barnett shale leases in Texas that were sold to Chesapeake Energy for $845 million, as announced June 5, 2006.

10.     For whatever reasons, on February 23, 2006, just 102 days before the Barnett Shale sale was announced, Defendants caused all three corporate names above to refer to completely different entities, including new entities with the identical names "Sinclair Oil Corporation" and "Sinclair Oil and Gas Company," neither of which had any relationship (contractual or otherwise) with Seismic Wells, but had the identical names of the entity that did enter into the Initial Participation Agreement.

11.     It is indisputable that the only legal entity named "Sinclair Oil Corporation," as announced in Defendants' June 5, 2006 press releases announcing the Barnett shale transaction, was not the Sinclair Oil Corporation that entered into the Initial Participation Agreement with Seismic Wells, because that entity had changed its name to "The Sinclair Companies" on or around March 1, 2006.[12]  That fact is undiscoverable in Texas, because the Sinclair Companies has never existed in Texas Secretary of State Records, and it never filed Franchise Tax Reports.

12.     SOG #2, the entity that signed the Replacement Participation Agreement, did not exist at the time of the Initial Participation Agreement and thus did not purchase a 37.5% interest from Seismic Wells; nevertheless, SOG #2, as "exchanger" misrepresented that it did, in fact, own a 37.5% interest in the Miller Ranch Lease under the Initial Participation Agreement in the

---

[12] Through conduct that could not have been discovered through a review of the Texas SOS and Franchise Tax Board public records (which are tainted), Defendants amended their Articles of Incorporation by voting and approving on February 23, 2006 to change the names of the Sinclair Oil Corporation to The Sinclair Companies and from Sinclair Petroleum Company to Sinclair Oil Corporation on the same day.  *See* **"Exhibit G."**

Letter Agreement dated September 29, 2006.  SOG #2 later assigned the rights in that Letter Agreement to a 1031 exchange Qualified Intermediary named Petroleum Strategies Inc.

**B.**     **Defendants' Violated State Law and Tainted the Public Record, Including by Never Recording Assignments, in Furtherance of the Fraud.  Defendants had Exclusive Knowledge that does Not Exist in County Clerk, Texas Secretary of State, or Franchise Tax Board Records.  As a result, Defendants' fraud was undiscoverable.**

13.     Unknown to Seismic Wells, the operator, the Defendants tainted the public records by never recording any assignment(s) or bill(s) of sale from Sinclair Oil Corporation (SOG #1) to any other party in a series of transfers, including SOG #2.  By default and through 1031 exchange(s), these entities came to own the interests owned by SOG #1 under the Initial Participation Agreement, in breach of the Initial Participation Agreement's terms.  As a result, contracting party (SOC #1) could no longer perform any promise under that agreement, since it no longer owned an interest in the Miller Ranch Lease.  Moreover, the new entities with the identical names received all of the oil production revenues intended to be paid to the original contracting entity, despite their never being a party to the original assignments or agreement.  This rendered as false the common sense perception of reasonable business people and title opinions that the previous acts of identical names were the acts of the same party.

14.     As operator, Seismic Wells was diligent at all times in its contractual relationships, including running legal title opinions that did not detect any sale or disposition of SOC #1's interest.  When an oil and gas operator is drilling and completing wells, administering drill site title opinions, distributing run checks, and paying lease operating expenses, the only way it cannot know that a sale of the interest has occurred is if the buyer(s) and seller(s) do not want anyone to know and there is no evidence of the conveyance existing, except information that is exclusive to the buyer and seller's knowledge and exists only in unrecorded instruments to

which there is no public accessibility, rendering them as literally undiscoverable by the Plaintiffs, which is unprecedented to the Plaintiffs knowledge.

15.     Here, because of Defendants' use of identical corporate names, Seismic Wells never even suspected a sale or disposition of SOC #1's interest in the Miller Ranch Lease. Defendants changed all their names from The Sinclair Companies, Sinclair Oil Corporation, and Sinclair Oil and Gas Company, to different entities named The Sinclair Companies, Sinclair Oil Corporation, and Sinclair Oil and Gas Company, all on the same day.  No reasonable person would ever suspect this type of maneuvering and would never know unless it was fully disclosed, and here, it was not, even to the Texas Secretary of State and Texas Franchise Tax Board.

16.     As happened in this case, the new entities even claimed the acts of the original contracting party and assignee with the identical name, and they did so with high confidence that nobody would ever know, because reasonable people would never suspect it, and a reasonable inquiry into public records could not detect it because of violations of the Texas Business Organization Code Section 9.001, which requires foreign entities to amend their Texas registration within 91 days of changing their names in their home state, which Sinclair Oil Corporation and The Sinclair Companies never did.  Accordingly the existence of these material facts is undiscoverable in Texas Public Records.

17.     In order to obtain a Certificate of Authority to do business in Texas, a foreign corporation must exist as a valid foreign-filing entity under the laws of its jurisdiction of formation.[13]  When a foreign entity ceases to exist in its jurisdiction of organization, it must terminate its registration in Texas.[14]  In this case, on or around March 1, 2006 the entities SOC#1 and Sinclair Petroleum Company ceased to exist in Wyoming under those names, but they failed

---

[13] *See* TEX. BUS. ORG. CODE ANN. § 9.004(b)(5).
[14] *See* TEX. BUS. ORG. CODE ANN. § 9.011(a).

to comply with Texas law by failing to either amend or terminate their Texas registrations,[15] including from on or around March 1, 2006 through July 2007.

18.     To date, it is completely undiscoverable in Texas Secretary of State and Texas Franchise Tax Board Public Information Report search records that any party named "The Sinclair Companies" ever existed; nor could one discover that while having that legal name in Wyoming, The Sinclair Companies was present in Texas and was injuring Seismic Wells without using or registering the only legal name that it could be sued upon, or that it left the state on July 17, 2007 without any trace of the existence of its only legal name, "The Sinclair Companies."

19.     Even worse, at the same time (beginning between February 23, 2006 and March 1, 2006), the only Wyoming Corporation with the legal name "Sinclair Oil Corporation," was a completely different entity than Sinclair Oil Corporation that contracted with Seismic Wells, and that fact remains completely undiscoverable in Texas because the "new" Sinclair Oil Corporation was registered in Texas as "Sinclair Petroleum Company," a name that no longer existed and was not a legal name of anyone.  Again, Defendants' conduct tainted the public record.

20.     There is absolutely no way of discovering in Texas public records that from on or about March 1, 2006 through July 17, 2007, the only Wyoming corporation named "Sinclair Oil Corporation" was registered in Texas as "Sinclair Petroleum Company," and that the original "Sinclair Oil Corporation," which signed the Initial Participation Agreement, no longer existed in the name Sinclair Oil Corporation and was in fact The Sinclair Companies.

---

[15] *See* **Exhibit "H,"** which includes a Certificate of Withdrawal for Sinclair Oil Corporation on July 17, 2007 (when in fact its only legal name was The Sinclair Companies for the prior 14 months); an Amendment to Sinclair Petroleum Company's Texas registration changing its name to Sinclair Oil Corporation two days later on July 19, 2007 (when in fact its only legal name was Sinclair Oil Corporation for the prior 14 months).  The truth is not reflected in these filings.  Since on or around March 1, 2006 as reflected in **Exhibit "G,"** The Sinclair Companies was the only legal name of that entity that signed the Initial Participation Agreement as Sinclair Oil Corporation.  At the same time, Sinclair Petroleum Company's only legal name was Sinclair Oil Corporation.  These facts rendered the filings tainted by fraud – The Sinclair Companies never even filed a Texas Certificate of Authority or Franchise Tax Board Public Information Report.

21.    From March 1, 2006 through July 17, 2007,  the only legal names of the Wyoming entities named "The Sinclair Companies" and "Sinclair Oil Corporation" were never registered with the Texas Secretary of State and Texas Franchise Tax Board.

22.    Through the conduct described herein, Matthews violated Section A (2) of Article 2.21 of The Texas Business Corporations Act and perpetrated an actual fraud upon Seismic Wells by misusing the corporations for his personal benefit.  Evidence of the fraud and the Defendants' actual knowledge of it, including the conspiracy to defraud, exists in writings as signed by Matthews, and Matthews' knowledge is imputed to the corporate Defendants.

23.    Matthews combined literally dozens of actions detailed herein, exposing the corporations to unacceptable liabilities and risks contrary to their own interests, such that his will for personal gain and of his personal beneficiaries, defied all norms of corporate behavior.

**C.    Defendants' Fraud had an Improper Purpose Achieved through Wrongful Means.**

24.    Defendants' conduct had a specific purpose.  The Defendants intentionally breached the Initial Participation Agreement to obtain tax benefits in 1031 exchange(s) relating to the publically announced sale of Barnett shale leases to Chesapeake Energy for $845 million in June of 2006, with SOG #2 as exchanger[16].  The exchange plan included the disposition of the Miller Ranch interest (37.5%) in breach of the Initial Participation Agreement's terms, and Defendants were unwilling to accept the consequences of the breach because they would neither have operations nor a controlling interest to exchange for tax avoidance benefits.  The Defendants joined together to fraudulently conceal the breach to achieve their common and improper purpose through the unlawful means of defrauding Seismic Wells by securing execution of the documents and real property by deceptions concealing the truth.

---

[16] The notification of the Assignment of SOG's Rights as exchanger under the Letter of Understanding as required to be signed by Seismic Wells while being represented that "this in no way effects you" is attached as **Exhibit "I."**

**D.    Defendants' Fraud Prevented Seismic Wells from Enforcing its Rights under the Initial Participation Agreement and Induced Seismic Wells into Signing the binding Letter of Understanding and Replacement Participation Agreements.**

25.    The Defendants combined acts of never recording any assignments and bills of sale, never notifying Seismic Wells as operator of any change in ownership; never amending the operating agreement to reflect that change; the material omissions of the new entities with the identical names; failure to correct the misrepresentations in the Letter Agreement with the new information; causing and not correcting Seismic Wells mistaken belief that was communicated in writing to SOG on October 12, 2006; violating their duties to disclose; and affirmative misrepresentations claiming the actions and rights of the Initial Participation Agreement using identical names, fraudulently concealed Sinclair Oil Corporation's (SOC #1) breach of the Initial Participation Agreement.

26.    On September 20, 2006 at 11:20 a.m., in furtherance of the fraud, Defendants' employee Marilyn Meehan solicited Seismic Wells about acquiring an "additional" interest in the Miller Ranch Lease and exercising the option to assume operations.  Meehan wrote: "Thank you so much for taking the time to educate me on Miller Ranch.  It is my hope that this will be a wonderfully successful project for all parties concerned. I look forward to hearing from you regarding possible sale of interest to Sinclair.[17]"

27.    The Plaintiffs had generated tens of millions of dollars from the right to operations of the Miller Ranch Lease in the decade prior to Sinclair becoming operator. Plaintiffs believed the benefit of having a multi-billion dollar partner in the further exploitation of the vast amount of the lease acreage, which was described as a primary objective of the operations in Section 9.1 of both Participation Agreements, provided an opportunity to exceed

---

[17]  Ms. Meehan's emails communicated to Seismic Wells are attached as **Exhibit "J."**

their past success.  That did not happen, and only recently did Plaintiffs learn that it was because of the Defendants' fraud.

28.    Seismic Wells realized it could not keep up with Sinclair drilling wells as operator because Sinclair had billions of dollars and Seismic Wells is a small business.  Seismic Wells believed it to be prudent to sell down with Sinclair Oil Corporation exercising its option to assume operations.  At the time, Seismic Wells was unaware that the option had been terminated through the concealed breach.

29.    On September 25, 2006 Meehan wrote: "Thank you, Barry, for your quick response**.**  I will get back to you as soon as possible.  Ross [Matthews] is not in the office today but hopefully will be so tomorrow."

30.    On September 29, 2006, Seismic Wells received a binding Letter of Understanding from Meehan.  The Letter of Understanding was solicited and authored by SOG #2, and it contained the following misrepresentations on the face of the agreement:

> "I have begun preparing the documents I outlined this morning, which are:
>
> ● **Amendment** to Original Assignment from SW to SOG (which conveyed 37.5% interest in and to Miller Ranch properties) to include any additional leases - for execution by SW.
>
> ● **Amendment** to Participation Agreement to include new leases, new working interest percentages and to name SOG as Operator - for execution by all Working Interest Owners.
>
> ● **Amendment** to Joint Operating Agreement to include new leases, new working interest percentages and to name SOG as Operator - for execution by all Working Interest Owners."

31.    These misrepresentations gave Seismic Wells the mistaken belief that it was dealing with the party to and having the rights under the Initial Participation Agreement – Sinclair Oil Corporation (SOC #1).  The document portrays actions that appear to have occurred

First Amended Complaint                                                                                         Page 12
379844

at a different time or place than when or where they actually occurred, since Sinclair Oil & Gas (SOG #2) did not exist at the time the 37.5% interest was assigned pursuant to the Initial Participation Agreement.  These affirmative misrepresentations concealed the truth that SOG #2 acquired the interest through SOC #1's breach of the Initial Participation Agreement and violated SOG #2's duty to disclose new information that would have rendered the misrepresentations as false and misleading.

32.     The new information was that SOG #2 was not the party to the Initial Participation Agreement, and that the Defendants had formed a new entity and changed its name to the identical name "Sinclair Oil Corporation" as a subsidiary of a newly named entity "The Sinclair Companies," which had at the very same time changed its name from Sinclair Oil Corporation, and continued to own the trade name "Sinclair Oil and Gas Company." Defendants' conduct could not be discovered in Texas because both entities were never registered in their only legal names.  Through their actions, both names of the original contracting party – Sinclair Oil Corporation and its trade name Sinclair Oil and Gas Company – referred to identically named entities that were not party to the contract with Seismic Wells.  At the same time, those entities were being misused by claiming they were parties to the Initial Participation Agreement on the face of the Letter Agreement and Replacement Participation Agreement.

33.     On October 12, 2006, after Sinclair Law Department's meeting with Meehan to "approve the form of the documents" (per Meehan's email of October 9, 2006), the form of the documents was changed from that represented in the Letter of Understanding as "amendments to the original assignments and agreement."  Rather than present "amendments," as Defendants represented they would do, SOG #2 faxed the approved, fraudulent replacement agreement to

achieve the majority of their fixed and improper purpose through the unlawful means of securing

another document by deception, which fraudulently concealed the truth by stating affirmative

misrepresentations on the face of Replacement Participation Agreement under "<u>WITNESSETH</u>."

Specifically, the Replacement Participation Agreement stated:

> WHEREAS, HERETOFOR, **Seismic Wells and SOG entered into that certain Participation Agreement** effective the 1st day of April 2005 (hereinafter referred to as "Initial Participation Agreement") for good and valuable consideration, **paid and delivered by SOG to Seismic Wells**, the receipt and sufficiency of which is acknowledged by Seismic Wells, **SOG purchased (hereinafter referred to "Initial Purchase" an undivided Thirty-Seven and Five-Tenths Percent (37.5%) interest in and to the Leases** described on Exhibit "A" attached thereto (hereinafter referred to as "**SOG's Initial Interest**"[18]

34.     It is indisputable that the Defendant named "Sinclair Oil and Gas Company," ("SOG" #2) (WY Filing ID 2005-000504991) was initially incorporated in Wyoming on December 28, 2005, and did not exist at the time of the Initial Participation Agreement. This entity co-existed with another entity with the identical trade name "Sinclair Oil and Gas Company," ("SOG" #1) (WY Filing ID 1986-000239550) that referred to and was owned by the original contracting party to the Initial Participation Agreement – Sinclair Oil and Gas Company. This trick and contrivance excluded suspicion and prevented inquiry, and was made as deception concealing the truth for a wrongful purpose that caused extensive actual damages to Seismic Wells and Barry Tranckino.

35.     In continuing the fraud, Matthews was no longer an officer or director for The Sinclair Companies[19], which continued to own the trade name Sinclair Oil and Gas Company.

---

[18] The Replacement Participation Agreement goes on to state "Whereas the Parties hereby designate SOG as Operator of the Miller Ranch Area…"
[19] That Matthews was no longer acting as an officer or director of the original contracting party is reflected in the Texas Franchise Tax Public Information report signed on October 6, 2006. *See* **Exhibit "K."**

Matthews also lacked any legal authority to enter into any contract to amend or replace the Initial Participation Agreement because he was no longer with SOC #1, which itself had no legal authority to enter into any such contract because it no longer owned any interest in the contract area and could not perform any promise regarding the Miller Ranch Lease.

36.     Matthews, as President and Director of the new entity with the identical name SOG #2, signed its Texas registration filed on February 23, 2006.  Matthews had actual knowledge that SOG #2 (Tax ID ------6718) had no legal authority to amend the Initial Participation Agreement because it did not even exist when the agreement was made and was neither a party to that agreement nor an intended beneficiary of it because the agreement states that it has no third party beneficiaries and purposefully made no provision for any successors or assigns.[20]

37.     Lacking any recorded assignments of record from SOC #1 to SOC #2, the entire public record is tainted by fraud.  Further, the new entity with the identical name could not legally represent that it was a party to any agreement or assignment that preceded its existence; therefore, a reasonable inquiry into public records could not detect Defendants' fraud because of Defendants' violations of the Texas Business Organization Code Section 9.001, which requires foreign entities to amend their Texas registration within 91 days of changing their names in their home state, which neither Sinclair Oil Corporation and The Sinclair Companies ever did.

**E.     Defendants' Conspiracy to Defraud Seismic Wells Continued June 2014.**

38.     On June 20, 2014, the Defendants completed the final overt acts pursuant to the common purpose of their conspiracy to defraud Seismic Wells, including the object of

---

[20] It is well established in Texas that "a court will not create a third party beneficiary contract by implication."  It necessarily follows that a court will not allow a non-party to otherwise enforce or obtain the benefits of an exclusive agreement by misrepresenting its identity as party to that exclusive agreement on the face of a document solicited to amend or replace it.

permanently defrauding Seismic Wells of its exclusive right to operate the Miller Ranch Lease, without which Defendants could not seek to profit on the value of that right as originally intended.

39.     Specifically, Defendants repudiated their obligations under the Initial Participation Agreement and Replacement Participation Agreement.   In correspondence to Seismic Wells, Defendants stated (1) "… Sinclair may assign all of its interest in that lease including operations, certainly without your consent and even without the lessors consent;" (2) "Sinclair is under no obligation to drill the remaining two wells;" (3) "Sinclair, did not obligate themselves to drill all nine wells;" (4) "These were not truly obligation wells;" and (5) "It is Sinclair's position that Seismic Wells exclusive right to assume operations was assigned to Sinclair…", through assignments attached to and made part of the Replacement Participation Agreement.  In addition to being absolute repudiations made while advertising the operations for sale, Defendants' statements constitute categorical claims that upon the agreements' formation, the promises (which Defendants authored) were never binding or valid whatsoever, which constitute circumstantial evidence that SOG solicited and authored the Initial and Replacement Participation agreements with no intent to perform their essential and material promises, without which the Agreements would have never been made.

40.     Commencing June 26, 2014, Defendant SOG#2 published and distributed injurious falsehoods and false statements about the Plaintiffs to all of their industry peers who had expressed interest in the exact area of the Plaintiffs pecuniary interests, and from which the Plaintiffs have exclusively depended on for their income since 1994.  The falsehoods disparaged the Plaintiffs pecuniary interests by stating "Neither you MR Royalty or Seismic Wells, LLC owns any interest or residual rights in the [Miller Ranch] Lease," and the false statements

accused Plaintiffs of engaging in criminal activity by extortion from Chesapeake Energy, and thus, were defamatory per se, and caused the loss of a contractual relationship that previously earned several million dollars of net income, and diminished Plaintiffs' reputations, earnings capacities and the value of their pecuniary interests.  All of the Plaintiffs' damages in this case would never have occurred if not for the intentional breach of the Initial Participation Agreement and its fraudulent concealment.

41.     In misusing an identical name of the original contracting party to misrepresent its identity, actions and rights as those of the original contracting party, SOG caused foreseeable damages to the Plaintiffs. Through this action the Plaintiffs are seeking the extensive monetary damages that would have never occurred if not for the Defendants Fraudulent Concealment of the intentionally terminated Initial Participation Agreement.[21]

## II.      JURISDICTION

42.     This Court has personal jurisdiction over the Defendants named in this Complaint due to the fact that the Defendants transacted business in Borden and Garza Counties, Texas, which are located within the Lubbock Division of the Northern District of Texas.   The Defendants also committed torts in Borden and Garza Counties, Texas, which are located within the Lubbock Division of the Northern District of Texas, and are thus subject to the Texas long arm statute.

43.     There is complete diversity of citizenship between the Plaintiff and each of the Defendants and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; therefore, this Court has jurisdiction over the subject matter of this action

---

[21] Under Texas Law, a non-party to a contract that is not an intended beneficiary can neither enforce the contract nor be sued for its breach; an incidental beneficiary has no rights or obligations under a contract, nor can an incidental beneficiary sue to enforce a contract.  Accordingly, SOG #2 cannot form any contract by representing that it was the party to the Initial Participation Agreement, and because SOG #2 attempted to do so, the Letter of Understanding and Replacement Participation Agreements are void and never came into effect

pursuant to 28 U.S.C. §1332(a) because there is complete diversity between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

### III.       VENUE

44.      Venue in the Lubbock Division of the United States District Court for the Northern District of Texas is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in Borden and Garza Counties, Texas, which are located within the Lubbock Division of the Northern District of Texas.  Moreover, all of the real property that is the subject of this action is situated in Borden and Garza Counties, Texas, which are located within the Lubbock Division of the Northern District of Texas.  Venue is also otherwise proper.

### IV.       PARTIES

**A.      Plaintiffs Seismic Wells and Barry Tranckino.**

45.      Plaintiff Seismic Wells was founded in 1999 by its sole principal and sole member, Barry Tranckino.  Seismic Wells is a Texas Limited Liability Company with its principal place of business at 10000 North Central Expressway, Dallas Texas 75231.

46.      Plaintiff Barry Tranckino ("***Tranckino***") is an individual residing at 5201 Rockport Way, Edmond, Oklahoma.

**B.      The Defendants.**

47.      Defendant Ross B. Matthews ("***Matthews***") is an individual residing in in Salt Lake City, Utah.  Matthews may be served by personal delivery at his principal address or domicile – 610 Capitol Park Ave, Salt Lake City, UT 84103.  Matthews has been served with process and has appeared herein through counsel.

48.      Defendant The Sinclair Companies is a Wyoming Corporation, which, in May 2005, entered into the Initial Participation Agreement as "Sinclair Oil Corporation" (SOC #1),

FEIN -----0188.  As of 2005, SOC was also known as "Sinclair Oil and Gas Company, (WY Filing ID 1986-000239550), and it had conducted business under the names Sinclair Oil Corporation and Sinclair Oil and Gas Company since 1986.  In November 2005, Sinclair Oil Corporation amended its Articles of Incorporation, changing its name to The Sinclair Companies effective March 1, 2006, while continuing its Texas registration as Sinclair Oil Corporation throughout 2006 as if nothing had changed, in violation of the Texas Business Organizations Code.  The Sinclair Companies may be served with process by delivering a copy of the summons and complaint to its agent authorized by appointment or by law to receive service of process – Lon Rodney Kump, 333 E. Fourth South, Salt Lake City, UT 84111-2988.  The Sinclair Companies has been served with process and has appeared herein through counsel.

49.    Defendant Sinclair Oil Corporation ("***SOC***"), FEIN -----6441, as presently constituted, is a Wyoming Corporation formerly known as Sinclair Petroleum Company. Sinclair Petroleum Company was initially incorporated on December 23, 2005, and effectively registered in Texas on February 23, 2006, the same day its sole shareholder approved amending its Articles of Incorporation changing its name to Sinclair Oil Corporation effective March 1, 2006, without amending its Texas registration in violation of the Texas Business organizations Code.  SOC maintains its principal place of business at 550 E. South Temple, Salt Lake City, Utah 84130.  SOC may be served with process by service upon its registered agent, Corporation Service Company DBA CSC Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.  Sinclair Oil Corporation has been served with process and has appeared herein through counsel.

50.    Defendant Sinclair Oil and Gas Company FEIN -----6718, is a Wyoming Corporation which initially incorporated on December 28, 2005, and effectively registered in

Texas on February 23, 2006.  Defendant Sinclair Oil and Gas Company is a separate entity with the identical name as the Sinclair Oil and Gas Company that at the time of the Replacement Participation Agreement continued to be the trade name and DBA owned by The Sinclair Companies, which entered into the Initial Participation Agreement and continued its Texas registration as Sinclair Oil Corporation after changing its name to The Sinclair Companies. Sinclair Oil & Gas Company maintains its principal place of business at 550 E. South Temple, Salt Lake City, Utah.  SOG may be served with process by service upon its registered agent, CT Corp. System, 811 Dallas Avenue, Houston, TX. Sinclair Oil and Gas Company has been served with process and has appeared herein through counsel.

51.     All of the corporate Defendants maintain their principal place of business at 550 East South Temple, Salt Lake City, Utah 84102.

## V.     FACTUAL BACKGROUND

**A.     Seismic Wells Originates the 20 Year Primary Term Miller Ranch Lease through its Ownership of Valuable and Proprietary 3D Seismic Data.**

52.     In 1994, Seismic Wells' sole member, Barry Tranckino ("**Tranckino**"), originated the first I/O System Two 3D Seismic survey ever conducted in Garza County, Texas. The seismic data resulted in the drilling of a well that ultimately produced approximately 200,000 barrels of oil.

53.     In 1995, Tranckino obtained a Seismic and Lease Option on the entirety of the Miller Ranch.  The Miller Ranch is situated in Borden and Garza Counties, Texas, which are located within the Lubbock Division of the Northern District of Texas.

54.     After obtaining the option, Seismic Wells performed multiple 3D seismic shoots; each shoot covered 20-25 sections of land.  Ultimately, Seismic Wells shot 3D seismic covering approximately 70 square miles on and adjacent to the Miller Ranch.  The 3D Seismic Data is

valued in excess of $4,095,000 and represents an integral part of Seismic Well's proprietary and extensive geological/geophysical database.

55.     In 2001, Seismic Wells agreed to an oil and gas lease with Ralph Miller and various members of the Miller family, which owns the Miller Ranch (as amended the "***Miller Ranch Lease***").  The Miller Ranch Lease, as amended, is a singular oil and gas lease with a 20 year primary term expiring in 2021, consisting of approximately 17,500 net mineral acres under 70 sections of land.

56.     Under Section 6 of the Miller Ranch Lease, Seismic Wells specifically holds the right to be the sole operator of the leased premises for so long as the lease remains in force and effect and regardless of the interest it retains.  Seismic Wells' right to operate is extremely valuable, and according to the terms of the lease, the operations do not transfer by assignment alone; they require the written consent of the lessors (*i.e.* the Millers), and lessee Seismic Wells.

57.     From 1995 through 2005, Seismic Wells and/or Barry Tranckino caused 25 wells to be drilled on and adjoining the Miller Ranch.  These wells have produced more than 850,000 barrels of oil.  Since 1994 and 2001, Barry Tranckino and Seismic Wells, respectively, have done business exclusively by generating drilling prospects on and adjacent to the Miller Ranch.

58.     Between 1995 and 2005, Seismic Wells and/or Tranckino entered into various business ventures relating to the Miller Ranch Lease with public and private oil companies including Patterson Energy, International Paper, DLB Oil & Gas, South Coast Exploration, JMC Exploration, Ricks Exploration and H.A.T. Oil & Gas.  These relationships were dependent upon Seismic Wells' business acumen, expertise, outstanding references, and the Plaintiffs' reputations for honesty and fair dealing.

59.     Seismic Wells also has a history bringing in other successful operators to operate the lease.  In those instances, Seismic Wells would bring in another operator to drill wells and the right to operate would eventually revert to Seismic Wells when that operator no longer desired to continue drilling.  Seismic Wells would then drill wells or bring in a new operator and repeat the process, making significant income each time.

**B.      Seismic Wells Enters into a Participation Agreement (the "Initial Participation Agreement") with Sinclair Oil Corporation, ("SOC #1") also known since 1986 by its Trade Name – Sinclair Oil and Gas Company ("SOG #1").**

60.     Since obtaining the Miller Ranch Lease, Seismic Wells has actively solicited large oil companies (*e.g.*, Devon, etc.) to engage in ventures relating to the Miller Ranch Lease.  After obtaining appropriate assurances of confidentiality, Seismic Wells presents information and data relating to the lease, including its seismic data, prospects, and well logs.  Seismic Wells also utilizes its industry contacts to locate potential business relationships.

61.     In early-2005, one of these industry contacts, petroleum engineer Thomas Zadick made the connection between Seismic Wells and Defendant The Sinclair Companies (SOC#1/Sinclair Oil Corporation)[22]

62.     After Mr. Zadick described the project to SOC #1, representatives of SOC #1 contacted Seismic Wells (through Tranckino) and offered to meet in person to discuss the project.  The meeting occurred in February 2005 in Oklahoma City.  Tranckino appeared at the meeting on behalf of Seismic Wells; engineer Robert Taylor and geologist Don Harris appeared on behalf of SOC #1. After the meeting, the project was recommended to Sinclair's management.  Subsequently, John Herndon approached Tranckino on behalf of Defendant SOC

---

[22] Sinclair Oil Corporation also did business under the trade name "Sinclair Oil and Gas Company," and it had done so since 1986.

#1 and initiated negotiations that ultimately led to a participation agreement between Seismic Wells and SOC #1.

63.     Seismic Wells required that under any agreement, the primary objectives of the lease operations be the efficient and cost effective operation and further exploitation of the Miller Ranch Lease.  Seismic Wells also required that, in the event SOC #1 became the operator, Seismic Wells would have the exclusive right to be subsequent operator and that a minimum of nine obligation wells be drilled.

64.     Effective April 1, 2005, Seismic Wells entered into a Participation Agreement with Sinclair Oil Corporation (referred to herein as the "***Initial Participation Agreement***").  The basic terms of the Initial Participation Agreement are summarized below:

- The parties agreed "In all cases for operations hereunder, the Parties agree that the primary objectives shall be the efficient and cost effective operation and further exploitation of the Leases. (§ 9.1)

- The parties agreed that SOC may elect to assume operations, but was under no obligation to do so.  (§ 9.1).  However, having once assumed operations, should SOC sell, transfer or otherwise dispose of its interest, Seismic wells was to have the first and exclusive right to assume operations (§ 9.4)

- SOC agreed to fund, to the extent of its interest, the drilling of nine oil and gas wells on certain specifically identified sections of the Miller Ranch Lease (§ 3.1)

- SOC agreed to pay Seismic Wells $1.5 million to purchase a 37.5% interest in the Miller Ranch Lease, including the producing oil wells (§ 1.1).

- Seismic Wells and SOC agreed that all costs and expenses were to be borne in proportion to their respective ownership interests (§ 5.1).

- Subject to the availability of a drilling rig, Seismic Wells agreed to cause the commencement of drilling operations for the Obligation Wells. (§ 3.3).

- Seismic Wells agreed to provide SOC with copies of three-dimensional seismic data covering the Miller Ranch Lease (the "***3D Seismic***") (§ 2.3).

- SOC agreed not to sell, trade or license the 3D Seismic to any third party (§ 2.3)

First Amended Complaint                                                                                                          Page 23
379844

65.    Additionally, SOC #1 expressly represented to Seismic Wells that "**SOC is purchasing the interest solely for its own account and not for resale or distribution to others and understands that Seismic Wells has relied upon such representation in agreeing to permit the participation in the project**."   Initial Participation Agreement Art. 12.1(e) (emphasis added).[23]   The Initial Participation Agreement was signed by Barry Tranckino, as Manager of Seismic Wells, and Ross B. Matthews, as Senior Vice President of SOC #1.

66.    Seismic Wells was operator of the Miller Ranch lease prior to and after the Initial Participation Agreement being signed.  Between May 2005 and December 2005, a period of only seven months, Seismic Wells drilled the first three of nine wells that SOC #1 was obligated to participate in, completing two of the three as producing oil wells prior to February 2006.

67.    Through October of 2006, almost a year and a half after the Initial Participation Agreement was signed, no one purporting to act on behalf of SOC #1 ever notified Seismic Wells (the operator) of any change in ownership, transfer, conveyance, or other disposition of SOC #1's 37.5% interest.

68.    Seismic Wells was never notified to pay production revenues to any new owner; no request to amend the Joint Operating Agreement or the operator's insurance coverage to add a new working interest owner or name a new insured party was made; and no assignment and bill of sale was ever recorded, such that Seismic Wells subsequent title opinions do not detect any sale or disposition of SOC #1's interest.[24]

---

[23] Section 10.1 of the Initial Participation Agreement also stated "This Agreement is for the benefit of Seismic Wells and SOC. There are no third party beneficiaries."  The agreement made no provision for successors or assigns.
[24] When dealing with Seismic Wells, representatives purporting to act on behalf of SOC, the signatory to the Initial Participation Agreement, referred to themselves as representatives of "Sinclair," "Sinclair Oil Corporation," and "Sinclair Oil & Gas Company."  All three names were used interchangeably and without distinction.  Seismic Wells even wrote checks to "Sinclair Oil & Gas" while that name was solely the trade name and DBA of Sinclair Oil Corporation.

**C.    A Different Entity with the Duplicated Name of "Sinclair Oil and Gas Company" Solicits, Authors and Executes a Replacement Participation Agreement with Seismic Wells, misusing the Original Contracting Party's Tax ID Number.**

69.    On September 20, 2006, Marilyn Meehan, purporting to act on behalf of SOG #1 and SOC #1 (the contracting party to the Initial Participation Agreement), solicited Seismic Wells about amending the parties' Initial Participation Agreement.[25]    The purpose of the amendment was threefold: (1) "Sinclair" wished to acquire an "additional" interest in the Miller Ranch Lease; and (2) "Sinclair" wished to exercise its option to become the operator under the Initial Participation Agreement; and (3) "Sinclair" wished to have the remaining non-operators added to the agreement.

70.    Upon negotiating the amount and price of the "additional" interest, Ms. Meehan prepared and faxed to Seismic Wells a Letter of Understanding dated September 29, 2006 between Seismic Wells and Sinclair Oil and Gas Company (which at the time, was SOC #1's trade name).

71.    The Letter of Understanding represented that SOG was one and the same party to the Initial Participation Agreement and Assignments; SOG also proposed "amendments" to those pre-existing contracts.  After the Letter of Understanding was executed on September 29, 2006, SOG as "exchanger" assigned its rights under the Letter of Understanding to Petroleum Strategies, Inc., a 1031 exchange intermediary.

72.    On October 9, 2006, Meehan emailed Seismic Wells that she had scheduled a meeting with Sinclair's Law department, and that upon their approval of the form of the documents that she would forward the documents to Seismic Wells.

---

[25] Ms. Meehan's solicitation was confirmed in an in e-mail dated September 20, 2006, and her misrepresentations occurred, among other instances, in a written "Letter of Understanding" dated September 29, 2006.

73.     On October 12, 2006, Meehan sent Seismic Wells a new Participation Agreement. Seismic Wells responded to Ms. Meehan in writing October 12, 2006 and stated that there was no need to for a new Participation Agreement, since the parties' current agreement (Initial Participation Agreement) already afforded Sinclair the option to become the operator.  "Sinclair" responded through Meehan (a lawyer by training) that the new agreement would simply reiterate the terms of the Initial Participation Agreement and would be signed by the non-operated working interest owners for sake of completeness.  Sinclair had actual knowledge of Seismic Wells mistaken belief that the Initial agreement was in effect and that SOG was party to that Agreement.

74.     Being unaware of SOC's breach of the Initial Participation Agreement,[26] Seismic Wells and Defendant Sinclair Oil and Gas Company ("**SOG #2**") ultimately entered into a Participation Agreement dated November 1, 2006 (the "**Replacement Participation Agreement**").  The Replacement Participation Agreement was solicited and authored by SOG.

75.     The basic terms of the Replacement Participation Agreement are summarized below:

- The parties agreed that, subject to Seismic Wells exclusive right to be subsequent operator and other certain provisions in the Replacement Participation Agreement, SOG #2 would be the operator of the Miller Ranch Lease (§ 4.2) and would assume operations effective November 1, 2006 (§ 9.1).

- The parties agreed that once having assumed operations, should SOG #2 sell, transfer, or otherwise dispose of its interest in the Miller Ranch Lease, Seismic Wells would have the first and exclusive right to assume operations of the Miller Ranch Lease (§ 9.4).

---

[26] As set forth below, SOC#1's transfer of the interest it acquired under the Initial Participation Agreement was inherently undiscoverable and exclusive to the Defendants' knowledge, because no public record of any sale existed, and SOC did not disclose the sale to Seismic Wells.

- The parties acknowledged that three of the original nine obligation wells had been drilled (§ 3.1). The parties further agreed that SOG #2 was obligated to fund drilling, completion, and equipping of the remaining six obligation wells (§ 3.1).

- SOG #2 agreed to pay Seismic wells for an additional 15.625% interest in the Miller Ranch Lease, including the producing oil wells (§ 1.1).

76.    Additionally, SOG #2 made various misrepresentations to Seismic Wells throughout the agreement, including: (1) Seismic Wells and SOG #2 entered into the Initial Participation Agreement; and (2) SOG #2 paid Seismic Wells and purchased a 37.5% "Initial Interest" in the Miller Ranch Lease pursuant to the Initial Participation Agreement. As set forth herein, those misrepresentations turned out to be false.

77.    Since SOG #2 became operator and with unprecedented oil prices, only four of the six remaining obligation wells have been drilled on the Miller Ranch by SOG #2. SOG #2 has not drilled a single well since 2008, and in 9 years since becoming operator, SOG #2 has never drilled a single well outside of the 200 acre Miller Spraberry Unit on the 17,500 acre Miller Ranch Lease. Moreover, as operator, SOG #2 has

- Made total failure of the consideration SOG #2 made in exchange for both Seismic Wells and the Lessor's consent to operate as evidenced by Article 9 Section 9.4 of the Replacement Participation Agreement, as made subject to Article 9 in Section 4.2, and separately by Section 2 of the Consent to Operate-Estoppel Agreement.

- SOG #2 failed its absolute duty to assign 100% of the 527-1A (MSU #2) well to Seismic Wells under the contract after SOG #2 and the remainder of the working interest excluding Seismic Wells elected to plug the well. This constitutes a breach of the parties' agreement. Instead, SOG #2 advertised (and continues to advertise) the well for sale.

- Foreseeably allowed corrosive waters to corrode and destroy the casing inside the MSU #2 well, terminally damaging the productive well far beyond what was once a reasonable and routine repair had it been attended to in the proper time frame.

- Refused to either implement or non-consent Seismic Wells proposed submersible pump testing of the productive 525#2 well that produces oil with a high water level that has not been lowered by rod pump, failing to optimize pumping

procedure/design to insure wells are pumped off.  This also constitutes a breach of the parties' agreement.

- Negligently injected water into an injection well with a hole in the casing.

- Failed to consistently maintain water injection and oil production, allowing many months to pass without repairing rod parts and transfer pumps.

- As of the time of its repudiation, ceased all communication including sending any monthly reports due to Seismic Wells.

**D.     The Replacement Participation Agreement was Procured by Defendants' Fraudulent Misrepresentations and Omissions of Material Fact.**

78.     Unbeknownst to Seismic Wells and contrary to SOG #2's written representations,[27] SOG #2 (the solicitor of and party to the Replacement Participation Agreement) was an entirely different entity than SOC #1 (the party to the Initial Participation Agreement that used "Sinclair Oil and Gas" as its trade name).  In fact, SOG #2 (the party to the Replacement Participation Agreement) was not even in existence at the time of the Initial Participation Agreement.

79.     Nevertheless, representatives of SOG #2 solicited, drafted, and ultimately entered into the Replacement Participation Agreement based on representations by SOG #2 representatives Marilyn Meehan, John Herndon, and Ross Matthews[28] that SOG #2 and SOC #1 were one in the same, and that SOG #2 was merely a DBA or trade name for SOC #1, as "Sinclair Oil and Gas Company" had been since 1986.  For example, SOG #2 represented in writing that it was a party to the Initial Participation Agreement; SOG #2 also represented that it owned a 37.5% interest in the Miller Ranch Lease pursuant to the Initial Participation Agreement.  These representations, among others, were false.

_____

[27] SOG made misrepresentations in both the Replacement Participation Agreement and the Letter of Understanding,
[28] Meehan, Herndon, and Matthews also acted on behalf of SOC #1.  Herndon authored both Participation Agreements.

80.     SOG #2's representations that it was the same entity as SOC #1 were part of a scheme to conceal the fact that, sometime between May 2005 and October 2006, SOC #1 transferred the entirety of its interest in the Miller Ranch Lease, leaving Seismic Wells unknowingly without a contractually obligated working interest partner, in breach of the Initial Participation Agreement.[29]   Seismic Wells would not have entered into the Replacement Participation Agreement had SOC#1 divulged its breach of the Initial Participation Agreement, and the Defendants would never have obtained operations or a controlling interest in the Miller Ranch Lease.

81.     Defendants' scheme was not without a purpose.  Upon information and belief, Defendants were seeking to lessen their tax liability and/or avoid paying income tax on hundreds of millions of dollars from their 50% share of an $845 million dollar sale of low basis Barnett shale leases to Chesapeake Energy.  Therefore, in anticipation of the Barnett shale sale, the original SOC #1 transferred its interest in the Miller Ranch Lease to a newly formed entity with the identical name of SOC #2, a 1031 exchange intermediary, or both, through which SOG #2 acquired the interest in anticipation of or as part of an exchange pursuant to Section 1031 of the Internal Revenue Code (IRC).

82.     Under Section 1031 of the IRC (26 U.S.C. § 1031), "[n]o gain or loss shall be recognized on the exchange of property held for use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."  As a result, the exchange of "like kind"

---

[29]   As set forth above, the Initial Participation Agreement expressly stated: "SOC is purchasing the interest solely for its own account and not for resale or distribution to others and understands that Seismic Wells has relied upon such representation in agreeing to permit the participation in the project."

property may be used to defer recognition of capital gains (and taxes upon those gains) due upon sale.

83.     On September 15, 2000, the Internal Revenue Service released Revenue Procedure 2000-37 that provided guidelines for structuring reverse exchanges (a transaction in which replacement property is acquired by an accommodating party before the sale of the relinquished property and held as replacement property to complete the exchange). A replacement property may be acquired and held (sometimes called "parked") by the accommodating party for up to 180 calendar days.  Recently, the IRS provided guidance (See ILM 200836024) approving the combination of a reverse parking arrangement exchange and a forward delayed exchange resulting in two sequential 180 day exchange periods associated with one exchange transaction.

84.     Upon information and belief, SOG#2 upon its formation was an exchanger (as evidenced by Petroleum Strategies notification describing SOG as exchanger and that the Qualified Intermediary and or Exchange Authorized Titleholder paid Seismic Wells) that was engaged in a combination forward and reverse exchange wherein there is a 180 day window for the acquisition of replacement property upon the sale of the relinquished property, and an additional 180 day window looking back prior to the sale of the relinquished property in acquiring replacement property in a combination forward and reverse exchange.  SOG #2 acquired the 15.625% interest in the Miller Ranch Lease as replacement property as dictated by the fact that Petroleum Strategies Inc., as a Qualified  Exchange intermediary, could only acquire the 15.625% interest either as replacement or relinquished property and the 15.625% interest was never relinquished . Prior to acquiring the 15.625% interest and upon the closing of the sale of the Barnett shale leases as relinquished property, in July of 2006, SOG #2 received the initial

Miller Ranch Interest from the intermediary as replacement property that was owned by SOC#1 and exchanged prior to the sale of the Barnett Shale Leases, through either an instantaneous exchange made the week of February 23 to March 1, 2006 made between the contracting party to the Initial Participation Agreement, an EAT (Exchange Accommodator Titleholder) and the newly formed entities with the identical names Sinclair Oil Corporation and Sinclair Oil and Gas Company.  The other possibility is that prior to that time, the contracting party to the Initial Participation Agreement made an separate exchange between an EAT and Sinclair Petroleum Company just before it changed its name to Sinclair Oil Corporation and after that exchange the new entities Sinclair Oil Corporation and Sinclair Oil and Gas Company initiated their exchange with an EAT.  Under both of these scenarios an assignment from Sinclair Oil Corporation to Sinclair Oil and Gas Company would be tainted with fraud because the unrecorded assignment would have been from the Sinclair Oil Corporation that was not party to the Initial Participation Agreement, even though it has the identical name.

85.     SOC#1 and/or SOG#2 wished to obtain tax avoidance benefits by using the large amount of acreage and exceptionally long term lease to afford a high value on their interest in the Miller Ranch Lease in the 1031 exchange as "replacement property."  The Replacement Participation Agreement allowed them to do so by virtue of SOG #2's acquisition of a 15.625% interest in the lease, and obtaining some benefit by misrepresenting that SOG #2 had made the initial purchase of the 37.5% interest before SOG #2 even existed.  In addition, this enabled SOG #2 to acquire the right to operate, which has substantial value.

**E.     Defendants Abused the Corporate Form to Carry Out the Scheme to Defraud Seismic Wells into Assigning Operations and a Controlling Interest in the Miller Ranch Lease to SOG.**

86.     Unknown to Seismic Wells, and as no reasonable person or business would ever suspect, the identical names Sinclair Oil Corporation (SOC #1) and its Trade Name/DBA since

1986, Sinclair Oil and Gas Company (SOG #1) referred to two different entities using the same names at the same time.  SOG #2's used these violations of name registration laws in soliciting and authoring the Letter of Understanding and Replacement Participation Agreement.  For example, despite its representation to the contrary, SOG #2 was not a party to the Initial Participation Agreement, and SOG #2 did not even exist at the time it was formed.  In short, in violating duties to disclose new information and correct Seismic Wells mistaken belief caused by SOG #2's previous misrepresentations, SOG #2 made affirmative misrepresentations of the contracting party's identity and rights, and material omissions of fact, fraudulently concealing the breach and numerous material facts fundamental to the contract.

87.    The Defendants' scheme also violated Section 9.001 of the Texas Business Organizations Code, which requires foreign corporations to amend their Texas registration within 91 days of the change of name in its home jurisdiction, and is intended to prevent the use of identical and deceptively similar names that is prohibited in Section 5.053 of the Code.

88.    .  For example, effective March 1, 2006 and continuing through the time when SOG #2 authored and solicited the Replacement Participation Agreement (which was executed on October 25, 2006), the name "*Sinclair Oil Corporation*" simultaneously referred to (1) the corporation that entered into the Initial Participation Agreement – "*SOC #1*" – which continued its Texas Registration as if there had been no change and continued to own its trade name SOG, and (2) the identically named and newly formed "*Sinclair Oil Corporation,*" (SOC #2) which did not even exist at the time of the Initial Participation Agreement continued to be registered throughout 2006 in Texas as Sinclair Petroleum Company.

89.    At the time of the Replacement Participation Agreement, it was undiscoverable through a review of the Texas state records that a new "Sinclair Oil Corporation" existed,

because the Wyoming corporation named Sinclair Oil Corporation that had entered into the Initial Participation Agreement and had changed its name effective March 1, 2006 to The Sinclair Companies, but nevertheless continued its existence in Texas as Sinclair Oil Corporation throughout 2006, while at the same time owning the trade name Sinclair Oil and Gas Company. Texas public records contained no record of any entity named The Sinclair Companies, nor did the public records reveal that Sinclair Petroleum Company had changed its name to Sinclair Oil Corporation.

90.     Moreover, effective March 1, 2006 and continuing through the time when SOG #2 authored and solicited the Replacement Participation Agreement, the name "*Sinclair Oil and Gas Company*" simultaneously served as (1) the trade name since 1986 for Sinclair Oil Corporation (the party to the Initial Participation Agreement), and (2) the name of an entirely separate entity that did not even exist at the time of the Initial Participation Agreement.  In other words, the newly formed SOG #2 solicited and authored the Replacement Participation Agreement by posing as an imposter for the SOC #1 that was a party to the Initial Participation Agreement.

91.     Upon information (*e.g.*, no recorded assignments, Defendants' corporate records and press release) and belief, all of the oil operating, exploration, and production interests owned by the Sinclair Oil Corporation that entered into the Initial Participation Agreement came to be owned by the new Sinclair Oil Corporation (Sinclair Petroleum Company) and/or the new Sinclair Oil and Gas Company, with absolutely no public record of these sales and transfers.

92.     For example, the Miller Ranch Interests were simply notated as a clarification in a recital ("a story unacknowledged by the alleged grantor and not an assignment"), which gave the appearance to title opinions that the original SOG #1 made a clarification of assignment to its

trade name and DBA Sinclair Oil and Gas Company, when in fact the recital is tainted by fraud, referring to an unrecorded sale or transfer that was between new entities with the identical names, that were never parties to the Initial Participation Agreement or the assignments of June 2005.   On or around March 1, 2006 any assignment or recital using the name Sinclair Oil Corporation as grantor is tainted by fraud because on or around March 1, 2006, the only legal entity of that name had just become that entity with the identical name as the previous entity, and did not exist as a party to any previous assignment of record because it did not exist. Separately their existed two different entities with the identical name "SOG" on or around March 1, 2006.

93.     SOG #2 also authored and solicited a Letter of Understanding dated September 29, 2006, which included material misrepresentations and omissions of material fact, including (1) the letter misrepresented that SOG #2 was purchasing an "additional" interest in the Miller Ranch Lease, when in fact, SOG #2 was not even in existence at the time of the Initial Participation Agreement; (2) the letter misrepresented that the original assignment and Initial Participation Agreement would be amended, intentionally misleading Seismic Wells into believing Seismic Wells was simply carrying out its obligations under the Initial Participation Agreement to allow SOG #1 to assume operations, while failing to disclose the fact that SOG #2 was a stranger to that agreement and had no right to assume operations of the Miller Ranch.

94.     Through Seismic Wells Letter dated October 12, 2006, all Defendants had actual knowledge that Seismic Wells had been misled and tricked into believing Seismic Wells was honoring the terms of the Initial Participation Agreement, including honoring SOC #1's option to assume operations, even though the contract had been breached, and SOC #1 no longer held an option to assume operations.  SOG #2, the party to and solicitor of the Replacement Participation Agreement, was not a party to the Initial Agreement, and Seismic Wells owed no obligations to

SOG #2.   SOG #2 knew that there was no assent of Seismic Wells to the Replacement Agreement through the misrepresentation of the party's identity and wrongfully claimed actions and rights under the Initial Participation Agreement.

95.      As a result of Defendants' abuse of the corporate form and scheme to hide SOC #1's breach of the Initial Participation Agreement, Seismic Wells was fraudulently induced and deceived into assigning operations in the Miller Ranch Lease and controlling interest to SOG #2, as well as to refrain from enforcing the Initial Participation Agreement, including using its operating rights and legal remedies to rescind that agreement, damaging Seismic Wells.

**F.      In 2011, Seismic Wells Makes a Partial Assignment of its Interest in The Lease, Including Certain Non-Producing Acreage to M.R. Royalty, but Retains its Interest in Producing Acreage and Right to Operate the Miller Ranch Lease.**

96.      Knowing that Sinclair would only drill the remaining two obligation wells within the Spraberry Unit (as communicated in writings), in 2011 Seismic Wells made a partial assignment of the Miller Ranch Lease to M.R. Royalty, LLC (the "***Partial Assignment***").   M.R. Royalty, LLC then assigned the interest to Bold Energy II, LLC.   The Partial Assignment consisted of only nonproductive acreage in which SOG has never drilled or operated a well, and the assignment was expressly made subject to all terms, conditions, covenants, and obligations contained in the Miller Ranch Lease.

97.      As a result, Seismic Wells owns and continually has owned an interest in every well ever drilled and/or operated by SOG #2 on the Miller Ranch Lease, including all wells in the Miller Spraberry Unit, and the Miller 590, 587 and 525-2 wells outside of the unit.   Seismic Wells' rights include leasehold rights under the wells, the residual rights to income from the oil produced from the leasehold, and all rights in the Joint Operating Agreement, and the Initial Participation and Replacement Participation Agreement, to the extent such agreements are enforceable.

**G.      Defendants Repudiate their Obligations in June 2014.**

98.      In mid-June, 2014, Seismic Wells, through Tranckino, learned that the owner of the interest (now known to be SOG#2) was marketing the operations of and their interest in the Miller Ranch Lease for sale through the Lantana Energy Advisors and Petroleum Listing Services websites.   Upon learning of SOG#2's marketing effort, Seismic Wells promptly contacted SOG#2 and gave notice that Seismic Wells would exercise its exclusive right to operate upon any sale or disposition of SOG#2's interest in the Miller Ranch Lease.   Seismic Wells also notified Defendants of their unfulfilled obligation to drill obligation wells on the Miller Ranch.

99.      On June 20, 2014, "Sinclair" responded by repudiating their obligations under the Initial Participation Agreement and Replacement Participation Agreement.   "Sinclair" stated: (1) "… Sinclair may assign all of its interest in that lease including operations, certainly without your consent and even without the lessors consent;" (2) Seismic Wells did not own any leasehold interest or residual rights in the Miller Ranch Lease; and (3) that Sinclair had replaced Seismic Wells as Lessee under "The Lease"; and (4) that Seismic Wells did not own the exclusive right to be subsequent Operator the Miller Ranch Lease; and (5) "It is Sinclair's position that Seismic Wells exclusive right to assume operations was assigned to Sinclair…" through assignments attached to and made part of the Replacement Participation Agreement, (6) "Sinclair, did not obligate themselves to drill all nine wells;" (7) "Sinclair is under no obligation to drill the remaining two wells;" (8) "These were not truly obligation wells."   SOG#2, through its co-marketing venture, also published a statement that Seismic Wells and Tranckino had attempted to and actually extorted money from Chesapeake Energy and were attempting to extort SOG#2's co-marketing agreement with its co-marketing partner.

100.    Defendants' written statements, made while advertising the entirety of their alleged interest and the operations for sale through Lantana Energy Advisors and Petroleum Listing Services websites, show a fixed intention to abandon, renounce, and refuse to perform the Initial Participation Agreement and Replacement Participation Agreement.

101.    In addition to being absolute repudiations of the essential promises, Defendants' statements constitute categorical claims that upon the agreements' formation, the promises (which Defendants authored) were never binding or valid whatsoever, which constitute circumstantial evidence that SOG solicited and authored the Initial and Replacement Participation agreements with no intent to perform the essential and material promises, without which the Agreements would have never been made.

102.    The gist of these collective published statements is that Tranckino and Seismic Wells do not own what they represent and say that they own, and are of poor character, extorting money from their business partners, warning everyone interested in that specific area not to do business with them.  This is wanton and malicious conduct.

**H.   On June 26, 2014, Defendant SOG#2 Published Blatant Injurious Falsehoods about Plaintiffs to the Industry.  Therefore, Seismic Wells Conducts an Investigation and Eventually Discovers Defendants' Fraud.**

103.    Additionally, in June 2014, Defendant SOG#2 willfully and intentionally published and distributed knowing injurious falsehoods about Seismic Wells and Tranckino to their professional peers and potential customers that expressed interest in the area of the Plaintiffs' pecuniary assets.  These injurious falsehoods, were published and distributed in a file titled "*Matter of Barry Tranckino*," which was associated with the marketing materials described above.  SOG#2's statements and those of its co-marketing partner, which SOG#2 published, caused actual damages to the Plaintiffs and their pecuniary interests, including the loss of a contractual relationship between Tranckino and Mdh Investments.  The specific false statements

that disparaged the Plaintiffs' interests were: (1) Seismic Wells did not own any leasehold interest or residual rights in the Miller Ranch Lease; and (2) that Sinclair had replaced Seismic Wells as Lessee under "The Lease"; and (3) that Seismic Wells did not own the exclusive right to be subsequent Operator the Miller Ranch Lease; and (4) that both Seismic Wells and Tranckino had attempted to and actually extorted money from Chesapeake Energy, and were attempting to extort SOG #2's joint marketing effort.  See Exhibit P, Appendix pp. 182, 184-85

104.    As a result of the SOG#2's false, disparaging statements about Seismic Wells and Tranckino to the industry, Tranckino began an extensive investigation into the Defendants. Tranckino's investigation uncovered Defendants' abuse of the corporate form; scheme to hide SOC #1's breach of the Initial Participation Agreement and prevent its enforcement; scheme to trick Seismic Wells into relinquishing the right to operate and a controlling interest in the Miller Ranch Lease to SOG #2; and scheme to avoid taxes by claiming SOG purchased the "Initial Interest" in the Miller Ranch as part of an IRC 1031 exchange.

## VI.        CAUSES OF ACTION, TOLLING DOCTRINES, DERIVATIVE TORTS, AND OTHER REQUESTED RELIEF

**Counts 1—3, Counts 5-6, and Fraudulent Concealment Doctrine: (1) Common Law Fraud; (2) Fraud by Non-Disclosure; (3) Statutory Fraud (Tex. Bus. & Comm. Code. §27.01); Fraudulent Concealment Doctrine; (5) Conspiracy to Defraud (Letter of Understanding and Replacement Participation Agreement); and (6) Breach of the Initial Participation Agreement.**

### A.    Defendants Intentionally Breached the Initial Participation Agreement and Were Unwilling to Accept the Consequences of the Breach.

105.    Plaintiffs' incorporate and re-allege the foregoing allegations as if expressly set forth herein.

106.    The Defendants intentionally breached the Initial Participation Agreement in order to obtain tax benefits and were unwilling to accept the consequences of the breach, whereby they would have neither a controlling interest to exchange for tax avoidance benefits,

nor the valuable operations.  Therefore, they joined together to fraudulently conceal the breach to achieve their common purpose through unlawful means of securing the documents by deception.

107.    Per its terms and after the breach, under Texas law, SOG #2 was a non-party and was not an intended beneficiary; thus, it had no rights or obligations under the Initial Participation Agreement, including no right to enforce the agreement, or to be sued for the breach of that contract.  Defendants would not accept that SOG #2 could not enforce the Initial Participation Agreement.  Defendants' actions in soliciting, making, and approving the Letter of Understanding and Replacement Participation Agreement, obtaining Seismic Wells' signatures by misrepresenting on the face of the agreements that SOG#2 was the party and performed the actions in obtaining the rights of the Initial Participation Agreement, constitutes fraud and deception in the execution of the Letter of Understanding and Replacement Participation Agreement.  Accordingly, the Letter of Understanding and Replacement Participation Agreement are void and never came into existence.[30]

**B.     Defendants had Actual Knowledge of the Wrongful Affirmative Misrepresentations Fraudulently Concealing the Intentional Termination and Breach of the Initial Participation Agreement.  But for Defendants' Fraud, Seismic Wells Would have Retained Operations and Enforced the Initial Participation Agreement.**

**(Fraudulent Concealment Element #1 – Actual Knowledge of the Wrong Committed; Common Law Fraud Element #4 – Knowledge of the Falsity)**

108.    Defendants had actual knowledge that SOC #1 intentionally breached and terminated the Initial Participation Agreement (including the termination of SOC#1's option to assume operations of the Miller Ranch Lease), as evidenced by the fact that SOG #2, which currently "owns" and operates the interest did not exist at the time of the assignments of June 5, 2005, and thus, never acquired the initial 37.5% interest from Seismic Wells.  Instead, SOG #2

---

[30] Alternatively, the Letter of Understanding and Replacement Participation Agreement are voidable.

acquired the interest through a series of unrecorded assignments pertaining to 1031 exchange(s) that title opinions cannot detect and were never disclosed to Seismic Wells, the operator.

109.    Upon SOC #1's intentional breach and termination of the Initial Participation Agreement, there existed no Sinclair entity that had any legal right or authority to amend or alter the terms of the Initial Participation Agreement, because SOC #1 no longer owned any interest in the Lease, and SOG#2 was never a party to or an intended beneficiary of the Initial Participation Agreement.  Likewise, no Sinclair entity owned an option to assume operations of the Miller Ranch Lease.

110.    On June 5, 2005, Matthews signed the Initial Participation Agreement and assignments as an officer and/or director of the contracting party known at that time as SOC #1 and SOG #1 (Tax ID -------0188).  Matthews also signed the Texas Certificate of Authority for SOG #2, which was filed February 23, 2006, eight months after the Initial Participation Agreement, using the identical name as the trade name of the contracting party to the Initial Participation Agreement.  According to Ms. Meehan's email September 25, 2006, Matthews also approved the Letter Agreement and subsequently signed the Replacement Participation Agreement and its assignments on October 25, 2006, as an officer and director of SOG #2, while also as an officer of SOC #2.  John Herndon authored both the Initial and the Replacement Participation Agreements while purporting to be an employee of the respective contracting parties. These indisputable and documented actions gave actual knowledge of the fraud to every one of the Defendants.

111.    Through Matthews, all of the Defendants also had actual knowledge that the newly formed entities with the identical names Sinclair Oil Corporation (SOC #2, Tax ID -------6441) and Sinclair Oil and Gas Company (SOG #2, Tax ID -------6718) did not exist at the time

of the Initial Participation Agreement that was entered into by Sinclair Oil Corporation (SOC #1, Tax ID -------0188) being also known since 1986 as its trade name Sinclair Oil and Gas Company (WY Filing ID 1986-000239550). The Defendants all had actual knowledge that it was wrong and unlawful to use different entities with the identical names as the contracting party and misrepresent that they were the contracting party to the Initial Participation Agreement (when they were not) and that doing so would damage Seismic Wells.

112.    Neither The Sinclair Companies and its trade name Sinclair Oil and Gas Company (Tax ID -------0188), nor the co-existing entity SOG #2 (Tax ID -------6718) that tricked Seismic Wells using the identical name Sinclair Oil and Gas Company while misusing Tax ID -------0188, had any legal authority whatsoever to amend or replace the Initial Participation Agreement. Moreover, Matthews had actual knowledge that he had no legal authority to sign any agreement to amend or replace the Initial Participation Agreement.

113.    First, Matthews knew he was no longer an officer or director of the contracting party, SOC #1, which was renamed The Sinclair Companies, SOC#1 (Tax ID-----0188) but continued to own the trade name SOG #1 (WY Filing ID 1986-000239550) during September and October of 2006. No longer an officer or director of The Sinclair Companies, Matthews knew that his signature could not legally make any contract on behalf of that entity.

114.    Second, Matthews knew The Sinclair Companies never filed a Certificate of Authority identifying itself to the Texas Secretary of State and never filed any Texas Franchise Taxpayer Reports in that name, and thus, was not authorized to transact business in Texas.

115.    Third, Matthews had knowledge that The Sinclair Companies (SOC #1) no longer owned any interest in the contract area (*i.e.* the Miller Ranch), rendering it incapable of making any contract or promise pertaining to the Miller Ranch Lease.

116.    Fourth, Matthews had actual knowledge that Sinclair Oil and Gas Company (SOG#2) (Tax ID -------6718; WY Filing ID 2005-000504991) was initially incorporated in Wyoming on December 28, 2005 and had no legal authority to amend the Initial Participation Agreement because it did not exist at the time of the Initial Participation Agreement.  SOG#2 was neither a party to that agreement, nor an intended beneficiary of it, because the agreement expressly states that it has no third party beneficiaries and purposefully made no provision for any successors or assigns.

117.    Finally, the fifth separate and independent reason that the binding Letter of Understanding and Replacement Participation Agreement could not be made by the SOG #2 is because they both (on their face) misrepresent the fundamental, essential and material elements of contracting party's identity and that party's condition precedent rights under The Initial Participation Agreement; thus, there was no mutual assent to these agreements by Seismic Wells.

118.    Additionally, Seismic Wells specifically expressed its mistaken belief in writing to SOG #2 on October 12, 2006, and SOG #2 violated its duty to disclose new information of two new entities with the identical names and to correct the misrepresentations in the Letter of Understanding.  Instead, Defendants chose to continue perpetrating a fraud on Seismic Wells through the Replacement Participation Agreement.

119.    Defendants approved and agreed upon misrepresentations in these agreements (which are void *ab initio*), including affirmative misrepresentations that concealed the truth, and non-disclosures in violation of the duty to disclose, made in furtherance of their conspiracy to defraud Seismic Wells, all of which enabled the Defendants to obtain all of the benefits of both agreements as if they had never breached the Initial Participation Agreement and all of the benefits of the Letter Agreement and Replacement Participation Agreement, even though they

were void *ab initio* and never legally came into being.  The Defendants knew their conduct was wrong.

## C.     The Defendants formed a Combination of Two or More Persons to Achieve a Common, Improper Fixed Purpose by Unlawful Means

### (Civil Conspiracy Elements # 1 and 2 – Combination of Two or More Persons, Object of the Combination was to Accomplish Unlawful Purpose or Lawful Purpose by Unlawful Means) (Fraudulent Concealment Element # 3 – Fixed Purpose to Conceal the Wrong)

120.    The Defendants had a common, improper and fixed purpose of fraudulently concealing SOC #1's intentional breach and termination of the Initial Participation Agreement, (which also terminated SOC's option to assume operations of the Miller Ranch Lease), in order to prevent and deny Seismic Wells right to mitigate and remedy its ongoing damages, eliminate The Sinclair Companies' (aka SOC #1) liabilities to Seismic Wells, and achieve their goal of permanently obtaining the operations of and a controlling interest in that real property, enabling tax avoidance benefits by using the interest as replacement property in one or more 1031 exchange(s), including for the personal benefit of Matthews, who is married to Ms. Kathleen Holding, a director and daughter of the founder of The Sinclair Companies.

121.    As a former director and officer of the contracting party to the Initial Participation Agreement, Matthews could not execute any amendment or replacement agreement, as he in fact did on October 25, 2005, without the knowledge and approval of the original contracting party that had changed its name to The Sinclair Companies, evidencing a conspiracy to defraud Seismic Wells between The Sinclair Companies and SOG #2, and separately between The Sinclair Companies and Ross B. Matthews.   Additionally, the conspiracy is evidenced by Marilyn Meehan's email on October 9, 2006, which stated that she would meet with "Sinclair's" Law Department and upon their approval of the documents form, that she would forward the

documents to Seismic Wells, which she did on October 12, 2006, including the Sinclair approved fraudulent form of the Replacement Participation Agreement.

122.    Matthews never disclosed to Seismic Wells that he was no longer an officer or director of the original contracting party renamed The Sinclair Companies, or that he was acting as an agent for The Sinclair Companies.  Accordingly, he is personally liable for his fraudulent acts, including conspiring to defraud Seismic Wells with The Sinclair Companies.

**D.     Defendants Used Wrongful Means of Deception to Achieve the Improper Purpose.**

**(Fraudulent Concealment Element # 2 – Misrepresentations Intended to Influence; Civil Conspiracy Element # 2 – Object of Combination was to Accomplish Unlawful Purpose)**

123.    Notwithstanding that the valid Letter of Understanding or Replacement Participation Agreement never came to exist because they were void *ab initio*, the Defendants acts prevented and denied Seismic Wells right to mitigate and remedy its ongoing damages from the intentional breach and termination of the Initial Participation Agreement, as the proximate cause of all of the ensuing damages.  Defendants secured documents and real property through concerted deceptions.

124.    The affirmative, material misrepresentations specifically stated on the face of Letter of Understanding and Replacement Participation Agreement concealed the truth and omitted material facts in violation of duties to disclose (as part of the conspiracy to defraud Seismic Wells) constitute fraud by non-disclosure and fraudulent concealment of SOC #1's breach and termination of the Initial Participation Agreement, and such conduct fraudulently induced Seismic Wells to refrain from acting to enforce the Initial Participation Agreement.

125.    As one and the same entity, SOC #1 and its trade name SOG #1 were a single taxpayer (Tax ID --------0188) that had acquired and owned both Barnett shale leases and the Miller Ranch Interest during 2005.

126.    Despite having that actual knowledge of the fact that SOC #1 was a party to and had breached the Initial Participation Agreement, Defendants knowingly misrepresented that SOG #2 was the party to the Initial Participation Agreement on the face of both the binding Letter of Understanding and the Replacement Participation Agreement, claiming the actions and rights under the Initial Participation Agreements in securing the documents by deception that was a fraud upon Seismic Wells.  They even misused the Tax ID of the party to the prior agreement ending in 0188 in Exhibit C, made part of the Replacement Participation Agreement.

127.    In addition to the Defendants' separate and multiple independent acts of fraud, The Sinclair Companies (SOC#1) breached the Initial Participation Agreement and conspired to defraud Seismic Wells with its then former director Ross Matthews, a director of SOG #2, who violated Section A (2) of Article 2.21 of The Texas Business Corporations Act by causing the corporations to be used for the purpose of perpetrating and did perpetrate an actual fraud on Seismic Wells, the obligee, primarily for the direct personal benefit of the holder, owner, subscriber – Matthews and his family.

128.    In addition, while holding themselves out as unrelated parties to the Texas Secretary of State and Franchise Tax Board through Public Information Reports, tainting the public records with fraud, SOC#1 and SOG#2 also conspired to defraud Seismic Wells.

**E.      SOC #1's Breach and Termination of the Initial Participation Agreement.**

**(Breach of Contract Elements # 1-4 – Existence of a Contract; Plaintiff Tendered Performance; Defendant Breached; Plaintiff Damaged as a Result of the Breach)**

129.    Seismic Wells, as a party to the Initial Participation Agreement, is the proper party to sue for breach of the Initial Participation Agreement.  Seismic Wells has, at all relevant times, fulfilled its obligations under the Initial Participation Agreement, by, among other things, drilling the first three wells, completing and equipping two as producing oil wells, paying the

lease operating expenses, selling the oil production and distributing the production run checks. All conditions precedent to Seismic Wells enforcing the Initial Participation Agreement, if any, have been fully performed or are otherwise satisfied.

130.    In May of 2005, through Matthews's signature to the Initial Participation Agreement, SOC #1 expressly represented to Seismic Wells that "**SOC is purchasing the interest solely for its own account and not for resale or distribution to others and understands that Seismic Wells has relied upon such representation in agreeing to permit the participation in the project**."   Initial Participation Agreement Art. 12.1(e) (emphasis added).[31]   Prior to or on March 1, 2006, SOG #1 (The Sinclair Companies) sold or distributed the entirety of its working interest in the Miller Ranch Lease without ever recording the assignment(s) and bill(s) of sale; without ever notifying Seismic Wells as operator; without ever notifying Seismic Wells of any change in ownership; without ever requesting that the oil production run checks be paid by Seismic Wells to the new owner; and without ever notifying Seismic Wells to amend the Joint Operating Agreement that did not correctly identify the owner. From March through October 2006 Seismic Wells never paid a single monthly run check to The Sinclair Companies.   Defendants then undertook multiple abuses of the corporate form in continuing efforts to conceal the breach.

131.    It is indisputable that the week of February 23, 2006 to March 1, 2006, respective corporate records show that the names The Sinclair Companies, Sinclair Oil Corporation (SOC #2), and Sinclair Oil and Gas Company, (SOG #2) all came to refer to different entities with the identical names than they had referred to for the previous two decades, including May 25, 2005, when the Initial Participation Agreement was executed.   The checks Seismic Wells paid in

---

[31] Section 10.1 of the Initial Participation Agreement also stated "This Agreement is for the benefit of Seismic Wells and SOC. There are no third party beneficiaries."

August and September of 2006 to Sinclair Oil Corporation amounted to tens of thousands of dollars and were apparently deposited by a different entity with the identical name as the original contracting party.

132.     It is also indisputable that the Defendant named Sinclair Oil and Gas Company, (SOG #2) (WY Filing ID 2005-000504991) was initially incorporated in Wyoming on December 28, 2005 with the identical name as the existing trade name Sinclair Oil and Gas Company, (SOG #1) (WY Filing ID 1986-000239550), which was owned by SOG #1, the contracting party to the Initial Participation Agreement.  Thus, the "SOG" that solicited and authored the Letter of Understanding and Replacement Participation Agreement did not even exist at the time of the Initial Participation Agreement and never purchased 37.5% interest in the Miller Ranch Lease from Seismic Wells.  Because it operates and owns that interest, and there is no other 37.5% interest outstanding, and their no longer remains any duplicated entities, it is objectively verifiable that the interest was obtained through SOC #1's (The Sinclair Companies) breach of the Initial Participation Agreement.  The Sinclair Companies, owning no interest, could no longer make or keep any promise in the entirety of the contract area.

133.     By reaffirming on February 23, 2006 a vote made on November 22, 2005 to approve changing the name of Sinclair Oil Corporation (SOC #1) to The Sinclair Companies, while continuing its Texas registration as Sinclair Oil Corporation; voting to change the name of Sinclair Petroleum Company to Sinclair Oil Corporation; and filing the Texas Certificates of Authority for Sinclair Petroleum Company and Sinclair Oil and Gas Company that same day, while The Sinclair Companies still owned the registered trade name Sinclair Oil and Gas Company, the Defendants, all of which were Wyoming Corporations, created a co-existing duplication of the names Sinclair Oil Corporation and Sinclair Oil and Gas Company.

Defendants conduct occurred just 105 days before Chesapeake Energy announced that it was "making an $845 million dollar definitive purchase of Barnett shale leases owned By Four sevens and its 50-50 partner Sinclair Oil Corporation." Neither The Sinclair Companies nor Sinclair Oil Corporation ever amended their Texas Certificates of Authority, and being more than 91 days after changing their names in their home jurisdiction, the Defendants' conduct also violated the Texas Business Organizations Code § 9.001 and Wyoming Business Corporation Act. W.S. 17-16-401(V).

134.    On September 29, 2006, The Sinclair Companies (formerly SOC #1) was a Wyoming Corporation owning the trade name Sinclair Oil and Gas Company (SOG #1, WY Filing ID 1986-000239550), as evidenced by the subsequent assignment of that trade name from The Sinclair Companies filed on December 1, 2006, with the Utah Division of Corporations and Commercial Code.[32]

## F.    Defendants had a Meeting of the Minds on the Object of their Conspiracy.

**(Civil Conspiracy Elements # 3 and 4 – Meeting of the Minds and Unlawful Acts in Furtherance of the Conspiracy) (Fraudulent Concealment Element #2 – More Deception with Intent)**

135.    Defendants' conduct was extraordinary.  It required the agreement and concerted action of both buyer and seller acting contrary to their respective business interests by the seller remaining at risk and liable after selling and the buyer having no rights whatsoever under the operating agreement and without any interest of public record after purchasing.  This included all of the Defendants never coming forward to get paid or stop being billed and none of the parties acknowledging any change for eight months, before soliciting and securing two documents by deception – the Letter of Understanding and the Replacement Participation Agreement.

---

[32] The Sinclair Companies subsequent assignment of its co-existing and identical trade name, Sinclair Oil and Gas Company, is attached hereto as **Exhibit "L."**

136.   Seismic Wells was fraudulently induced into the binding Letter of Understanding, the rights of which were subsequently assigned by SOG as "exchanger" to a 1031 exchange Qualified Intermediary named Petroleum Strategies Inc. of Midland, Texas.   Petroleum Strategies Inc. notified Seismic Wells of the assignment of rights on October 23, 2006.

137.   Seismic Wells was fraudulently induced by affirmative misrepresentations on the face of the Letter of Understanding that were used as a means of deception that concealed the truth of SOC #1's breach of the Initial Participation Agreement.   Using the identical name as the trade name of the contracting party, SOG #2 falsified that it was the same entity as the party to the original participation agreement and assignments, concealing that it had acquired the interest by exchanging for it as a result of a sale to a Qualified Exchange Intermediary, or otherwise as exclusive to their knowledge in unrecorded assignments, which constituted a breach and gave rise to a cause of action for Seismic Wells to mitigate and remedy its damages that was prevented by the Defendants.

138.   The acts that fraudulently concealed the cause of action in this case included the very same affirmative misrepresentations and material omissions violating their duties to disclose, even in the absence of a replacement contract.   In other words, the Plaintiffs were fraudulently induced into refraining from enforcing the Initial Participation Agreement, and the Defendants obtained all the benefits, including the benefits of void agreements that no Defendant had any legal authority to make, while representing it did in Section 12.1(b).

**G.     Affirmative Misrepresentations and Material Omissions as Acts of Deception.**

**(Common Law Fraud Elements #1-3 – False, Material Representations; Fraud by Nondisclosure Elements # 1, 3 – Concealment of Material Facts; Statutory Fraud Element #2 – False Representations of Fact, Fraudulent Concealment Element #2)**

139.   SOG's misrepresentations were designed to, and in fact did, conceal the truth, by giving Seismic Wells the mistaken belief that SOG #2 was the same legal entity as SOC #1

(which owned the SOG #1 trade name since 1986), the party that acquired rights under the Initial Participation Agreement, including the option to assume operations.  For example, on September 29, 2006,  Meehan, acting on behalf of SOG #2, faxed to Tranckino a "Letter of Understanding regarding Sinclair's Acquisition of *additional* working/leasehold, etc. interests in Miller Ranch Lease(s), *amending* the original assignment from Seismic Wells to SOG as well as being designated as Operator of same." (emphasis added)  As set forth above, SOG #2 was not even in existence when the Initial Participation Agreement was signed, and thus, could not acquire any "additional" interest in the Miller Ranch Lease or "amend" the agreement and assignments unless it was the same entity as SOC#1 and its trade name SOG#1 (which it was not).

140.    The Letter Agreement also stated:

"I have begun preparing the documents I outlined this morning, which are:

● **Amendment** to Original Assignment from SW to SOG (which conveyed 37.5% interest in and to Miller Ranch properties) to include any additional leases - for execution by SW.

● **Amendment** to Participation Agreement to include new leases, new working interest percentages and to name SOG as Operator - for execution by all Working Interest Owners.

● **Amendment** to Joint Operating Agreement to include new leases, new working interest percentages and to name SOG as Operator - for execution by all Working Interest Owners."

**H.    The Affirmative Misrepresentations and Omissions were False and Material.**

141.    Defendants' misrepresentations were false and material because, as affirmative misrepresentations of obtaining the interest under the original participation agreement and assignments, Defendants were fraudulently concealing the truth of how SOG #2 actually obtained the interest, which was through the intentional breach and termination of the Initial Participation Agreement and unrecorded conveyance(s).  SOC #1 (The Sinclair Companies) no

longer had any option to assume operations, and Seismic Wells no longer had any contractually obligated partner able to perform the essential promises of the Initial Participation Agreement (that never were performed).  Defendants' misrepresentations were also false and material because SOG #2 did not exist at the time of the Participation Agreement, never entered into that agreement, and never was party to the original assignments and did not have the option to assume operations of the Miller Ranch Lease, an option that was intentionally terminated by the contracting party.  Defendants also failed to disclose material facts because Seismic Wells believed it was contractually obligated to assign the operations, and never would have assigned them to some other non-party to the Initial Participation Agreement.  The fact that SOG #2 was not a party to the Initial Participation Agreement is material to the making of any contract to amend or replace that agreement.

142.    The Letter of Understanding was a very important document to SOG #2 and The Sinclair Companies' management, because unknown to Seismic Wells until after Tranckino signed it, and before the Replacement Participation Agreement was executed, SOG #2 assigned the rights of this agreement to a 1031 exchange intermediary which required that Seismic Wells be notified.  Twice by email SOG #2 misrepresented that signing the notification "in no way affects you."

143.    Defendants' representations were false, and the Defendants made them recklessly without knowledge of their truth.  Defendants' representations were material because the Defendants had already acquired the 37.5% interest from the intentional termination that was concealed.  Defendants' representations were made with the intent that Seismic Wells act upon them by entering into the Replacement Participation Agreement and refraining from enforcing the Initial Participation Agreement.  Seismic Wells justifiably relied upon the representations,

believing it would not affect it because there was no reason to think SOC #1 had breached and terminated the Initial Participation Agreement, including SOC #1's option to assume operations. Had Seismic Wells been aware of the breach, it would have never entered into the Letter Agreement and Replacement Participation Agreement and would have taken action against the Defendants to limit and remedy its injuries.

144.   At that time, whoever was directing Meehan, being John Herndon, Dave Donegan, and Matthews certainly knew that these representations were false when made because Meehan's management knew that SOG #2 was formed after the Initial Participation Agreement. If Ms. Meehan (who is an attorney) did not know that these were false representations, she made them recklessly without knowledge of their truth as a new employee. In either event, The Sinclair Companies (SOC #1), SOG #2, SOC #2, and Matthews knew of their falsity and they were made as deception concealing the truth and with the intention that they be acted upon by Seismic Wells in entering into the agreement and refraining from enforcing the breach, which was concealed by the affirmative misrepresentations and material omissions violating duties to disclose.

145.   Defendants' conduct also violated state law.  The names Sinclair Oil and Gas Company could not lawfully coexist for more than 120 days according to Wyoming Business Corporation Act W.S. 17-16-401(V),  but they did for 10 months.  The statute provides that in order to issue the name "Sinclair Oil and Gas Company" to SOG #2,

> Where the other corporation is affiliated with the proposed user corporation and has consented in writing to the use of the name by the proposed user corporation, and the written consent also sets forth a description of a proposed merger, consolidation, dissolution, amendment to articles of incorporation or other intended corporate action which establishes to the reasonable satisfaction of the secretary of state that the coexistence of two (2) corporations using the same name will not continue for more than one hundred twenty (120) days.

146.    Here, SOG #2 could not have acquired its name without the agreement of the contracting party to the Initial Participation Agreement, and the names co-existed for 10 months.

147.    The Sinclair Companies could not lawfully be registered in Texas without amending its Texas registration to that name within 90 days under TBOC 9.001, but it never did, and it never identified itself to the Texas Secretary of State or Texas Franchise Tax Board.

148.    Likewise, the new Sinclair Oil Corporation (SOC #2) could not lawfully be registered in Texas as Sinclair Petroleum under TBOC 9.001 after changing its name to Sinclair Oil Corporation, but it did for 16 months. Accordingly, Defendants' conduct was undiscoverable in Texas, because the public records are tainted by fraud.

149.    The Sinclair Companies (SOC #1) could not breach the Initial Participation Agreement and still retain all of its benefits, but it did through the conspiracy to defraud.

150.    The 2006 and 2007 Texas Franchise Tax Public Information Reports for Sinclair Oil Corporation, Sinclair Petroleum Company, and Sinclair Oil and Gas Company declared that each of these entities were not either parent or subsidiary of each other, and The Sinclair Companies has never filed any registration or Franchise Tax Report in Texas, and it has never legally existed in Texas.

151.    Section 5.001 of the Texas Business Organizations Code codifies that the issuance of any name "does not authorize the use of a name in this state in violation of a right of another under the common law."  The Defendants violated Seismic Wells rights under the common law through fraud using their duplicated names, attaching the other entities tax ID number ending in ------0188.

152.    On June 5, 2006 Chesapeake Energy issued a press release published through PRNewswire stating "Company to Purchase Fort Worth Basin Barnett Shale Assets from Four

Sevens Oil Co. Ltd. and Sinclair Oil Corporation for $845 Million." At the same time, Sinclair Oil and Gas Company (SOG#2) announced that it was 50-50 partners with Four Sevens in the same sale. Because SOG #2 was the exchanger, as stated by Petroleum Strategies' notification as acquiring interest in the Miller Ranch as replacement property, it was also the party that relinquished the Barnett Shale leases as relinquished property.

153.    The only Sinclair Oil Corporation that existed in 2005 when the Barnett shale leases were acquired was the same SOC #1 (with its trade name SOG #1) that entered into the Initial Participation Agreement with Seismic Wells in May of 2005.

154.    SOC #1 changed its name to The Sinclair Companies on or around March 1, 2006. Therefore, on June 5, 2006 The Sinclair Companies was in violation of the TBOC 9.001 requirement to amend its registration to reflect the name change within 91 days, continuing its registration as Sinclair Oil Corporation and filing its 2006 Texas Franchise Tax Public Information Report on October 6, 2006 stating it had no parent and no subsidiary of the names Sinclair Petroleum Company or Sinclair Oil and Gas Company. The name the Sinclair Companies was never registered in Texas and never filed any Texas Franchise Tax Board Reports.

155.    On June 5, 2006 the only "Sinclair Oil Corporation" was the Wyoming Corporation that had changed its name from Sinclair Petroleum Company 105 days earlier and was registered in Texas under Sinclair Petroleum Company the same day it voted to change its name (February 23, 2006), in violation of the requirement to amend its registration within 91 days of changing its name as a foreign corporation. This entity states on its 2006 Texas Franchise Tax Public Information Report that under both parent and subsidiary that it has "none."

## I.   Defendants Use of Identical Corporate Names for Legally Separate Entities Tainted the Public Records.

156.   Defendants tainted the public record through violations of the Texas Business Organizations Code Section 9.001, such that the decades old names "Sinclair Oil Corporation" and its trade name since 1986 "Sinclair Oil and Gas Company" co-existed with the identically named new entities that were never parties to the previous assignments and agreements made in those names.  This rendered as false the common sense perception of reasonable business people and formal title opinions that the previous acts of identical names were the acts of the same party.

157.   SOG #2's first Public Information Report[33] stated that as of July 19, 2007, Sinclair Oil and Gas Company had no parent company and was not a subsidiary of anyone (see Texas File ID 07208210327).  Subsequent to the initiation of the conspiracy it became one (see Texas File ID 07295211774).  The Sinclair Companies conspired with SOG #2 and separately with Matthews as a director of SOG to defraud Seismic Wells.

158.   SOG #2 held itself out as not being a subsidiary and having no parent at the time of the conspiracy. Matthews as a director of SOG #2, was no longer an officer or director of The Sinclair Companies (SOC #1).  Therefore, these are not the acts of a corporation conspiring with itself.[34]  In addition to their purposeful separation for independence in treatment for tax-exchange status, SOG made false documents purporting to be the acts of another while securing the execution of those documents by deception, with The Sinclair Companies approval in extinguishing its liabilities.

---

[33] SOG's first Public Information Report, which states that it is not a subsidiary and has no parent, as attached as **Exhibit "M."**

[34] Notwithstanding their independence, it is implicit in the intracorporate conspiracy doctrine that employees, directors, and agents of a corporation, who are not acting within the scope of their employment, can conspire with that corporation.  This has been expressly recognized in a number of jurisdictions and is clearly the prevailing view on the issue.  *See, e.g., ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 80-81, n. 28 (Bankr. S.D. Tex. 2008).

159.    Through his misuse of the corporations, Matthews combined literally dozens of actions detailed herein, exposing these corporations to unacceptable liabilities and risks contrary to their own best interest, such that his will for personal gain and that of his personal beneficiaries overruled all norms of corporate behavior.

160.    Beginning February 23, 2006 to March 1, 2006, there was no legal foreign entity named "Sinclair Petroleum Company" because its name was Sinclair Oil Corporation, and the old "Sinclair Oil Corporation" voted to become The Sinclair Companies the same day.  The Sinclair Companies never filed an assumed name certificate of "Sinclair Oil Corporation" and could not have done so because there was a different Wyoming corporation named "Sinclair Oil Corporation" at the same time.  There is not a single report ever filed in Texas under the name The Sinclair Companies, such that it was never amenable to service with absolutely no way for a plaintiff to discover The Sinclair Companies existed or to serve notice on them whatsoever, after being present in Texas when causing the Plaintiffs injuries and fraudulently concealing them.

161.    The public record is tainted with fraud because even the recital made by SOG #2, as grantee but without the grantors acknowledgment, was made without the grantee having a prior interest of record and is a partial voluntary disclosure made as a misrepresentation evoking a duty to disclose the whole truth.  It was also a violation of the duty to disclose new information known only to the maker, that would render the misrepresentation as false and misleading because on or about March 1, 2006 there existed duplicate entities with the identical names Sinclair Oil Corporation and Sinclair and Gas Company, neither of which even existed at the time at the time of the June 5 assignments that were referenced in the recital of Sinclair Oil Corporation and its trade name Sinclair Oil and Gas Company made while misusing the Tax ID ending in 0188 and referring to that single entity.

162.    Defendants' conspiracy to defraud was highly complex and could never be discovered unless both the duplication of names was discovered and the duplication of names ceased to exist.  For example, in the hypothetical case that someone aware of the conspiracy informed Seismic Wells of the fraud, the unscrupulous Defendants could just produce their trade name certificate that still belonged to the Sinclair Companies and a bogus unrecorded assignment among SOC and its trade name and deny that any sale ever took place because it had never been recorded.

163.    By forming the new entities with the identical names the new owners would own the interest even without any recorded assignment, and continue to be paid even after the real owner had changed its name to The Sinclair Companies and conveyed away the interest without ever recording it.

164.    Defendants, while holding themselves out as unrelated entities to the State of Texas through Franchise Tax Public Information Reports, conspired to and actually did defraud Seismic Wells, in addition to the individual acts of fraud as stated within this Complaint.  In addition, regardless of relations, The Sinclair Companies conspired to defraud Seismic Wells with its then former director Matthews, as a director of SOG#2 who acted for his own personal benefit by misusing an entity SOG #2 that did not exist at the time of the Initial Participation Agreement, but was subsequently formed using the identical name Sinclair Oil and Gas Company (SOG #2).  The entity co-existed with the identical trade name of the contracting party to the Initial Participation Agreement.  The Sinclair Companies (SOC #1) also individually breached the Initial Participation Agreement and concealed the cause of action through its own acts, along with concerted acts of the others which it agreed with and approved of as evidenced.

165.    The Defendants achieved their common improper purpose through unlawful means by falsely claiming the actions and rights of the Initial Participation Agreement, made as a trick and contrivance excluding suspicion and preventing inquiry, as deception in securing the document by fraudulently concealing SOC #1's (The Sinclair Companies) intentional breach and termination of the Initial Participation Agreement, the loss of SOC's option to assume operations and the cause of action thereunder for the breach.

166.    The Sinclair Companies could have never achieved this fraud acting alone because if it had come to Seismic Wells as The Sinclair Companies and disclosed the breach, Seismic Wells would have known immediately that it had been deceived from at least March 1 through October, 2006, and that SOC #1 did not keep its word and its contractual promises. SOG #2 could not amend the Initial Participation Agreement because they were not a party to it.

167.    Matthews certainly controlled the oil and gas exploration department while at SOC #1 in 2005 and at SOG #2 in 2006. The Plaintiffs never experienced any significant action taken or not taken outside of his approval or rejection while at the respective corporations.  The fraud required The Sinclair Companies perpetrate its independent fraud and fraudulent concealment, along with a concerted effort and agreement to implement the Defendants' common purpose, including after Matthews was no longer an officer or director of The Sinclair Companies, though his wife and in-laws remained so. All of the fraudulent actions directly involved Matthews, and never would have happened without him.

168.    The Defendants deemed the sale and distribution of the entirety of the interest acquired under Initial Participation Agreement as fundamentally necessary to affect a 1031 exchange, presumably because it is not possible to exchange property you already own and claim

you replaced it with property that you also already own.  Nevertheless, it is the misuse of those names that damaged the Plaintiffs.

169.    Defendants used the wrongful means of knowing material misrepresentations and material omissions to achieve the improper purpose, intending that Seismic Wells act on these knowingly false misrepresentations by entering into the Letter Agreement and Replacement Participation Agreement and refrain from acting to enforce the Initial Participation Agreement, while also violating SOG's duty to disclose new information known to the maker that must be disclosed, when that new information makes the earlier representation misleading or untrue.

170.    When the Defendants caused to be formed entities with the identical names SOC #2 and SOG #2, which were not in privity of contract with Seismic Wells, and when the names were duplicated and co-existing, each representation using those names was false and or misleading, violating Defendants' legal duty to disclose new information known only to the maker that would have rendered the previous representations as to the identity of the contracting parties and their rights false and misleading, as well as Defendants' duty to disclose the whole truth when making voluntary and partial disclosures that conveyed a false impression.

171.    On October 12, 2006, with the Sinclair Law Department's review completed (according to SOG employee Meehan's email of October 9, 2006) and after changing the documents from the format represented in the Letter of Understanding as "amendments to the original assignments and agreement," Defendants faxed the approved format to achieve their fixed and improper purpose, through unlawful means of securing the second document by deception that fraudulently concealed the truth.

172.    SOG #2 even used a Tax ID with the same last four numbers as the party to the Initial Participation Agreement (Tax ID ending in 0188) and claimed to be the same entity as that

party by stating on the face of Replacement Participation Agreement executed October 25th and

dated November 1st, 2006 as stated under  -"WITNESSETH:"

> WITNESSETH: WHEREAS, HERETOFOR, **Seismic Wells and SOG entered
> into that certain Participation Agreement** effective the 1st day of April 2005
> (hereinafter referred to as "Initial Participation Agreement") for good and
> valuable consideration, **paid and delivered <u>by SOG to Seismic Wells</u>**, the
> receipt and sufficiency of which is acknowledged by Seismic Wells, **<u>SOG
> purchased</u> (hereinafter referred to "Initial Purchase" an undivided Thirty-
> Seven and Five-Tenths Percent (37.5%) interest** in and to the Leases described
> on Exhibit "A" attached thereto (hereinafter referred to as "**SOG's Initial
> Interest**"[35]

**J.     Defendants Violated Duties to Disclose.**

      **(Fraud by Nondisclosure Elements # 2, 4, 5 – Duty to Disclose, Knowledge that
Plaintiff was Ignorant of the Facts, Deliberate Silence)**

173.    Prior to execution of the Replacement Participation Agreement, The Sinclair

Companies' Law Department approved the documents' form by changing the documents'

format, which was represented in the Letter of Understanding as "amendments" to the original

assignments and agreement.  At that point, even though the Defendants knew all along that the

representations were false, Defendants recognized that with no legal authority to enforce or

amend an agreement to which they were not a party, that it would be necessary to "replace" it.

Therefore, they again violated their duty to disclose the new information known only to the

maker that would render the misrepresentations in the Letter of Understanding as false and

misleading.

174.    Defendants were aware their misrepresentations had caused Seismic Wells

mistaken belief – the belief that Seismic Wells was carrying out its promises under the Initial

Participation Agreement, including those with respect to the operations.  Defendants were also

---

[35] The Replacement Participation Agreement goes on to state "Whereas the Parties hereby designate SOG as
Operator of the Miller Ranch Area…"

aware Seismic Wells was relying on Defendants' misrepresentations.  On October 12, 2006 Seismic Wells communicated to Meehan in writing: "As you know, our current agreement provides for the terms of our relationship including an opportunity for Sinclair to be operator. The only new aspect to our agreement is the additional 5/32nds being acquired from Seismic Wells and the requisite consents for the change in operator. The execution of the JOA was also provided for in our original agreement, the proposed content of which has been previously supplied by John Herndon."

**K.    Defendants Intended to Deceive and Carried Out that Intent with Willful Disregard for the Truth and the Law, including their Common Law Duty to Avoid Foreseeable Harm to Others.**

**(Common Law Fraud Element #5 – Intent; Fraud by Nondisclosure Element #6 – Intent; Statutory Fraud Element #4 - Intent)**

175.    The reason that the Defendants did not correct Seismic Wells mistaken belief is the same reason they made all of the other numerous actions fraudulently concealing the intentional breach and termination of the Initial Participation Agreement.  Defendants knew since even before November 2005 that they planned to change the name of "Sinclair Oil Corporation" (SOC#1) to "The Sinclair Companies" and form a new entity named "Sinclair Petroleum Company" only to change its name to "Sinclair Oil Corporation" (SOC#2), while not registering either in Texas in their only legal names.  Defendants failed to register the new "Sinclair Oil Corporation" in Texas under its only legal name, and they failed to register "The Sinclair Companies" in its only legal name.  Defendants also elected not to come to Seismic Wells and disclose what they were doing and see if the parties could work things out and agree to make a proper novation of the Initial Participation Agreement, as it required in order to make a change.  Defendants knew Seismic Wells did not know of their abuse of the corporate form and had no way of knowing.  The reason for the Defendants' conduct is that they had the intent to

deceive and to carry out their deception, with willful disregard for the Plaintiffs rights, and violating their common law duty to avoid foreseeable harm to others.

**L.    Plaintiffs Justifiably Relied On the Material Misrepresentations and Omissions.**

**(Common Law Fraud Element #6 – Reliance; Fraud by Nondisclosure Element #7 – Reliance; Statutory Fraud Element #4 – Reliance; Fraudulent Concealment Element #4 – Reliance)**

176.    Seismic Wells justifiably relied on the Defendants' material misrepresentations that concealed the truth, without knowledge of the material omissions that were also concealing the truth through non-disclosure.  That SOG #2 was not a party to the Initial Participation Agreement was material to any contract to amend or replace it.  Seismic Wells was tricked into believing that it was carrying out the pre-existing obligation to assign operations to SOC #1 under the Initial Participation Agreement, which had been intentionally terminated; therefore, Seismic Wells was willing to assign additional interest that it never would have assigned had Seismic Wells known the truth.

177.    SOG made the express representation and warranty in Section 12.1(b) that "SOG has full authority to enter into this agreement" - an agreement stating on its face that SOG was party to the Initial Participation Agreement.  Seismic Wells had the right to justifiably rely on the express representation and warranty of SOG as made in the contract.  Seismic Wells had knowledge that it was contractually obligated to assign the operations of The Lease under the terms of the Initial Participation Agreement, without knowledge of its intentional breach and termination, which were concealed from Seismic Wells.

178.    Seismic Wells believed SOG's drilling and operating costs would be higher and that as operator, SOG would drill faster than Seismic Wells could afford to keep up.  Seismic Wells would never have assigned the operations to some other entity while being contractually obligated under the Initial Participation Agreement.  Had Seismic Wells discovered that it had

been deceived for 8 months, it would have realized Defendants break their contractual promises. Seismic Wells would have told Sinclair that Sinclair will never operate the lease, and Seismic Wells would have sought rescission of the agreement and affected it by pursuing its legal remedies.

179.    Justifiably relying on the fundamental, material and essential elements of the contracting parties identity and precedent rights that were knowingly misrepresented, not knowing of the material omissions which rendered them untrue, Seismic Wells entered into the agreements and refrained from acting to enforce the Initial Participation Agreement because its breach and termination were concealed, thereby suffering extensive and objectively verifiable damages.

180.    "The Sinclair Companies" that was present in the state at the time it injured Seismic Wells left the state without ever being an entity or filing any report under that name including a year when it exchanged Barnett Shale leases for its 50% share of $845 million dollars.  Accordingly, The Texas Secretary of State and Franchise Tax Board Public Records were tainted by fraud.

**M.     Defendants Final Acts in Conspiracy to Permanently Defraud Seismic Wells**

181.    On June 20, 2014, The Defendants completed the final overt acts pursuant to the common purpose of their conspiracy to defraud Seismic Wells, including the object of permanently defrauding Seismic Wells of its exclusive right to operate the Miller Ranch Lease, without which Defendants could not seek to profit on the value of that right as intended. Defendants repudiated their obligations under the Initial Participation Agreement and Replacement Participation Agreement.  Specifically, Defendants stated (1) "… Sinclair may assign all of its interest in that lease including operations, certainly without your consent and even without the lessors consent;" (2) "Sinclair is under no obligation to drill the remaining two

wells;" (3) "Sinclair, did not obligate themselves to drill all nine wells;" (4) "These were not truly obligation wells;" and (5) "It is Sinclair's position that Seismic Wells exclusive right to assume operations was assigned to Sinclair…", through assignments attached to and made part of the Replacement Participation Agreement.   In addition to being absolute repudiations, Defendants' statements constitute categorical claims that upon the agreements' formation, the promises (which Defendants authored) were never binding or valid whatsoever, which constitute circumstantial evidence that SOG solicited and authored the Initial and Replacement Participation Agreements with no intent to perform their essential and material promises, without which the Agreements would have never been made. Additionally, upon information and belief, Defendants entered the Initial Participation Agreement intending to enact 1031 exchange(s) as separate and distinct evidence that they entered into the Initial Participation Agreement with no intent to perform its essential and material promises.

**N.     Plaintiffs Suffer Actual Damages Proximately Caused by Defendants Fraud and Breach of Contract.**

182.    As a result of Defendants intentional termination of the enforceable Initial Participation Agreement and fraud in preventing and denying Seismic Wells rights under its terms, Plaintiffs suffered actual damages that would not otherwise have occurred.  The damages were foreseeable.  The damages from what would have been a routine breach of contract had the Defendants accepted the consequences of the breach, pale in comparison to the separate and distinct damages of their unlawful taking of Seismic Wells Miller Ranch Lease operations through fraud.

183.    Tranckino and Seismic Wells had generated tens of millions of dollars from the right to operations of the Miller Ranch Lease in the decade prior to Sinclair becoming operator. Seismic Wells believed the benefit of having a multi-billion dollar partner in the further

exploitation of the vast amount of the Lease acreage as stated as a primary objective of the operations in Section 9.1 of both Participation Agreements, provided an opportunity to exceed their past success. That did not happen because of Defendants fraud.

184.    The foreseeable damages Defendants proximately caused include $2.25 million dollars pertaining to 15 years of lost net income from actually operating the wells of the Miller Ranch Lease consisting of the past 8 years and the additional seven years remaining; the lost value of those operations for 15 years beginning in 2006; $2 million dollars to date of lost oil income from the actual oil production attributable to the assigned interests as of the date of the concealed termination, as actually sold at specific prices; $1.5 million dollars as the lost current value of those interests; damages to 63 square miles of Plaintiffs' proprietary 3D Seismic Data valued at $4,095,000 based upon the most recent sale of 67% partial interest in 10 square miles for $435,000; and special damages of the loss of income generated by having the exclusive right to operations, whereby separate from oil production, Tranckino and or Seismic Wells have verifiably earned more than $4 million during each successive 5 year period beginning in 1995 by having the exclusive right to operations of the Miller Ranch Lease, a right that has been unlawfully taken by the Defendants for the past 8 years, and with 7 years remaining, amounting to $12 million dollars of lost income in addition to the other damages, including more than $1 million dollars attributable to SOG never drilling two of the nine obligation wells in the Section 525 pod, as specified in the Initial Participation  Agreement.

185.    On June 26, 2014, in marketing the operations of the Miller Ranch Lease for sale, Defendant SOG#2 published and distributed injurious falsehoods and false statements about the Plaintiffs to all of their industry peers who had expressed interest in the exact area of the Plaintiffs pecuniary interests, and from which the Plaintiffs have exclusively depended on for

their income since 1994.  The falsehoods disparaged the Plaintiffs pecuniary interests and false statements accused Plaintiffs of engaging in the criminal activity of extortion of Chesapeake Energy, and thus, were defamatory per se, causing the loss of a contractual relationship that earned millions of dollars and diminishing Plaintiffs' reputations, earnings capacity and the value of their pecuniary interests.[36]

186.    Defendants have destroyed the Plaintiffs' business enterprise.  Through the Defendants unlawfully obtaining the operations of the Miller Ranch Lease in 2006, and subsequent permanent taking of those operations in the final act and objective of fraud and their conspiracy to defraud Seismic Wells as made June 20, 2014, the Defendants foreseeably damaged the Plaintiffs with knowledge that those operations had earned the Plaintiffs tens of millions of dollars and had generated more than 850,000 barrels of oil production.

187.    Accordingly, the Plaintiffs allege that the Defendants' are liable for all damages to Seismic Wells incurred by the breach of the Initial Participation Agreement and their fraud as the proximate cause of those damages not being mitigated and remedied, including the monetary damages due to the rescission of the Initial Participation Agreement that Defendants prevented, and all of the subsequent tortious acts the Defendants proximately caused by committing fraud in preventing the enforcement of the Initial Participation Agreement, including the fraud in the execution and making of the Letter of Understanding and Replacement Participation Agreement, which are void.[37]

188.    Alternatively, the Plaintiffs allege that the Defendants' are liable for all damages attributable to the Letter of Understanding and Replacement Participation Agreement, and all of

---

[36] Plaintiffs assert claims based upon SOG#2's publishing of injurious falsehoods below.
[37] Plaintiffs contend the Letter of Understanding and Replacement Participation Agreements were procured by fraud in the execution, fraud in the making and/or fraud in the factum, and thus, were void *ab initio*.

the subsequent tortious acts of Defendants as proximately caused by committing fraud in procuring those agreements.

189.    The Defendants' initial fraud is also the proximate cause of the damages inflicted by the Defendants' subsequent torts, which never would have occurred without the initial fraud, including the known lost profit of $3,718,750 on the sale of the assigned interests' non-producing acreage, as confirmed by the proven sale of the entirety of the non-operated working interest in the same acreage at $400 per acre, and $12,500,000 in damages to the pecuniary interests, diminished earnings capacity and reputations of Seismic Wells and Barry Tranckino.

190.    Currently the known damages excluding any duplication of damages are estimated to total $27,718,750, excluding additional damages for mental anguish, exemplary damages and any other expected future damages that are being assessed.

191.    In the ten years prior to these agreements, Seismic Wells and/or Barry Tranckino had drilled or caused to be drilled 20 wells that have produced in excess of 850,000 barrels of oil in this immediate area including more than 600,000 barrels from the Miller Ranch Lease. As a result of Defendants fraudulently obtaining operations and controlling interest, not a single well has ever been drilled outside the 200 acre Miller Spraberry Unit for the past eight years, including not one single well anywhere under the lease in the past seven years. This has never happened during the past 100 years of the Miller Ranch's existence and during this period of record high oil prices certainly would never have happened with Seismic Wells as rightful operator, if not for the Defendants fraudulent taking of those operating rights.

192.    Plaintiffs also sue to recover damages stemming from at least a dozen or more additional wells not drilled for the past 9 years, which would never have happened if not for the

Defendants unlawful taking of the operations, as separate and independent from the contractual liabilities.

**Counts 7, 8, and 10**:   **Fraud, Statutory Fraud, and Anticipatory Breach of Consent Agreement.**[38]

193.   Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

194.   Seismic Wells, as a party to the Consent to Assignment and Change of Operator-Estoppel Certificate Agreement,[39] ("***Consent Agreement***") is the proper party to sue for fraud and anticipatory breach of contract.   Seismic Wells has, at all relevant times, fulfilled its obligations under the Consent Agreement by, among other things, granting its consent and obtaining the Lessors consent for SOG #2 to be operator of the Miller Ranch Lease.   All conditions precedent to Seismic Wells enforcing the Consent Agreement, if any, have been fully performed or are otherwise satisfied. At all times, Seismic Wells has retained ownership of working interest in all producing wells, the leasehold attributable to those wells, and residual rights including but not limited to the income from the oil sold from those wells under the singular Miller Ranch Lease. "The Lease" is defined in the original instrument, with Seismic Wells as "Lessee" as attested to in the Consent Agreement.

195.   The Consent Agreement is a clear and unambiguous agreement between the Lessors, Seismic Wells and SOG #2.   It was signed by the Lessors in mid-November of 2006, and was signed by all parties including Matthews of SOG #2, and was placed of record by Sinclair.[40]

---

[38] Count 9, promissory estoppel, was dismissed with prejudice by the Court's Order of September 11, 2015.  *See* Dkt. 40.
[39] The Consent to Assignment and Change of Operator- Estoppel Certificate Agreement is attached as **Exhibit "J."**
[40] As set forth below, Defendant SOG attested to facts in this notarized agreement that is a matter of public record. Plaintiffs relied on these facts, which allowed the Defendant to obtain this agreement to the detriment of the

196.    In section "A" of the preamble it is attested that the Miller Ranch Lease is a singular oil and gas lease as referred to by "The Lease" and as "leased to Seismic Wells," as the Lessee.

197.    In section "B" of the preamble it is attested "Paragraph 6 of the Lease provides, in pertinent part, that notwithstanding such assignments (to Sinclair) Seismic shall be the operator of the Leased Premises for so long as the Lease remains in force and effect"(hence, the need for this Consent Agreement).

198.    In Section 2, the agreement states "In consideration of such consent, Sinclair hereby covenants and agrees to comply with and be bound by the terms and provisions of the Lease."

199.    In section 4, the agreement states "Nothing contained in this Consent shall be deemed in any manner to modify, amend or otherwise change the terms of the Lease" (wherein Seismic Wells is "Lessee").

200.    Seismic Wells was fraudulently induced into the Consent Agreement by the specific promise made in Section 9.4 of both the Initial Participation Agreement and the Replacement Participation Agreement, which the Defendants made with no intent to perform the promises at the time the promises were made. The specific material promise was one of Seismic Wells essential requirements of any agreement between the parties. As stated in Sections 9.4 "Having once assumed operations, should [SOC/SOG] sell, transfer or otherwise dispose of its interest in the Leases, Seismic Wells shall have the first and exclusive right to assume operations of the leases."

---

Plaintiffs, while the Defendant was committing multiple acts of fraud. SOG subsequently denied those same facts in making false statements directly contradicting that which it attested to and should be equitably estopped from doing so.

201.    Under Section 1.1 of both agreements, Defendants made separate and distinct monetary consideration paid to Seismic Wells for the interest in producing oil wells and leasehold acreage.

202.    The promise in Sections 9.4 was made as consideration in exchange for Seismic Wells promise contained in Sections 9.2 of both Participation Agreements which state: "Certain of the individual oil and gas leases that are subject to this Agreement contain restrictions upon whom and under what circumstances an operator other than Seismic Wells can or may be permitted to operate.  Seismic Wells agrees to use its best efforts in securing an appropriate amendment(s) to such oil and gas leases in the event SOC makes an election to assume operations", and as modified in Section 9.2 of the Replacement Participation Agreement to include the phrase "when SOG assumes operations."  The Consent Agreement was made and obtained by Seismic Wells pursuant to its promise in Sections 9.2 of the participation agreements.  Sinclair's operations were specifically conditional upon Seismic Wells exclusive right, as made subject to Article 9 in Section 4.2 of the Replacement Participation Agreement.

203.    Despite their promises and attesting to the facts and terms of Consent Agreement, on June 20, 2014, while advertising the operations of the Miller Ranch Lease for sale Defendants communicated the following statements in writing and notified Seismic Wells:[41]

  A.    "Moreover, by reason of the assignment of its interest in the Lease to Sinclair, Sinclair is substituted as Lessee for all purposes under the terms and provisions of the Lease."

  B.    "Nothing in the Lease prohibits Sinclair's assignment of the rights to operate the Lease."

  C.    "[Y]our predecessor in interest, Seismic Wells, LLC, [did] not reserve or retain any rights to operate the lease."  "The Lease" in Defendants' statement refers to the singular lease that Seismic Wells owns an interest in.

---

[41] Defendants' response letter is attached hereto as **Exhibit "O."**

D.     "It is Sinclair's position that Seismic Wells exclusive right was assigned to Sinclair."[42]   (In other words, Defendants' position is that the Participation Agreement rights never existed upon its execution through assignments made part of the Participation Agreement and attached thereto).

E.     "It is Sinclair's position that Seismic Wells exclusive right to assume operations was assigned to Sinclair since such right arises from a 'contract' which pertains to operations conducted on the Lease."(In other words, Defendants' position is that Seismic Wells allegedly never had the right to operate from the inception of the agreement – authored by Defendants – that  promised Seismic Wells that right).

F.     "Sinclair may assign all of its interest in that Lease including operations certainly without your consent, and even without the Lessors consent," ("Sinclair" previously attested that this could not be done per the lease terms, which was the very purpose of the Consent Agreement).

G.     "Neither you, MR Royalty, nor Seismic Wells, own any leasehold interest or residual rights in the Lease." (In reality, Sinclair bills Seismic Wells monthly for Lease operating expenses, which it could not do unless Seismic Wells owned an interest).

H.     "Notwithstanding their designation in Section 3 of the Participation Agreement the parties, specifically including Sinclair, did not obligate themselves to drill all nine wells. These were not truly obligation wells." (Demonstrating that Sinclair authored the agreements such that from the agreements' inception, Sinclair never intended to perform the essential promises).

204.     Defendants' written statements, including denying Seismic Wells' exclusive right to assume operations, were made at the same time Defendants were marketing the entirety of their interest in the Miller Ranch Lease and right to operate for sale through Lantana Energy Advisors and Petroleum Listing Services websites.  Defendants' statements demonstrate SOG #2's fixed intention to abandon, renounce, and refuse to perform its material obligations under the Consent Agreement, including the total failure of the consideration made for both Seismic Wells consent and the Lessors consent as obtained by Seismic Wells, which consent included the following acknowledgement: "Sinclair hereby covenants and agrees  to comply with  and  be

---

[42] As set forth below, Defendants' statements are categorical claims that upon the agreements formation, the promises were never binding or valid.  They also demonstrate Defendants' willingness to contradict attestations and their written promises to make false representations in order to obtain benefits to which they are not legally entitled.

bound by the terms and provisions of the Lease" (the terms of which are attested to be unchanged and which required both the Lessors' consent and Seismic Wells' consent as Lessee to transfer operations to anyone other than Seismic Wells - as demonstrated by the need for the Consent Agreement).

205.   Defendants' statements constitute categorical claims that upon the agreements' formation, the promises (which Defendants authored) were never binding or valid whatsoever. Defendants' statements constitute circumstantial evidence that Defendants obtained the Consent Agreement by authoring the Initial and Replacement Participation Agreements with no intent to perform their essential and material promises, without which the Agreements, including the Consent to Assignment and Change of Operator Agreement would have never been made.

206.   As additional circumstantial evidence that the Defendants' entered into the Consent Agreement with no intent to perform the promises through which it was obtained, the Defendants breached the Initial Participation Agreement within months of its formation by selling or otherwise disposing all of its interest in the contract area, rendering it completely unable to perform any promise of that agreement, including the further exploitation of the leases, and separately by drilling all nine obligation wells, which never occurred.  The Defendants fraudulent concealment of the breach, their mutually agreed upon non-disclosures in violation of their duties to disclose, and their mutual approval of a non-party and unintended beneficiary to claim the actions and rights of the Initial Participation Agreement in creating void agreements in order to obtain the operations of the Miller Ranch Lease (including the Consent Agreement) are additional circumstantial evidence that the Defendants entered into each and every one of these agreements with no intent to perform these essential promises at the time they were made.

207.    Separately, Seismic Wells was fraudulently induced into the Consent Agreement by the void agreements and all of SOG #2's affirmative misrepresentations and material omissions concealing the truth and violating duties to disclose as very specifically detailed throughout this Complaint, without which the Consent Agreement could not and would not have occurred.

208.    Seismic Wells suffered actual damages from the anticipatory breach of the Consent Agreement that are separate and distinct from the damages of the fraud claims set forth above.  The foreseeable actual and ongoing damages from the date of the anticipatory breach on June 20, 2014 include the loss of Seismic Wells' operating income for the seven years remaining on the lease that expires in 2021 and the amounts paid for SOG #2's operating overhead, as paid by Seismic Wells, in addition to the lost value of those operations for the next seven years including the loss in value of Seismic Wells' pecuniary interests by not having those operations to sell with those interests and lost ability to effect a successful water injection program that dramatically increases value.

209.    The fraud damages are distinct and separate because they dictate that SOG would have never obtained the operations at all, amounting to 15 years of lost operating income and special damages of the lost value of those operations for that time period, whereby Seismic Wells has a decade long and consistent previous history of proven income from owning those operating rights and generating net income from those operations in excess of $10 million dollars.

210.    The Defendants made the specific promises set forth above in exchange for Seismic Wells obtaining the Consent Agreement, knowing that Seismic Wells was justifiably relying on those promises.  Seismic Wells did, in fact, rely upon those promises by acting to its detriment by relinquishing the right to operate to SOG #2, and injustice can only be avoided by

legal enforcement of those promises against the Defendants, and the payment of the monetary damages foreseeably suffered by Seismic Wells. The Defendants attested to the truth of facts in the recorded Estoppel Certificate and should be estopped from contradicting those facts.

**Count 11:  Fraud by Promises Made With No Intent to Perform.**

211.    Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

212.    Defendants fraudulently induced Seismic Wells by authoring and making the essential and material promises in the Initial Participation Agreement, the Letter of Understanding, and the Replacement Participation Agreement, with no intent to perform their essential and material promises, without which the Agreements, including the Consent to Assignment and Change of Operator Agreement would have never been made.

213.    The material promises required by Seismic Wells were essential to any agreement between the parties, and without those promises, no agreement would have been formed. The material promises included the following specific terms contained in the same numbered Articles of both Initial Participation Agreement and Replacement Participation Agreement:

- Section 9.4: "Having once assumed operations, should SOC sell, transfer or otherwise dispose of its interest, Seismic Wells shall have the first and exclusive right to assume operations of the Leases." (Initial Participation Agreement)

- Section 9.4: "Having assumed operations effective November 1st, 2006, should SOG sell, transfer or otherwise dispose of its interest in the Leases, Seismic Wells shall have the first and exclusive right to assume operations of the Leases." (Replacement Participation Agreement)

- Section 4.2: "Subject to Article 9 and Article 13, Section 13.1 b, it is understood and agreed that Sinclair Oil and Gas Company shall be the Operator of the Leases." (Replacement Participation Agreement)

- Section 12.1 (e): "SOC is purchasing the interest solely for its own account and not for resale or distribution to others and understands that Seismic Wells has relied upon such representation in agreeing to permit the participation in the project." (Initial Participation Agreement)

- Section 12.1 (e): "SOG is purchasing the interest solely for its own account and not for resale or distribution to others and understands that Seismic Wells has relied upon such representation in agreeing to permit the participation in the project." (Replacement Participation Agreement)

- Section 3.1: "To the extent of SOG's interest as specified in Article 5 herein, SOG is obligated to fund the drilling, and completion and equipping, if successful, of the remaining Six (6) oil and gas wells on the Leases as follows (the 'Obligation Wells')."

- Section 3.1: "To the extent of SOC's interest, SOC agrees to fund the drilling, and completion and equipping, if successful, of Nine (9) oil and gas wells on the Leases as follows (the 'Obligation Wells')." (Initial Participation Agreement)

- Sections 9.1: "In all cases, for operations hereunder, the Parties agree that the primary objectives shall be the efficient and cost effective operation and further exploitation of the Leases." (Both Participation Agreements)

- Section 12.1 (b): "SOG represents and warrants that it has full authority to enter into this agreement and fulfill its obligations and duties thereunder." (Replacement Participation Agreements)

214.   The above promises pertaining to the obligation wells, the promise that Seismic Wells would have the exclusive right to operate, and the further exploitation of the leases were never performed, which by itself, is not sufficient evidence that Defendants entered into the agreements with no intent to perform them.  However, on June 20, 2014, while advertising the operations of the Miller Ranch Lease for sale, Defendants communicated the following statements in writing and notified Seismic Wells:[43]

A.   "Moreover, by reason of the assignment of its interest in the Lease to Sinclair, Sinclair is substituted as Lessee for all purposes under the terms and provisions of the Lease."

B.   "Nothing in the Lease prohibits Sinclair's assignment of the rights to operate the Lease."

C.   "[Y]our predecessor in interest, Seismic Wells, LLC, [did] not reserve or retain any rights to operate the lease."  "The Lease" in Defendants' statement refers to the singular lease that Seismic Wells owns an interest in.

---

[43] *See* **Exhibit "O."**

D.  "It is Sinclair's position that Seismic Wells exclusive right was assigned to Sinclair."[44]   (In other words, Defendants' position is that the Participation Agreement rights never existed upon its execution through assignments made part of the Participation Agreement and attached thereto).

E.  "It is Sinclair's position that Seismic Wells exclusive right to assume operations was assigned to Sinclair since such right arises from a 'contract' which pertains to operations conducted on the Lease."(In other words, Defendants' position is that Seismic Wells allegedly never had the right to operate from the inception of the agreement – authored by Defendants – that  promised Seismic Wells that right).

F.  "Sinclair may assign all of its interest in that Lease including operations certainly without your consent, and even without the Lessors consent," ("Sinclair" previously attested that this could not be done per the lease terms, which was the very purpose of the Consent Agreement).

G.  "Neither you, MR Royalty, nor Seismic Wells, own any leasehold interest or residual rights in the Lease." (In reality, Sinclair bills Seismic Wells monthly for Lease operating expenses, which it could not do unless Seismic Wells owned an interest).

H.  "Notwithstanding their designation in Section 3 of the Participation Agreement the parties, specifically including Sinclair, did not obligate themselves to drill all nine wells. These were not truly obligation wells." (Demonstrating that Sinclair authored the agreements such that from the agreements' inception, Sinclair never intended to perform the essential promises.)

215.  SOG #2's written statements, including denying Seismic Wells exclusive right to assume operations, were made at the same time SOG was marketing the entirety of its interest in the Miller Ranch Lease and right to operate for sale through Lantana Energy Advisors and Petroleum Listing Services websites.  The statements demonstrate SOG #2's fixed intention to abandon, renounce, and refuse to perform its material obligations under all of the agreements.

216.  Defendants' statements constitute categorical claims that upon the agreements' formation, the promises (which Defendants authored) were never binding or valid whatsoever, which constitute circumstantial evidence that SOC #1 and SOG #2 entered into the participation

---

[44] As set forth below, Defendants' statements are categorical claims that upon the agreements formation, the promises were never binding or valid.  They also demonstrate Defendants' willingness to contradict attestations and their written promises to make false representations in order to obtain benefits to which they are not legally entitled.

agreements with no intent to perform their essential and material promises, without which the Agreements, including the Consent to Assignment and Change of Operator Agreement would have never been made.

217.     Separately, as documented in writings, at the time of the Replacement Participation Agreement, Defendants attempted to have the Lessors specifically ratify that the assignments made to Sinclair were the same as if the Lessors (*i.e.* the Millers themselves) had directly made the assignments to Sinclair (*i.e.*, a novation of the Lease).  The Lessors, through their attorney Mark Thompson, refused to do.  This would have enabled the Defendants to claim that they had replaced Seismic Wells as "Lessee" under the terms of "The Lease" and is additional circumstantial evidence that Defendants entered into the agreements with no intent to perform.  Defendants' conduct demonstrates the Defendants' intent upon assuming operations was to effect a novation of "The Lease" to enable the Defendants to subsequently claim that Seismic Wells right under section 6 of "The Lease" had become theirs in order to permanently deprive Seismic Wells of that right as stated in the Lease, which the Defendants attest to as a fact in the Consent Agreement.

218.     Separately, the Defendants intended to and with their respective agreement and approval, did intentionally defraud Seismic Wells by soliciting and making a contract purporting to be the act of another, purporting to be a contract made by the party to the Initial Participation Agreement in order to fraudulently procure the operations of and a controlling interest in "The Lease," in which they did succeed.

219.     Accordingly, Defendants intent in their actions of wrongfully taking the valuable operations was not to just kindly return them through the terms of a void *ab initio* agreement.

Rather, their intent was to profit from selling those valuable operations when the opportunity arose, which in fact Defendants have attempted to do.

220.     Independently, and collectively along with all of the other subsequent acts of the Defendants, these actions provide more than the even slight circumstantial evidence required under Texas law for a finding of no intent to perform the promises at the time they were made. The actual damages suffered by the Plaintiffs as proximately caused by the Defendants fraud of their promises as made with no intent to perform the promises at the time they were made are described in the damages of Counts 1-6 above.

**Count 12**:  **Breach and Anticipatory Breach of Replacement Participation Agreement.**

221.     Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

222.     Pleading in the alternative, the Replacement Participation Agreement constitutes valid and enforceable contract.[45]  Seismic Wells, as a party to the Replacement Participation Agreement, is the proper party to sue for breach of contract.  Seismic Wells has, at all relevant times, fulfilled its obligations under the Replacement Participation Agreement, by, among other things, paying its portion of the costs to drill wells, lease operating expenses, and obtaining consent for SOG #2 to become the operator of the Miller Ranch Lease.  All conditions precedent to Seismic Wells enforcing the Replacement Participation Agreement, if any, have been fully performed or are otherwise satisfied.

223.     SOG #2 solicited, authored and made material promises and representations in the Replacement Participation Agreement.   Without SOG #2's promises and representations,

---

[45] Seismic Wells pleads this count in the alternative.  As set forth above, Seismic Wells alleges the Replacement Participation Agreement was procured by fraud in the execution, and thus was void *ab initio* or at a minimum, voidable.

Seismic Wells would not have entered into the agreement.  SOG #2's material obligations include Seismic Wells' exclusive right to be successor operator to SOG (§ 9.4); SOG's promise to drill and fund SOG's share of the costs of the balance of nine obligation wells (§ 3.1); and SOG's obligation to act as operator in accordance with the terms of the operating agreement (§ 4.2).  SOG #2 also promised in Section 12.1(b): "SOG has full authority to enter into this agreement" – an agreement stating on its face that SOG was party to the Initial Participation Agreement.

224.    SOG #2 breached the Replacement Participation Agreement from its inception by the breach of the promise it made Section 12.1(b).  Further, SOG #2 fraudulently concealed the breach by misrepresenting on the face of the agreement that it was the party to the Initial Participation Agreement and by claiming the rights under and actions of the Initial Participation Agreement.  SOG #2's breach is the proximate cause of all of Seismic Wells actual and foreseeable damages from November 1, 2006 through the present, estimated at $11,500,000, which is the approximate amount stated in counts 1-6 above, less the amount of the damages attributable to the Initial Participation Agreement and the Defendants' independent torts.

225.    In exchange for Sinclair's promises, Seismic Wells agreed to, among other things, grant its consent and obtain the Lessors approval for SOG to be the operator of the Miller Ranch Lease.

226.    SOG #2's right to operate the Miller Ranch Lease was made conditional upon Seismic Wells exclusive right to be successor operator.  Specifically, Section 4.2 of the

Agreement states: "Subject to Article 9 and Article 13, Section 13.1 b, it is understood and agreed that Sinclair Oil and Gas Company shall be the Operator of the Leases." [46]

227.    In June 2014, SOG #2 breached and repudiated its obligations under the Replacement Participation Agreement. For example, SOG #2 unequivocally claimed that "Seismic Wells does not own any leasehold interest or residual rights under the Miller Ranch Lease," despite sending monthly joint interest billings for the lease operating expenses to Seismic Wells and receiving payment in full for those expenses from Seismic Wells, including every single well operated by SOG on the Miller Ranch Lease.

228.    It is undisputable that Seismic Wells owns interest in every oil well ever drilled and/or operated by SOG on the Miller Ranch Lease, a singular Oil & Gas Lease under which Seismic Wells has continually since its inception retained a working interest, including all wells of the Miller Spraberry Unit, and the Miller 590, 587 and 525-2 wells outside of the unit. Seismic Wells' interest includes leasehold rights under the wells, the residual rights to income from the oil produced from the leasehold and all rights in the signed agreements, including the Replacement Participation Agreement.  SOG #2 invoices the JIB's to Seismic Wells and receives the lease operating expenses from Seismic Wells.

229.    In June 2014, SOG #2 made absolute repudiation of the Replacement Participation Agreement, including SOG #2's agreement and promise that Seismic Wells would

---

[46] Article 9 provides that (1) Seismic Wells will pay all obligations incurred as operator prior to November 1, 2006, and SOG will assume the production operations of all existing wells and the drilling and production operation of all future wells; (2) the Miller Ranch Lease contains restrictions on who can act as operator, and Seismic Wells agrees to secure any consents necessary for SOG to become the operator; (3) Seismic Wells agrees to provide certain documents relating to the operations to SOG; (4) **should SOG sell, transfer or otherwise dispose of its interest, Seismic Wells shall have the first and exclusive right to assume operations of the lease**; and (5) if either party vacates the role of operator, it shall deliver to the party assuming the role of operator a fully executed Texas Railroad Commission form P-4 evidencing that the role of operator has changed.  Article 13 contains various representations by Seismic Wells, including (1) Seismic Wells represents it has authority to enter into the agreement; (2) Seismic Wells represents it is not violating the terms of any other agreement by entering into the agreement; and (3) Seismic wells represents it has full right and authority to make the seismic data available to SOG.

be the successor operator in the event SOG #2 transfers its interest in the Miller Ranch Lease, as well as its obligation to drill the two remaining test wells.   For example, SOG #2, through counsel, stated:

- "Sinclair is under no obligation to drill the remaining two wells."

- "Sinclair did not obligate themselves to drill all nine wells."

- "These were not truly obligation wells."

- "It is Sinclair's position that Seismic Wells exclusive right was assigned to Sinclair."[47]

230.   SOG #2's written statements, made at the same time SOG was marketing the entirety of its interest in the Miller Ranch Lease and right to operate for sale through Lantana Energy Advisors and Petroleum Listing Services websites, demonstrate SOG's fixed intention to abandon, renounce, and refuse to perform its material obligations under the Replacement Participation Agreement.

231.   SOG #2's repudiation additionally constitutes total failure of the consideration made in exchange for Seismic Wells agreement to obtain the Lessors' consent for SOG to operate the Miller Ranch Lease.   SOG #2's promises, which SOG has repudiated, are the only reason Seismic Wells consented and obtained the lessors (i.e. the Millers') consent for SOG to be operator.

232.   Seismic Wells suffered actual damages, which were proximately caused by SOG #2's repudiation and breach of the Replacement Participation Agreement.   These losses were a foreseeable result of the breach.

---

[47] As set forth below, Defendants' statements are categorical claims that upon the agreements formation, the promises were never binding or valid.  They also demonstrate Defendants' willingness to make false representations in order to obtain benefits to which they are not legally entitled.

233.    Seismic Wells has been damaged by the amount SOG #2 promised to fund –
53.125% of the drilling, completion and equipping costs for each of the remaining two obligation
wells.  As of the date of the repudiation these costs are $1,275,000 – 53.125% of the $750,000
per well dry hole cost for each of two wells and 53.125% of the additional $1,000,000 for
completing and equipping one well as a producer and one as an injector.

234.    On March 20, 2014, Seismic Wells received SOG's proposal and authorization
for expenditure (AFE) to plug and abandon the productive 527-1A well due to a casing leak.
Seismic Wells drilled this well in 2005 as operator.  In response, Seismic Wells notified Sinclair
of its non-consent to plug because the well is productive and had $10,000 of net income in
March of 2014, despite the fact that casing leaks dramatically reduce a wells production and exist
for extensive periods of time prior to becoming obviously detectable.  Similar casing leaks have
occurred commonly in the immediate area and have been readily repaired including the other
wells in Section 527.

235.    On April 10, 2014, SOG #2 informed Seismic Wells that the other working
interest owners had consented to plug the well.  Despite acknowledging that Seismic Wells had
elected to take over the well in exchange for assuming the plugging liabilities, SOG refused to
assign the entirety of 527-1A well to Seismic Wells or alternatively operate it 100% on Seismic
Wells behalf as provided for.  Instead, SOG #2, without any legal basis and with willful
disregard for the Plaintiffs rights, stated that SOG #2 believed it would be unfair to the other
working interest owners that had elected to plug the well.  Sinclair's refusal to turn over 100%
the Well to Seismic Wells constitutes a breach of its contractual obligations under Section D(2)
of the parties' Operating Agreement, which is expressly incorporated into the Replacement
Participation Agreement and attached to the agreement as Exhibit "C."   SOG commenced

advertising its interest (that it no longer rightfully owns) in the well for sale, constituting breach of contract.  SOG has also failed to live up to its obligations by allowing the well to be excessively damaged by continuous exposure to corrosion for the past year.

236.   Upon information and belief, at the same time SOG #2 denied Seismic Wells its contractual right to 100% of the well, SOG was planning on entering into or had already entered into a joint marketing agreement to advertise all of its interest and operations for sale (including the MSU#2 well that SOG elected to abandon and prevented Seismic Wells from repairing).[48] At the same time, SOG's conduct foreseeably caused corrosive waters to continue to corrode and destroy the casing inside the well for the next 12 months to date.  SOG has excessively damaged the well far beyond what was once a reasonable and routine repair, had it been attended to in the proper time frame.[49]

237.   The measure of damages for injury to an oil or gas well that can be reproduced is the lesser of two values: (1) the cash market value of the old well; or (2) the cost of reproducing the well with a new well equipped like the old one, less any salvage value of the old well.  As a result, Seismic Wells has been damaged in the amount of $600,000 as of the date of the breach. This represents the cash market value of the old well, being less than the $1,250,000 cost to replace the well less its salvage value.

238.   SOG's breach of the Replacement Participation has additionally damaged Seismic Wells in the amount of the $500 per well, per month previously charged by Seismic Wells as operator for administrative overhead, plus $2,500 per well annually for the administrative overhead charged per annual work-over of each well, plus 21.875% of such charges that Seismic

---

[48] Upon information and belief, Sinclair began creating marketing material files during April 2014.
[49] Despite being productive 8 of the preceding 12 months and with a casing leak that negatively affects production, the 527-1A well had net income of $9,588 in its last month of production (March of 2014), before SOG caused Seismic Wells complete loss of the value of the entire well.

Wells is instead paying monthly to SOG #2.  Seismic Wells' overhead costs have remained unchanged since SOG became operator.

239.    These damages have been ongoing since June 2014, averaging $5,000 per month. The primary term of the Miller Lease expires in June of 2021 – 85 months from June of 2014, resulting in $425,000 in damages.  The expected productive life of the Spraberry wells on the productive portion of the Miller Ranch Lease have a proven history of producing for multiple decades and long beyond the term of the damages claimed herein.[50]  Texas law supports the view that payment obligations under an operating agreement are like installment payments for statute of limitations purposes.[51]   Accordingly, Defendants are liable to Seismic Wells for those amounts dating back to June of 2010, an amount of approximately $340,000.

240.    SOG's anticipatory breach was also the proximate cause of special damages to Seismic wells including lost earnings and profits that were a foreseeable result of its actions.

**Count 13: Tortious Interference with Prospective Business Relations.**

241.    Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

242.    Prior to publication and distribution of the injurious falsehoods, on June 12, 2014 Seismic Wells and Tranckino informed the owner of the interest in the Miller Ranch Lease (now known to be SOG#2), through an email letter to Dave Donegan and Marilyn Meehan, that Plaintiffs desired to market their respective pecuniary interests to the exact same targeted audience as SOG#2 and that Plaintiffs desired to be included in SOG#2's co-marketing effort. MDH and others were part of that audience, and SOG#2 knew that publication of the injurious falsehoods were certain to interfere with Seismic Wells' prospective business relations with that

---

[50] Total damages attributable to SOG's breach is at least $11,500,000, excluding interest.
[51] *Hondo Oil and Gas Co. v. Texas Crude Operator, Inc.*, 970 F.2d 1433 (5th Cir.1992).

entire audience because no prudent oil company or industry investor will purchase interests from someone whom the operator refutes the existence of those interests and rights.  SOG#2 knew that defrauding Seismic Wells of it exclusive right to be subsequent operator of all wells operated by SOG#2 upon any sale of SOG#2's interest, advertising those operations for sale, and publishing injurious falsehoods slandering the title by stating that Seismic Wells owned no interest or rights in the Miller Ranch Lease in a file titled "*Matter of Barry Tranckino,*" was certain to damage both Plaintiffs and have the intentional effect of interfering with and damaging the Plaintiffs' prospective business relations.  SOG#2's conduct was wrongful and was intended to benefit SOG#2 and its co-marketing partner by capitalizing on the wrongful sale of the operations.

243.    In June 2014, there was a reasonable certainty that Seismic Wells and Tranckino would have entered into and continued an existing business relationship with MDH Investments, continuing a contractual relationship which had previously made $2.88 million in net income for both Plaintiffs on $4.5 million in sales.  The relationship would have consisted of the Plaintiffs selling their pecuniary interests, which are valued at over $6 million dollars pertaining to Seismic Wells 21.875% working interest in the Miller Spraberry Unit, 46.875% interest in the productive Miller 525-2 well, 100% ownership in the MSU #2 well that was denied to Seismic Wells upon Sinclair's election to plug that well, Tranckino's 25% working interest in the productive 301R well, 2720 acres and 3D Seismic data associated with that acreage, and other valuable assets including Seismic Wells proprietary 3D Seismic Data, additional drilling prospects, and Tranckino's royalty interests in multiple producing properties.

244.    In addition, there was a reasonable certainty of Seismic Wells entering into additional contracts and prospective business relationships, including contracts and/or relationships with the offset operators and industry participants specifically expressing interest in

the area of the Plaintiffs pecuniary interests.  In the previous two decades, the Plaintiffs have generated tens of millions of dollars of income from dozens of individual transactions and more than 850,000 barrels of oil production with that very same target audience, and had never failed to successfully enter into those prospective contractual relationships, which always materialized and dwarfed the not insignificant monetary payments made to the Plaintiffs by the SOC#1 and SOG#2.   Even the relationship with just MDH Investments was far more profitable and significant than the Plaintiffs' economic relationship with the SOC#1 and SOG#2, and that relationship was only one of dozens of such relationships successfully implemented by the Plaintiffs prior to SOG#2 effectively destroying Plaintiffs' business enterprise.

245.    SOG#2 intentionally and unlawfully interfered with the prospective relationship between Plaintiffs and MDH Investments and others, knowing that the Plaintiffs were certain to be damaged by the combined acts of permanently defrauding Seismic Wells of its exclusive right to be subsequent operator of the wells and advertising the operations for sale while publishing defamatory statements and injurious falsehoods about Seismic Wells and Tranckino (in a file identified by his personal name) to a known, specific targeted audience in the oil and gas industry to whom the Plaintiffs continually market their pecuniary interests.  The specific false statements SOG#2 published were: (1) Seismic Wells did not own any leasehold interest or residual rights in the Miller Ranch Lease; and (2) that Sinclair had replaced Seismic Wells as Lessee under "The Lease"; and (3) that Seismic Wells did not own the exclusive right to be subsequent Operator the Miller Ranch Lease; and (4) both Seismic Wells and Tranckino had attempted to and actually extorted money from Chesapeake Energy and were attempting to extort SOG#2's co-marketing agreement.  The gist of these collective statements is that Tranckino and Seismic Wells do not own what they represent and say that they own; are of poor character;

falsely represent ownership of interests and rights that the operator states Seismic Wells does not own; and extort money and attempt to extort from their business partners, warning everyone interested in that specific area not to do business with them because they own nothing to sell and have no rights under the Miller Ranch Lease

246.    SOG#2's intent was for its co-marketing venture to implement these torts for the benefit of SOG#2 in selling the operations.  SOG#2's actions were to contribute to and approve of the falsehoods for publication and distribution, the process of which the Plaintiffs have written evidence.  SOG#2's advertising operations of "The Lease" for sale in violation of Sinclair's contractual agreements, and violation of their common law duty to avoid foreseeable harm to the Plaintiffs by neither making non-damaging disclosures at the onset of the advertisements, nor withdrawing the operations from the sale prior to their wanton and malicious conduct, proximately caused Plaintiffs' damages. SOG#2's co-marketing venture partner was not the operator, does not own interest in any well operated on the Miller Ranch Lease, could never claim any right to operate those wells, or have any ability whatsoever to sell the operations. SOG#2's fraud in permanently taking the operations, advertising them for sale, and SOG#2's publication and distribution of injurious falsehoods were the very reason Plaintiffs' relationship with MDH could not continue.  If not for SOG#2's advertising of the operations for sale and failing to make a non-damaging disclosure, none of these letters would have ever been written or responded to, and the damages to the Plaintiffs from their publication and distribution would have never occurred.

247.    There is no justification or privilege for SOG#2's intentionally misrepresenting facts for the purpose of injuring Seismic Wells.  SOG#2's acts constitute wanton and malicious conduct.  SOG#2 published and distributed these statements after warning Tranckino in an email

through their co-marketing partner to come up with an offer that *Sinclair* would approve of by 9:00 a.m. Monday morning or "The gloves would come off."  There is simply no explanation for SOG#2's publishing the disparaging statements other than they were intended to disparage and discredit Seismic Wells and Tranckino, damage their pecuniary interests, and interfere with their prospective business relationships in order that SOG#2 could sell Seismic Wells' right to be successor operator, foreseeably damaging Plaintiffs by intentional interference that was certain to prevent the Plaintiffs from doing business with the specific targeted audience from which they have earned their livings for the past twenty years. SOG#2 knew that Seismic Wells and Barry Tranckino were certain to be damaged by the wrongful taking of Seismic Wells' exclusive right to be subsequent operator and selling those operations, with the foreseeable effect of injuring the Plaintiffs.

248.    SOG#2 knew its conduct was certain or substantially certain to interfere with Seismic Wells' and Tranckino's prospective business relationships, since they slandered Seismic Wells interest in the Miller Ranch Lease and since members of the oil and gas industry are virtually certain to decline the opportunity to do business with an individual or company that represents ownership and rights which the operator denies exist, or has attempted to extort and actually extorted money from any of their working interest partners and especially Chesapeake. Because of Chesapeake's extremely prolific deal making activity, no prudent dealmaker or oil and gas company will associate with such person since they would be an undesirable partner that would negatively affect and potentially preclude future deals with Chesapeake.

249.    SOG#2's conduct was independently tortious and unlawful.    SOG#2's independently tortious conduct includes: business disparagement, slander of title, defamation, and fraud.  SOG#2 permanently defrauded Seismic Wells of its exclusive right to operate the

Miller Ranch Lease by repudiating that right and advertising it for sale, publishing injurious falsehoods in order to capitalize on the value of that right.  SOG#2's conduct prevented others from dealing with the Plaintiffs, including the specific targeted audience which Seismic Wells and Tranckino had informed SOG#2 in writing that Plaintiffs desired to market their pecuniary interests to.  SOG#2 had actual knowledge that Seismic Wells owns an interest in every well operated by SOG#2 on the Miller Ranch Lease, both inside and out of the Miller Spraberry Unit and that Seismic Wells owns the exclusive right to be successor operator under both Participation Agreements.  Accordingly SOG#2 knew that its published and distributed statements were false and that those falsehoods were certain to damage Seismic Wells and Tranckino; the statements were even contained in a file bearing Mr. Tranckino's name. Those injurious falsehoods actually injured the Plaintiffs as intended, through MDH and others reading those false statements, and directly caused special damages to the Plaintiffs.

250.    SOG#2's publishing the statements was done with malice.  SOG#2 knew that its statements were false and were certain to damage the Plaintiffs because prior to their publication, Seismic Wells and Tranckino expressed in writing that Plaintiffs desired to sell their pecuniary interests to the exact same targeted audience as SOG#2.  Specifically, the statements were published after informing the Plaintiffs, through their co-marketing agent, that "The gloves will come off," and the statements served no purpose other than to intimidate and interfere with Plaintiffs' economic interest and to prevent Seismic Wells from asserting its rights against the SOG#2.  Had Sinclair not advertised the operations of the Miller Ranch for sale or alternatively made truthful and non-damaging disclosure of any alleged dispute from the onset of its co-marketing venture, or alternatively simply made non-damaging disclosure of any alleged issues or pulled the operations from the co-marketing venture, Seismic Wells and Tranckino would not

have been damaged.  Instead, SOG#2 proximately caused Plaintiffs' damages.  In fact, Plaintiffs were specifically informed by a representative of MDH Investments that MDH would not enter into and continue the relationship described above because of SOG#2's defamatory statements and injurious falsehoods, rendering it not possible for the relationship to continue.

251.    Plaintiffs sustained actual damage and losses as a result of SOG#2's interference. Specifically, Plaintiffs suffered at least $6 million in damages as a result of the singular business and contractual relationship pertaining to their pecuniary interests described above and special damages of at least an additional $10 million dollars pertaining to prospective relationships with the specific industry peers as the targeted audience that had always been the exclusive source of the Plaintiffs' income since 1995.  SOG#2's actions of advertising the operations for sale and publishing the injurious falsehoods contained in SOG#2's own letter response dated June 20, 2014 was the proximate cause of the Plaintiffs damages, because without any ownership interest or rights under the Lease, no industry partners will purchase assets which the operator publically denies the existence of.

**Count 14: Tortious Interference with Contract.**

252.    Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

253.    SOG #2 is liable for tortious interference with the contract, because it willfully and intentionally solicited and misled Seismic Wells with actual knowledge of the terms of the Initial Participation Agreement and with full knowledge of Seismic Wells' mistaken belief that SOG#2 was the party to the Initial Participation Agreement, as was misrepresented to Seismic Wells on the face of Letter of Understanding and the Replacement Participation Agreement.

254.    Seismic Wells and SOC #1 had a valid, enforceable, clear and unambiguous contract – the Initial Participation Agreement (even though the contract had been breached).

255.    SOG #2, through Matthews, had actual knowledge of the Initial Participation Agreement's terms.  Nevertheless, SOG #2 willfully and intentionally interfered with the Initial Participation Agreement by fraudulently representing it was a party to, and had the right to assume operations under, that agreement, when in fact, it did not.  SOG #2's interference was intentionally designed to conceal SOC #1's breach of the Initial Participation Agreement and prevent Seismic Wells from enforcing its rights, foreseeably damaging Seismic Wells.

256.    SOG #2's interference also induced Seismic Wells into assigning a 15.625% interest and the right to operate the Miller Ranch Lease to SOG #2.

257.    SOG #2's intentional and knowing tortious interference by purporting to be the party to the Initial Participation Agreement unlawfully induced Seismic Wells to enter into the Replacement Participation Agreement, allowed SOG #2 to wrongfully take Seismic Wells' valuable operations, and prevented and denied Seismic Wells' right to limit and remedy its damages due to SOC #1's breach of the specific terms of the Initial Participation Agreement, including Article 12.1(e ) which states **SOC is purchasing the interest solely for its own account and not for resale or distribution to others and understands that Seismic Wells has relied upon such representation in agreeing to permit the participation in the project**." SOG #2's tortious interference as a stranger to the Initial Participation Agreement extinguished Sinclair Oil Corporation's (now The Sinclair Companies) liabilities to Seismic Wells, while at the same time fraudulently concealing that SOC #1 had breached the Initial Participation Agreement.

258.    These willful and intentional knowing acts of fraud and interference were repeated and approved with actual knowledge of the Plaintiffs' mistaken belief that SOG #2 was the contracting party to the Initial Participation Agreement.  SOG#2 had no legal right and no

justification make agreements specifically purporting to be the actions of the party to the Initial Participation Agreement.  SOG #2 also had no right interfere with that agreement by fraudulently inducing its breach, concealing the truth of its intentional termination, preventing its enforcement, extinguishing Sinclair Oil Corporation's (now The Sinclair Companies) contractual liabilities to Seismic Wells, and fraudulently procuring the operations of the Miller Ranch through an option that no longer existed (which was concealed) and never existed at all for any non-party, unintended beneficiary such as SOG#2.  SOG #2 had no legal right to even make the agreement that it solicited, and there is no justification for its intentional and knowing interference and fraud.  SOG #2 was acting in concert with The Sinclair Companies, and The Sinclair Companies was working with Mathews to defraud Seismic Wells for Matthews' own personal benefit.

259.    SOG#2's tortious interference was part of the conspiracy between The Sinclair Companies and Matthews to defraud Seismic Wells by concealing the breach, eliminating SOC #1's liabilities, wrongfully taking the operations by purporting to be the party to the Initial Participation Agreement, attempting a novation of the Miller Ranch Lease to replace Seismic Wells as Lessee, and permanently keeping those operations in order to capitalize on them.  The final act and object of its tortious interference was to permanently obtain the operations of "The Lease" in order to capitalize on the value of those operations in selling them.  In mid/late-June 2014, Defendants accomplished that goal through their final act of interference in repudiating each and every obligation and promise pertaining to Seismic Wells exclusive right to be operator upon any sale, transfer or disposition of their interest.

260.    SOG #2's interference proximately caused Seismic Wells' injuries because, but for SOG #2's interference and fraud, Seismic Wells would not have conveyed the 15.625%

interest, and would never have transferred its operations to any Sinclair entity including SOG #2. Seismic Wells would not have refrained from enforcing the Initial Participation Agreement. Seismic Wells actual damages begin with the loss of the operations and the income derived from those operations, including the income it earned from operating the wells.  Seismic Wells also suffered actual damage as a result of SOG #2's interference in at least the amounts set forth in Counts 1-5, above.[52]

**Count 15: Defamation Per Se and Statutory Libel.**

261.    Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

262.    In June, 2014, the SOG#2 published defamatory statements about Tranckino and Seismic Wells, including that both Seismic Wells and Tranckino had attempted to and actually extorted money from Chesapeake Energy and were attempting extortion of SOG#2.[53]

263.    Beginning June 26, 2014, SOG#2's published statements in connection with marketing materials placed on Petroleum Listing Services and Lantana Energy Advisors titled "Matter of Barry Tranckino," wherein SOG#2's statements and those of its co-marketing agent could be and were viewed by members of the oil and gas industry, and were initially distributed to 38 industry peers that specifically expressed interest in the exact area of the Plaintiffs pecuniary interests.

264.    SOG#2's conduct constitutes statutory liable because (1) they were injurious to Tranckino's reputation and have and will expose Tranckino to financial injury; and (2) impeach

---

[52] SOG #2's actions of purporting to be the party to the Initial Participation Agreement also fraudulently concealed SOG#2's tortious interference with that agreement as a non-party, unintended beneficiary that had no right to even enforce it.   SOC #1 could only have lawfully accomplished SOC #2 did through a novation made with full disclosure, and with that novation agreed to by the original contracting parties, as the Initial Participation Agreement required.
[53] *See* **Exhibit "P,"** which was included in Defendants' marketing materials.

Tranckino's honesty, integrity, virtue, and reputation.  SOG#2's conduct of contributing to and approving the publication of the file with Tranckino's personal name also constitutes defamation per se at common law because the file includes statements falsely charge Tranckino with crimes.

265.   The statements SOG#2 published were false – Seismic Wells owns interest in every well operated by SOG#2 on the Lease, with residual rights to the income from the oil sold from the lease under those wells, and the exclusive right to be successor operator of those wells per Section 9.4 of both Participation Agreements.  In other words, Seismic Wells owns the interests it represents to own, as well as the rights pertaining to those wells and their leasehold under all of the agreements, and the neither Tranckino nor Seismic Wells has ever attempted to or actually extorted money from Chesapeake Energy or anyone else.  In fact, neither Tranckino nor Seismic Wells has ever done business with Chesapeake.  SOG#2 had knowledge of the complete falsity of these written statements and even received notification by email from Seismic Wells (through Tranckino) of their falsity prior to the statements being published and distributed.

266.   The statements SOG#2 published were made with malice, after informing the Plaintiffs through their co-marketing venture that "The gloves will come off" and served no purpose other than to intimidate and interfere with Plaintiffs' economic interest and to prevent Seismic Wells from asserting its rights against the Defendants.  Accordingly, had SOG#2 not advertised the operations of the Miller Ranch for sale or alternatively made truthful and non-damaging disclosure of any alleged dispute, Tranckino would never have been damaged as set forth in this Count, with SOG#2 being the proximate cause of those damages.

267.   The statements were published by SOG#2 without privilege and caused general and special damages to the Plaintiffs.  Specifically, SOG#2's statements caused the loss of a

contractual relationship between Tranckino and Mdh Investments. General damages are presumed due to the per se nature of SOG#2's defamatory statements. SOG#2's defamation and libel per se has diminished Seismic Wells and Tranckino's credibility, as well as the willingness of reputable companies to risk forming a relationship with them, since they were accused of representing ownership and rights which the operator denies and extorting money from their working interest partners (Chesapeake being one of the most prestigious and influential oil and gas company in the country). Because of Chesapeake's extremely prolific deal making activity, no prudent dealmaker or oil and gas company will associate with such person as being an undesirable partner that would be probable to negatively affect and potentially preclude future deals with Chesapeake Energy. The defamation per se is the proximate cause of the lost earning capacity that prior to the defamation per se averaged at least $500,000 per year as proven for the past two decades. SOG#2's statements directly caused other industry partners to be unwilling to do business with Plaintiffs.

**S.**     **Count 16: Business Disparagement.**

268.     Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

269.     Beginning on June 26, 2014, SOG#2 published disparaging words about the economic interests and business character of both Seismic Wells and Tranckino in a file titled "Matter of Barry Tranckino." The specific false statements SOG#2 published were: (1) Seismic Wells did not own any leasehold interest or residual rights in the Miller Ranch Lease[54]; and (2)

---

[54]   Attached hereto as **Exhibit "Q"** is the Miller Ranch Lease and its Extension, which are referred to as "The Lease," with Seismic Wells being "Lessee." The Miller Ranch Lease contains Section 6, which states that notwithstanding any assignments, Seismic Wells shall be the operator of the "The Lease," as attested to by SOG #2 in the Estoppel Certificate. The Extension of the primary term of the lease contains Seismic Wells' reversionary interest in the event SOG #2 failed to pay annual rentals to the Lessor. Seismic Wells as Lessee has the right to

that SOG#2 had replaced Seismic Wells as Lessee under "The Lease"; and (3) that Seismic Wells did not own the exclusive right to be subsequent Operator the Miller Ranch Lease; and (4) both Seismic Wells and Tranckino had attempted to and actually extorted money from Chesapeake Energy and were attempting to extort SOG#2's co-marketing agreement.  The gist of these collective statements is that Tranckino and Seismic Wells do not own what they represent and say that they own and are of poor character, extorting money from their business partners, warning everyone interested in that specific area not to do business with them.

270.    SOG#2's statements were published beginning June 26, 2014 in connection with marketing materials placed on and Lantana Energy Advisors website Data Room as referred to by advertisements on Petroleum Listing Services website, in a folder titled "Matter of Barry Tranckino," which was initially distributed to 38 industry peers that expressed interest, and was posted on the website where the injurious falsehoods could be and were viewed by members of the oil and gas industry that are or were interested in that specific area of the Plaintiffs' pecuniary interests.

271.    SOG#2's statements were false.  As operator, SOG #2 had actual knowledge that Seismic Wells owns leasehold interest in every productive well on the singular Miller Ranch Lease, and residual rights to income from those wells.  This includes all wells in the Miller Spraberry Unit, the Miller 590, 587 and 525-2 wells outside of the unit, and the exclusive right to be subsequent operator per Section 9.4 of the Replacement Participation Agreement.  SOG #2's operations are conditional upon Seismic Wells residual right to be subsequent operator, as made subject to that exclusive right in the Agreement under Section 4.2.   Seismic Wells has

---

obtain a New Lease by paying any rentals not paid by SOG #2.  This reversionary interest is in addition to Seismic Wells' rights under every producing well under "The Lease."

participated in every well drilled by SOG #2 and has paid all of the lease operating expenses as billed to Seismic Wells by SOG #2.

272.    As operator, SOG #2 had actual knowledge that Seismic Wells has ownership and residual rights to income in every producing well on the Miller Ranch Lease and governed by Seismic Wells' rights under the Replacement Participation Agreement that was specifically formed to govern the rights upon SOG #2's assumption of operations and its incorporated Joint Operating Agreement.  SOG #2's operations are conditional upon Seismic Wells' residual rights, as made subject to those rights in the Replacement Participation Agreement.  Under Section 4.2. of the Replacement Participation Agreement SOG #2 invoices Seismic Wells monthly for the lease operating expenses of those wells and has received all payments of every invoice ever received by Seismic Wells.  SOG #2 knows exactly the percentage of ownership in those wells both inside and out of the Miller Spraberry Unit and with all of those wells being part of the singular Miller Ranch Lease that Seismic Wells originated with the Miller Family as lessee. SOG had actual knowledge that the statements distributed were false.

273.    At a minimum, Seismic Wells owns a 21.875% interest in every well ever drilled on the Miller Ranch Lease and/or operated by SOG on the Miller Ranch Lease, including all wells in the Miller Spraberry Unit, and the Miller 590, 587 and 525-2 wells outside of the unit. Seismic Wells also owns the right to be successor operator to SOG under the Replacement Participation Agreement.

274.    Per the Miller Ranch Lease Extension, as original Lessee, Seismic Wells owns the residual right to acquire and designate a new lease from the lessors on any acreage for which the rentals are not paid by SOG#2.   SOG#2's knowledge of Seismic Wells' residual right is documented by letter correspondence in 2013.

275.    Moreover, neither Seismic Wells nor Tranckino has ever represented ownership of an interest it does not own nor rights it does not have, nor have Plaintiffs attempted to or actually extorted money from Chesapeake Energy or anyone else; there is no factual basis whatsoever for the statements SOG#2 published to that effect.

276.    SOG#2's publishing of the statements were done with malice.  The days before SOG#2 published and distributed them, Plaintiffs were even warned by SOG#2's co-marketing agent that "The gloves would come off."  As a party to the Replacement Participation Agreement and various other agreements with respect to the Miller Ranch, SOG#2 knew their statement that Seismic Wells did not own any leasehold interest or residual rights in the Miller Ranch Lease were false.  Additionally, all of Defendants statements were made with the intent to interfere with Plaintiffs' economic interest and to prevent Seismic Wells from asserting its rights (including rights under the Replacement Participation Agreement) against the Defendants.

277.    The statements SOG#2 published were without privilege and caused special damages to the Plaintiffs.  Specifically, the statements SOG#2 published caused the loss of a contractual relationship between Tranckino and MDH Investments that had previously made $2.88 million in net income for both Plaintiffs on $4.5 million in sales.  SOG#2 effectively destroyed the Plaintiffs business enterprise, including the values of the Plaintiffs pecuniary interests exceeding $6 million dollars and Plaintiffs proven consistent prior ability to generate tens of millions of dollars in business and earnings pertaining to the exact area of Miller Ranch Lease.

**T.    Summary of Accrual of Causes of Action.**

278.    The accrual of the causes of action for all fraud claims pertaining to the Defendants' promises made with the intention, design and purpose of deceiving, and with no intention of performing the act contained in those promises, is no earlier than June 20, 2014, the

date of Sinclair's written categorical claims that upon the formation of these agreements, the promises (which Defendants authored) were never binding or valid whatsoever.  As detailed herein Defendants made these promises pertaining to the Initial Participation Agreement, Letter of Understanding, Replacement Participation Agreement and the Consent Agreement.  Without these false promises, and specifically including those purporting to be the acts of another, no Sinclair entity would ever have obtained Operations of the Miller Ranch Lease, which damaged Seismic Wells and/or Tranckino.

279.   The accrual of the causes of action for business disparagement, defamation per se made as libel per se, statutory libel, and tortious interference with prospective business relations is no earlier than June 26, 2014, when SOG#2 in its co-marketing venture first began publishing and distributing the injurious falsehoods and false statements, contained in a file titled "Matter of Barry Tranckino".

280.   The accrual date for the causes of action for conspiracy to defraud and tortious interference with an existing contract, is no earlier than June 20, 2014.  At that time, The Sinclair Companies, which conspired with Mathews as director of SOG #2, made the final overt acts to damage Seismic Wells and obtain the object of permanent operations of the Miller Ranch Lease in furtherance of the conspiracy to defraud Seismic Wells by Matthews and SOG tortuously interfering with the Initial Participation Agreement.   Defendants repudiated the essential promises of the Initial Participation Agreement and Replacement Participation Agreement (which was procured by fraud and interference), enabling Defendants to achieve their ultimate goal of capitalizing on the value of those operations, which were wrongfully taken.

281.   The Defendants prior intent to achieve their objectives by the final act of the conspiracy and tortious interference is additionally evidenced by the agreements purporting to be

the acts of another and their attempt to make a novation of "The Lease." Even if that attempt had had been successful, which would have replaced Seismic Wells as Lessee, it still would have required the final acts of the Defendants' tortious interference taken June 20, 2014 by repudiating Seismic Wells' exclusive right to operate and claiming it was assigned to Sinclair through the interfering actions of the void agreements.

282.    The Sinclair Companies' (SOC #1) combined actions included changing its name to The Sinclair Companies, never recording any assignments and bills of sale, never notifying Seismic Wells as operator of any change in ownership; never amending the operating agreement to reflect that change; the material omissions of the new entities with the identical names, violating duties to disclose such that every use of those names created a false or misleading impression, and failure to ever amend its Texas Registration or register in Texas as The Sinclair Companies.

283.    As additionally pleaded elsewhere herein, these causes of action were tolled by the discovery rule, the fraudulent concealment doctrine and the second of two specific exceptions provided for non-residents under TEX. CIV. PRAC. & REM. CODE § 16.063, which generally does not apply to non-residents, but makes a specific exception in the unique circumstances of this case wherein The Sinclair Companies was present in Texas at the time it injured Seismic Wells and left the State July 17, 2007, without ever informing the Texas Secretary of State of the existence of any entity named "The Sinclair Companies" and thus was not amenable to service by the Texas Secretary of State, tolling the accrual of the cause of action until discovered on January 14, 2015.

284.    The accrual of the cause of action for the alternative claim of Anticipatory Breach and Breach of the Replacement Participation Agreement was mid/late-June of 2014, when those actions as described as comprising the actions in that contract occurred.

285.    The Plaintiffs injuries were inherently undiscoverable and objectively verifiable, and Defendants fraudulently concealed Plaintiffs' claims through multiple unrecorded assignments and bills of sale, while being perpetrated by Defendants' concerted actions using identical and co-existing duplicated names, tainting the public records.

286.    Even the Plaintiffs extremely diligent inquiry in preparing the business disparagement and defamation claims was completed without ever identifying Defendants' fraudulent acts and abuse of the corporate form.   Those claims (business disparagement and defamation) were originally completed in December of 2014, with Plaintiffs and attorneys consulting with the Plaintiffs at that time, making the mistaken assertion that the original Sinclair Oil Corporation terminated its existence on July 19, 2007, as evidenced by its Certificate of Withdrawal in Texas.   However, on January 14, 2015, in the course of investigating the Defendants, Tranckino discovered a pdf file of a letter written by a refinery manager notifying a Wyoming Environmental Agency that a refinery would be owned by a new subsidiary and that Sinclair Oil Corporation would change its name to the Sinclair Companies around February 1 2006.  The letter stated:

> In an administrative note, Sinclair Oil Corporation is undergoing a restructuring of its business divisions and this facility previously referred to as Sinclair Oil Corporation. Sinclair Wyoming Refinery) will be owned and operated by a wholly-owned subsidiary of Sinclair Oil Corporation. The subsidiary corporation will be named Sinclair Wyoming Refining Company.  The change in corporate ownership will be effective February 1, 2006.  Furthermore, Sinclair Oil Corporation will be renamed on or about February 1, 2006 without changing its corporate entity to The Sinclair Companies. Please address all future correspondences regarding this facility to Sinclair Wyoming Refining Company.

287.   With the knowledge of what was stated in the letter, knowing that the name Sinclair Oil Corporation exists with continuous use, and having never heard the name "The Sinclair Companies," Tranckino registered with the Wyoming and Utah Secretary of State websites, purchased dozens of filings under every Sinclair entity listed, and learned of the facts contained in this Complaint.   These facts should have never been discovered, were not discovered reasonably or easily, and were only discovered randomly after an extremely diligent inquiry.   Defendants intended that they never be discovered by Plaintiffs.   Otherwise, they simply would have written the agreements in conforming with the truth and recorded all of the transfers in the chain of title, as is customary in the oil and gas industry.

**U.     The Discovery Rule.**

288.   As set forth above, Defendants' conduct and Seismic Wells' injuries were inherently undiscoverable until, at the very earliest, June 20, 2014 (and more likely January 2015) because of the extraordinary nature of the Defendants' fraud.

289.   By causing multiple identical corporate names to co-exist and apply to different legal entities at the same time; never filing the name changes in Texas; never recording the assignments and bills of sale, in contrast to industry standards; and misusing those identical names by purporting to be and claiming the acts of another party with those same identical names, such that Defendants even received the oil production revenues from assignments of interest to other Defendants with the identical names that pre-dated their existence, the Defendants fraud tainted the public records.   An operator exercising more than reasonable diligence could not and did not discover Defendants' fraud.

290.   The injuries are objectively verifiable because the injuries' existence and the Defendants' wrongful conduct cannot be disputed, and the facts on which Defendants' liability will be demonstrated will primarily consist of direct evidence, including Defendants' corporate

records.  Accordingly, the accrual of any cause of action against the Defendants was tolled under the discovery rule until at least June 20, 2014 when the Plaintiffs were placed on notice for inquiry and eventually discovered the facts herein.[55]

## V.   Fraudulent Concealment Doctrine.

291.   The Defendants numerous acts of fraudulent concealment, including the identified non-disclosures violating duties to disclose and the affirmative misrepresentations purporting to be the acts of the party to the Initial Participation Agreement, by themselves fraudulently concealed that SOG #2 was not the contracting party to the Initial Participation Agreement and that SOG #2 obtained the interest elsewhere through the intentional breach of the enforceable Initial Participation Agreement.  At the very same time, those same affirmative misrepresentations fraudulently concealed that SOG #2 tortiously interfered with that the Initial Participation Agreement as a non-party and unintended beneficiary that is a stranger to the agreement, without any legal right to even enforce it.

---

[55] The discovery rule has been applied in oil and gas cases with facts less egregious that those set forth herein.  For example, in *Susanoil, Inc. v. Continental Oil Co.*, 519 S.W.2d 230 (Tex. Civ. App. – San Antonio 1975), the court of appeals determined that even though nine years had passed between the making of a unitization agreement between oil companies and the discovery of the fraud, the evidence did not establish that plaintiffs' cause of action for fraud was barred by limitations as a matter of law.  The plaintiff in *Susanoil* alleged Continental's fraud in obtaining the execution of the agreement from Susanoil, that Continental knew its representations to Susanoil were false when made, or even assuming they were true, that prior to completion of the agreement, Continental knew that the truth of the representations changed, and that Continental violated its duty to disclose new information to correct its prior representations before closing the transaction and accepting the assignment.  This case share similar elements.  In *Hooks v. Samson Lone Star, Limited Partnership*, 457 S.W.3d 52 (Tex. 2015), the Texas Supreme Court reversed the court of appeals decision barring a mineral owner's fraud claims and holding that the claims were not timely filed.  Hooks, the mineral owner, relied upon an incorrect plat provided to him by Samson's Landman.  Hooks agreed to a pooling amendment and took no action within the four-year limitations period.  Several different maps, including inaccurate ones, existed in Railroad Commission records.  Hooks argument was that (as in the instant case) the defendants' false information kept him from discovering the fraud for years.  The Texas Supreme Court reversed, holding that Hooks was entitled to rely upon the first plat filed with the TRRC by Samson that showed the well was located outside the protected area and was not obligated to review the records after that. The Court held that to require, as a matter of law, that the landowner double-check the more recent filings against earlier filings is a higher burden than reasonable diligence requires.  The Texas Supreme Court stated "While we agree that public records may under certain circumstances establish a lack of diligence in the discovery of fraud as a matter of law, here the records themselves were tainted by fraud and thus provide no conclusive proof on the subject."  Here, records themselves are tainted by fraud, as detailed throughout this Complaint.

292.     The fraudulent concealment doctrine tolls the accrual of the causes of action until such time as Plaintiffs discovered the fraud or should have discovered it with reasonable diligence.  Here, discovering the fraud required knowledge that the corporate names had been duplicated among separate legal entities through name changes that do not exist in Texas public records, knowledge that the interest had been sold with the benefit of a recorded assignments and bills of sale that do not exist in public records, and knowledge that the duplication of names had ceased to exist, so that deductive reasoning could confirm that the interest is owned by a party that did not exist at the time of the Initial Participation Agreement.  This constitutes a burden far greater than reasonable diligence, as even an operator exercising more than reasonable diligence could not have discovered the fraud.

**W.     Texas Civil Practice and Remedies Code § 16.063.**

293.     The accrual of the causes of action in this case are tolled by an exception provided for under the Texas Civil Practice and Remedies Code § 16.063.

294.     The Sinclair Companies (SOC #1), a non-resident, was present in Texas at the time of the injuries to Seismic Wells.  It maintained offices and employees in Abilene and/or Sweetwater, Texas and a Texas Oil and Gas Operating license while operating wells in west-Texas.  At the time The Sinclair Companies was concealing its actions that injured Seismic Wells, it was also concealing the identity of the only legal name under which it could be sued upon by never registering itself as The Sinclair Companies in Texas.  The Sinclair Companies left the state on July 17, 2007.  At the same time, the only foreign entity having the legal name Sinclair Oil Corporation was a Wyoming entity that had no contractual relationship with Seismic Wells and would be the wrong party in any breach of contract cause of action.

295.     The unique and extraordinary circumstances of this case fit within an exception to § 16.063, whereby a non-resident, The Sinclair Companies, was present in Texas at the time of

First Amended Complaint                                                                                          Page 104
379844

the Plaintiffs injuries, and subsequently left the state no later than July 17, 2007.  During the time

of the Plaintiffs injuries and afterwards, The Sinclair Companies never identified itself by the

only legal name under which it could be sued to the Texas Secretary of State, the Texas

Franchise Tax Board, or to the Plaintiffs, from whom it was concealing a cause of action.  The

Defendant, by hiding its very identity, was not amenable to service because Plaintiffs and even

the Texas Secretary of State could not even determine its existence.  At the same time, the only

foreign entity having the legal name Sinclair Oil Corporation was a Wyoming entity that had no

contractual relationship with Seismic Wells.

296.    Under the unique and extraordinary circumstances of the instant case, the

exception to the Texas Civil Practice and Remedies Code § 16.063 neither discriminates against

residents or non-residents that are hiding and concealing their identity while acting unlawfully,

nor does it in any way discriminate against lawful interstate commerce, as the Code was not

intended to offer protection to any corporation concealing its only legal identity while

performing unlawful acts. The accrual of the causes of action in this case are tolled by the

exception to Texas Civil Practice and Remedies Code § 16.063.[56]

## X.    <u>Count 17</u>: Declaratory Relief.

297.    Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set

forth herein.

298.    The Federal Declaratory Judgment Act provides that "[i]n a case of actual

controversy within its jurisdiction ... any court of the United States ... may declare the rights and

---

[56] TEX. CIV. PRAC. & REM. CODE § 16.063, generally, does not apply to non-residents.  However, Section 16.063 does apply to nonresidents who were present in the state at the time of the cause of action accrued or had its inception and who later leave the state.  *See Wise v. Anderson*, 359 S.W.2d 876, 879 (Tex. 1962).  The rules regarding a defendant's absence from the state apply to corporations as well as to individuals.  *See, e.g., Wyatt v. Lowrance*, 900 S.W.2d 360 (Tex. App. – Houston [14th Dist.] 1995); *Louis v. Discount Tire Co. of Texas, Inc.*, 1 S.W.3d 698 Tex. App. – Amarillo 1999).

other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

299.    There is an actual, justiciable controversy between Plaintiffs and Defendants within the jurisdiction of this Court, as described herein.  Accordingly, Plaintiffs request the Court issue a declaratory judgment declaring the rights and legal relations between among Seismic Wells, The Sinclair Companies (formerly Sinclair Oil Corporation), and Sinclair Oil and Gas Company, including the following:

- The Oil, Gas & Mineral Lease dated June 11, 2001 and the Agreement to Extend Primary Term of Oil & Gas Lease constitute a singular Oil and Gas Lease, as defined within itself and as attested to by Sinclair in the Estoppel Certificate as "The Lease."

- Seismic Wells is defined "Lessee" under "The Lease," as further attested to by Sinclair in the Estoppel Certificates.

- Sinclair attested to the following in the Estoppel Certificate: "Paragraph 6 of the Lease provides, in pertinent part, that notwithstanding such assignment (to Sinclair) Seismic shall be Operator for as long as the Lease remains in force and effect."

- Sinclair attested to the following: "Nothing contained in this Consent shall be deemed in any manner to modify, amend or otherwise change the terms of the lease."

- According to the terms of the Lease, which remain unchanged, Seismic Wells remains the "Lessee" of "The Lease," having at all times retained a minimum of 21.875% working interest in all of the producing oil wells under "The Lease" with residual rights to all of the income from its portion of the oil production sold from the leasehold attributable to those wells.

- Through the extension of "The Lease," quoted below, Seismic Wells, as Lessee, has a reversionary interest under the entirety of "The Lease:" "Furthermore, in the event any or all the acreage is released by proportional reduction or non-payment of the annual rental payment, Lessors agree to execute a new lease as per Lessee's designation under identical terms provided payment in full of the annual payment is made up within one year of the non-payment or proportionally reduced payment."

- Since the inception of the clear and unambiguous terms of the Initial Participation Agreement, the Replacement Participation Agreement and the Consent to

Assignment and Change of Operator - Estoppel Certificate Agreement , Sinclair's assumption of operations has at all times been subject to Seismic Wells' exclusive right to be subsequent operator.

- Seismic Wells' exclusive right to be subsequent operator was never assigned to Sinclair under any assignment because (1) the assignments were attached to and made part of the Agreements creating Seismic Wells' exclusive right to be subsequent operator, and (2) the partial assignments to Sinclair do not convey operations under The Lease, as attested to by Sinclair in the Estoppel Agreement as the very reason requiring consent through that Agreement in the first place, and (3) Section 4.2 of both Participation Agreements clearly states: "In the event of a conflict in the terms and conditions of the Operating Agreement and this Agreement, the terms and conditions of this (Participation) Agreement shall control."

- Any transfer of the operating rights that pertains to an interest in land must be in a writing complete within itself in every material detail in order to comply with the Statute of Frauds. Here, every written agreement involving the right to operate The Lease was made subject to Seismic Wells' exclusive right to be operator or subsequent operator.

- The Participation Agreements are exclusive Agreements with no third party beneficiaries and no provision for any successors or assigns.

- The Defendants made the specific promises set forth in Section 9.4 of both Participation Agreements in exchange for Seismic Wells obtaining the Consent Agreement as required in Sections 9.2, knowing that Seismic Wells was justifiably relying on those promises. Seismic Wells did, in fact, rely upon those promises by acting to its detriment by granting and obtaining consent for SOG #2 to operate "The Lease." Defendants are estopped from claiming otherwise or controverting the attestations made in the Estoppel Agreement.

## Y.    Requested Relief: Attorneys' Fees.

300.    Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

301.    Plaintiffs would show the Court that the recovery of attorneys' fees is authorized as provided under and according to the provisions of Section 38.001 of the Texas Civil Practice and Remedies Code, Section 27.01(3) of the Texas Business and Commerce Code, or other applicable law, and Plaintiffs further seek their reasonable attorney's fees, including fees for any

appeal, insomuch as Plaintiffs have been required to employ the undersigned attorneys to file suit and have agreed to pay them reasonable attorneys' fees for their services.

**Z.      Requested Relief: Exemplary Damages.**

302.    Plaintiffs incorporate and re-allege the foregoing paragraphs as if expressly set forth herein.

303.    The wrong done by the Defendants was aggravated by the kind of malice for which the law allows the imposition of exemplary damages.   Defendants' conduct was specifically intended to cause substantial injury to Seismic Wells and Tranckino, when viewed objectively from the standpoint of Plaintiffs at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others and Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights or welfare of the Plaintiffs.

304.    Additionally and in the alternative, the wrong done by Defendants was aggravated by the kind of fraud for which the law allows the imposition of exemplary damages, in that Defendants intentionally failed to disclose material facts and made material representations that were false, knowing they were false, with reckless disregard as to the truth and as a positive assertion, with the intent that Plaintiffs act upon the misrepresentations.   Plaintiffs justifiably relied on the representations and suffered injury as a result of this reliance.   Plaintiffs therefore seek exemplary damages, including that Defendants secured execution of documents by the deception of instruments purporting to be the acts of another and wrongfully obtained real property and valuable rights pertaining to it.

## VII.      DEMAND FOR JURY TRIAL

305.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted

**PASSMAN & JONES,**
**A Professional Corporation**

By: */s/ Christopher A. Robison*
Christopher A. Robison
Texas Bar No. 24035720
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2500
(214) 742-2121 Telephone
(214) 748-7949 Facsimile
robisonc@passmanjones.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of September, 2015 a true and correct copy of the above and foregoing was delivered to counsel of record for the Defendants in this matter via the Court's ECF/PACER system.

*/s/ Christopher A. Robison*
Christopher A. Robison