**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| SEISMIC WELLS, LLC AND<br>BARRY TRANCKINO, | ) | |
| | ) | |
| | ) | |
| Seismic Wells, | ) | |
| | ) | |
| v. | ) | Case No. 5:15-cv-00148 |
| | ) | |
| ROSS B. MATTHEWS, SINCLAIR | ) | |
| OIL CORPORATION, THE SINCLAIR | ) | |
| COMPANIES, AND SINCLAIR OIL | ) | |
| AND GAS COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

## TABLE OF CONTENTS

STANDARD OF REVIEW .................................................................................................1

ARGUMENT .................................................................................................................................2

I.    Seismic Wells Failed to Submit Sufficient Evidence to Support Its Fraud-Based
Claims .................................................................................................................................2

    A.    Seismic Wells did not present sufficient evidence that Sinclair 3 intended for
Seismic Wells to rely on the Replacement Participation Agreement's
inaccurate recitals, and it did not present sufficient evidence to show that it
justifiably relied on them. ....................................................................................2

    B.    Seismic Wells did not present sufficient evidence to show that Sinclair 3's
alleged misrepresentations proximately caused it any injury. ................................5

    C.    Seismic Wells did not present sufficient evidence to overcome Sinclair's
statute-of-limitations defense. ................................................................................7

II.    Seismic Wells Failed to Submit Sufficient Evidence to Support Its Breach-of-
Contract Claims Relating to the Initial Participation Agreement .....................................12

    A.    Seismic Wells failed to submit sufficient evidence to support its claim that
Sinclair 1 breached the Initial Participation Agreement by assigning its
interest to Sinclair 3. ............................................................................................12

    B.    Seismic Wells failed to submit sufficient evidence to support its claim that
Sinclair 1 breached the Initial Participation Agreement by "selling, trading,
or licensing" the seismic data to a third party. ......................................................14

III.    Seismic Wells Failed to Submit Sufficient Evidence to Support Its Breach-of-
Contract Claims Relating to the Replacement Participation Agreement ...........................15

    A.    Seismic Wells failed to submit sufficient evidence to support its claim that
Sinclair 3 repudiated the Replacement Participation Agreement by drilling
less than nine wells. .............................................................................................15

    B.    Seismic Wells failed to submit any evidence to support its claim that
Sinclair 3 breached the Replacement Participation Agreement by not
conveying the well with the leaking casing (the MSU #2) to Seismic Wells........17

    C.    Seismic Wells failed to submit sufficient evidence to support its claim that
Sinclair 3 repudiated the Replacement Participation Agreement by
reminding Seismic Wells it had sold its subsequent right to operate to Bold
Energy. ..................................................................................................................17

i

IV.     Seismic Wells and Mr. Tranckino Failed to Submit Sufficient Evidence to Support
        Their Business Disparagement Claims .................................................................................19

V.      Plaintiffs Failed to Present Sufficient Evidence to Show They Experienced Any
        Non-Speculative Damages .....................................................................................................19

        A.      Mr. Tranckino's Rule 701 testimony is speculative and should be stricken. ........19

        B.      The Court should exclude all of Mr. Thompson's Rule 702 testimony.................23

VI.     Seismic Wells and Mr. Tranckino Failed to Submit Sufficient Evidence to Support
        Their Claims Against Mr. Matthews .................................................................................23

VII.    Seismic Wells Failed to Submit Sufficient Evidence to Support Its Conspiracy
        Claim.........................................................................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berry v. Lee*,
    428 F. Supp. 2d 546 (N.D. Tex. 2006) ..................................................................23

*BP Am. Prod. Co. v. Marshall*,
    342 S.W.3d 59, 66–69 (Tex. 2011)...............................................................8, 10

*Brush v. Reata Oil & Gas Corp.*,
    984 S.W.2d 720 (Tex. App.—Waco 1998, pet. denied )..........................................2

*Coastal Bank SSB v. Chase Bank of Tex., N.A.*,
    135 S.W.3d 840 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ...........................4

*Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*,
    823 S.W.2d 591 (Tex. 1992), *superseded by statute on other grounds as noted
    in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212 (Tex.
    2002) ...............................................................................................................12, 13

*Field v. Mans*,
    516 U.S. 59 (1995)..................................................................................................3

*Ford v. Exxon Mobil Chem. Co.*,
    23 S.W.3d 615 (Tex. 2007).....................................................................................7

*Foreman v. Babcock & Wilcox Co.*,
    117 F.3d 800 (5th Cir. 1997) ..................................................................................1

*Grierson v. Parker Energy Partners 1984-I*,
    737 S.W.2d 375 (Tex. App.—Houston [14th Dist.] 1987, no pet.).......................24

*Hooks v. Samson Lone Star, Ltd.*,
    457 S.W.3d 52 (Tex. 2015)......................................................................................7

*In re FH Partners, LLC*,
    335 S.W.3d 752 (Tex. App.—Austin 2011, no pet.) ............................................12

*Landers v. Aurora Loan Servs., LLC*,
    434 S.W.3d 291 (Tex. App.—Texarkana 2014, no pet.)........................................2

*Lewis v. Bank of Am. N.A.*,
    343 F.3d 40 (5th Cir. 2003) ....................................................................................3

iii

*Pellegrini v. Cliffwood-Blue Moon Joint Venture, Inc.*,
 115 S.W.3d 577 (Tex. App.—Beaumont 2003, no pet.) ........................................................2

*Reyna v. First Nat'l Bank*,
 55 S.W.3d 58 (Tex. App.—Corpus Christi 2001, no pet.) ......................................................2

*Rubinstein v. Adm'rs of the Tulane Educ. Fund*,
 218 F.3d 392 (5th Cir. 2000) ...............................................................................................1

*Santa Fe Operating Partners, L.P. v. Universal Resources Corp.*,
 No. 07-95-0342-CV, 1996 Tex. App. LEXIS 3540 (Tex. App.—Amarillo
 Aug. 14, 1996, writ denied) ................................................................................6, 12, 13

*Shell Oil Co. v. Ross*,
 356 S.W.3d 924 (Tex. 2011)..............................................................................................7, 8

*Travis v. Bd. of Regents of the Univ. of Tex. Sys.*,
 122 F.3d 259 (5th Cir. 1997) ...............................................................................................1

*Ulico Cas. Co. v. Allied Pilots Ass'n*,
 262 S.W.3d 773 (Tex. 2008)................................................................................................16

*Via Net v. TIG Ins.*,
 211 S.W.3d 310 (Tex. 2006)..................................................................................................7

*Wallace v. Methodist Hosp. System*,
 271 F.3d 212 (5th Cir. 2001) ...............................................................................................1

*Woods v. William M. Mercer, Inc.*,
 769 S.W.2d 515 (Tex. 1988)..................................................................................................7

**Statutes**

TEX. BUS. & COMM. CODE § 27.01 ...............................................................................................2

TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4) ...........................................................................7

TEX. CIV. PRAC. & REM. CODE § 16.051 ....................................................................................7

**Rules**

FED R. CIV. P. 50 ...........................................................................................................................1

FED. R. CIV. P. 50(a) .....................................................................................................................1

FED. R. CIV. P. 701 ......................................................................................................................19

FED. R. CIV. P. 702 ......................................................................................................................23

iv

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, Defendants The Sinclair Companies ("Sinclair 1"), Sinclair Oil Corporation ("Sinclair 2"), Sinclair Oil and Gas Company ("Sinclair 3"), and Mr. Ross B. Matthews (collectively, "Sinclair") submit this Motion for Judgment as a Matter of Law, and in support thereof will show:

### STANDARD OF REVIEW

1.     Federal Rule of Civil Procedure 50(a) provides the standard for a motion for judgment as a matter of law:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> > (A)     resolve the issue against the party; and
>
> > (B)     grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a).

2.     "There is no legally sufficient evidentiary basis when 'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.'" *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 219 (5th Cir. 2001) (internal quotations omitted) (citing *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000)).  "[T]here must be more than a mere scintilla of evidence in the record to render the grant of [judgment as a matter of law] inappropriate." *Id*.  "A court should grant a Rule 50(a) motion not only when the non-movant presents no evidence, but also when there is not a sufficient 'conflict in substantial evidence to create a jury question.'" *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir. 1997) (citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997)).

**ARGUMENT**

I.  **Seismic Wells Failed to Submit Sufficient Evidence to Support Its Fraud-Based Claims.**

3.      Seismic Wells's fraud-based claims are ultimately premised on a single allegation: The Sinclair entities—in league with Mr. Matthews—intentionally tricked Seismic Wells into believing that Sinclair 1 was the party entering the Replacement Participation Agreement because they *knew* that Seismic Wells would never enter the contract with Sinclair 3.

4.      In support of this theory, Seismic Wells is asserting several permutations of a basic fraud claim.  These claims all require Seismic Wells to prove:

- Defendants *intended* for Seismic Wells to act on the Replacement Participation Agreement's inaccurate recitals;

- Seismic Wells *actually and justifiably relied* on the inaccurate recitals; and

- The inaccurate recitals proximately caused Seismic Wells's injury.

*See Landers v. Aurora Loan Servs., LLC*, 434 S.W.3d 291, 293–94 (Tex. App.—Texarkana 2014, no pet.) (common law fraud); *Pellegrini v. Cliffwood-Blue Moon Joint Venture, Inc.*, 115 S.W.3d 577, 580–81 (Tex. App.—Beaumont 2003, no pet.) (fraud by nondisclosure); *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 726 (Tex. App.—Waco 1998, pet. denied ) (statutory fraud (citing TEX. BUS. & COMM. CODE § 27.01)); *Reyna v. First Nat'l Bank*, 55 S.W.3d 58, 68 (Tex. App.—Corpus Christi 2001, no pet.) (fraud by promises made with no intent to perform).

   A.   **Seismic Wells did not present sufficient evidence that Sinclair 3 *intended* for Seismic Wells to rely on the Replacement Participation Agreement's inaccurate recitals, and it did not present sufficient evidence to show that it *justifiably* relied on them.**

5.      Seismic Wells did not present <u>any</u> evidence supporting its claim that Sinclair 3 *intended* for Seismic Wells to rely on the Replacement Participation Agreement's inaccurate

recitals.[1]   Despite playing hours of videotaped deposition and calling a Sinclair company representative live, Seismic Wells's counsel never even asked a single witness whether anybody at any Sinclair entity intended to trick Seismic Wells into signing the Replacement Participation Agreement.   Moreover, Seismic Wells did not point to a single email, letter, or conversation where any Sinclair employee expressed an intent to defraud Seismic Wells.

6.      In fact, the evidence showed that Sinclair could not have intended to defraud Seismic Wells because it mailed a notice letter in February 2006—seven months before the alleged fraud—explaining that the corporate reorganization was taking place.   *See* Ex. 167, Letter Notifying Vendors of Corporate Reorganization.   While Seismic Wells claims it did not receive the letter, that (suspect) claim is irrelevant for fraud: The only thing that matters is that Sinclair at least intended to send the letter.   By doing so, Sinclair could not have intended to hide the reorganization from Seismic Wells.

7.      Even assuming that Seismic Wells had some evidence supporting its high burden, the fact is that Seismic Wells could not have justifiably relied on the Replacement Participation Agreement's inaccurate recitals.   Under Texas law, a plaintiff "cannot recover [for a fraud-based claim] if he blindly relies upon a misrepresentation of falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."   *Lewis v. Bank of Am. N.A.*, 343 F.3d 40, 546 (5th Cir. 2003) (quoting *Field v. Mans*, 516 U.S. 59, 70–71 (1995)).   Moreover, a plaintiff may not justifiably rely on a representation if "there are 'red flags' indicating such reliance is unwarranted."   *Id.* at 546–47.

---

[1]       Seismic Wells spent an inordinate amount of time presenting evidence that Sinclair 3 designated its purchase in the Replacement Participation Agreement as replacement property for a § 1031 like kind exchange.   Its theory appears to be that Sinclair 3 felt pressured to hurry the deal through so that it could defer paying capital gains tax the approximately $70,000 profit it made during a sale of a Mississippi property.   This suspect theory—at best—applies to motive.   It is not any evidence supporting the required element of intent.

3

8.      Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context.  *Coastal Bank SSB v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 2004, no pet.).   "A party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party."  *Id.* at 843.

9.      For Seismic Wells's allegations of having been duped to be true, it would have had to repeatedly blind itself to the obvious "red flags" that indicated the Initial Participation Agreement and the Replacement Participation Agreement were with two separate Sinclair entities.  Seismic Wells, of course, *did know or should have known* that the companies were different before it ever saw the Replacement Participation Agreement.  *See infra* Part I.C (listing the numerous ways that Sinclair provided both actual and constructive notice of its reorganization to Seismic Wells).

10.     But even if Seismic Wells ignored everything outside of the contract, the fact is that it should have still realized that the two entities were different based on the contract alone. After all, the Replacement Participation Agreement correctly used Sinclair 3's <u>legal</u> name and never references Sinclair 1's expired assumed name.  *See* Ex. 6, Replacement Participation Agreement, at 1 (stating that it is a contract between Seismic Wells and "Sinclair Oil and Gas Company, a Wyoming corporation").  This fact alone should have raised a "red flag" for Seismic Wells.

11.     Moreover, the Replacement Participation Agreement's Assignment and Bill of Sale included a clarification clause that unequivocally put Seismic Wells on notice that it needed

to investigate Sinclair's corporate form if it was confused.  That Assignment—which Seismic Wells signed—explained how Sinclair 3 came to own an interest in the Miller Ranch lease:

> For purposes of clarification and acknowledgement, reference is made to that certain Assignment and Bill of Sale by and between Assignor [Seismic Wells, LLC] and Sinclair Oil Corporation effective the 1st day of June 2005 . . . wherein Sinclair Oil Corporation was conveyed 3/8ths of 8/8ths undivided interest in and to the same Assigned Interests being assigned herein ("Assignee's First Assignment of Interest"); Sinclair Oil Corporation, on or about March 1, 2006, assigned to Sinclair Oil and Gas Company, therefore, the interest conveyed in the First Assignment of Interest coupled with the conveyance in this Assignment and Bill of Sale increases Assignee's interest to 17/32nds of 8/8ths in Assignee's Assigned Interest.

Ex. 212, Assignment and Bill of Sale (Oct. 25, 2006), at 2–3 (emphasis added).

12.     Seismic Wells took the patently unreasonable position that it disregarded the assignment notification because it believed the clarification provision was just notifying the company that Sinclair 1 had assigned its interest in the Miller Ranch lease to *its own assumed name*.[2]  *See* Ex. A, Trial Transcript, at 61:14–62:1.  But again, Seismic Wells's absurd interpretation (if genuine) should have triggered red flags that it needed to investigate the issue. In all, Seismic Wells cannot show it justifiably relied on the inaccurate recitals.

### B.     Seismic Wells did not present sufficient evidence to show that Sinclair 3's alleged misrepresentations proximately caused it any injury.

13.     Seismic Wells did not present any evidence that Sinclair's alleged misrepresentations proximately caused it any injury.  Nor can it.

14.     Seismic Wells conceded that the Initial Participation Agreement was a valid and legally enforceable contract.  That contract gave Sinclair 1 the unequivocal right to operate "at any time."  *See* Ex. 2, Initial Participation Agreement, at § 9.1 ("At any time SOC [Sinclair 1]

---

[2]     Seismic Wells also took issue with the fact that the Assignment and Bill of Sale only references Sinclair 1 and Sinclair 3, rather than explaining that Sinclair 1's Miller Ranch interests also passed through Sinclair 2.  Seismic Wells did not offer any explanation for why it needed to know about the pass-through entity in order to understand that Sinclair 1 had assigned its interest to a different entity.

may elect to assume operations, but SOC is under no obligation to do so.").  As a result, Sinclair 1 legally acquired the right to operate pursuant to that contract in April 2005—months *before* the Sinclair reorganization.  Sinclair 1, therefore, did not need to reorganize its business or to trick Seismic Wells into signing the Replacement Participation Agreement in order to acquire the right to operate because Sinclair 1 had already legally purchased it from Seismic Wells.

15.     Seismic Wells tries to side-step this obvious problem by arguing that Sinclair 1 somehow forfeited its right to operate when it assigned its interest to Sinclair 3.  But here again, Seismic Wells is depending on a misinterpretation of the contract and a misinterpretation of Texas law.  The Initial Participation Agreement states:

> Section 9.4     Should Seismic Wells sell, transfer or otherwise dispose of its interest in the Leases, SOC [Sinclair 1] shall have the first and exclusive right to assume operations of the Leases.  <u>Having once assumed operations</u>, should SOC [Sinclair 1] sell, transfer or otherwise dispose of its interest in the Leases, Seismic Wells shall have the first and exclusive right to assume operations of the Leases.

See id. (emphasis added).

16.     Seismic Wells conceded that this provision imposed two conditions precedent to Seismic Wells reacquiring the right to operate that it sold Sinclair 1: (1) Sinclair 1 must assume operations of the Miller Ranch lease; and (2) *after* assuming operations, Sinclair 1 must "sell, transfer or otherwise dispose of its interest."  *See* Ex. A, Trial Transcript, at 89:18–91:21.

17.     But Seismic Wells admitted that these conditions precedent never occurred because Seismic Wells operated the Miller Ranch the <u>entire time</u> that the Initial Participation Agreement was in effect.  Sinclair 1, in fact, never assumed operations of the lease.  Instead, it assigned its interest in the lease—including the right to operate—to Sinclair 3 while Seismic Wells was still operating the lease.  Sinclair 3, therefore, legally acquired the right to operate that Seismic Wells sold to Sinclair 1.  *See Santa Fe Operating Partners, L.P. v. Universal Resources Corp.*, No. 07-95-0342-CV, 1996 Tex. App. LEXIS 3540, at *7 (Tex. App.—Amarillo Aug. 14,

6

1996, writ denied) (holding that the right to operate is a freely assignable right as a matter of law); *see also infra* Part II.A (explaining that Sinclair 1 had a right to assign its interest to Sinclair 3). <u>As such, Sinclair 3 already owned the right to operate when it signed the Replacement Participation Agreement.</u> The company, therefore, would not have benefitted in any way from disguising its true corporate form, and Seismic Wells could not have been harmed in any way by signing the second contract.

### C. Seismic Wells did not present sufficient evidence to overcome Sinclair's statute-of-limitations defense.

18.     Fraud-based claims are subject to a four-year statute of limitations. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4); *Ford v. Exxon Mobil Chem. Co.*, 23 S.W.3d 615, 617 (Tex. 2007). Generally speaking, these claims accrue on the date the fraud is committed.[3] *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988). Courts, however, will toll the running of the statute of limitations if the plaintiff can show that the defendant fraudulently concealed the existence of the action. *Hooks v. Samson Lone Star, Ltd.*, 457 S.W.3d 52, 57 (Tex. 2015). In that situation, the statute of limitations does not begin to run until the plaintiff is actually aware of the fraud or should have discovered the fraud by exercising reasonable diligence. *See id.*

19.     Texas courts charge plaintiffs with constructive knowledge of their claims as a matter of law when they could have discovered the alleged fraud by reviewing publically available information. In *Shell Oil Co. v. Ross*, for example, the Texas Supreme Court held that plaintiffs have a duty to "make themselves aware of relevant information available in the public

---

[3]     Breach-of-contract claims are also subject to a four-year statute of limitations, and they similarly accrue the day that the contract is breached. *See* TEX. CIV. PRAC. & REM. CODE § 16.051; *Via Net v. TIG Ins.*, 211 S.W.3d 310, 314 (Tex. 2006). Seismic Wells claims its breach-of-contract claim should be tolled for the same reasons as its fraud-based claims. *See* Pls.' First Am. Compl., at ¶¶ 278–92.

record." *See Shell Oil Co. v. Ross*, 356 S.W.3d 924, 928 (Tex. 2011) (concluding that a publically available price index put the plaintiffs on notice that their royalties were being underpaid); *see also BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 66–69 (Tex. 2011) (holding that the plaintiff's claim was time-barred because he could have compared two documents filed with the Texas Railroad Commission ("RRC") containing "highly technical information" to determine that BP had fraudulently represented it was maintaining continuous operations on a lease).

20.     At trial, Seismic Wells argued that Sinclair 1 made it "impossible" to discover its corporate reorganization. *See* Ex. A, Trial Transcript, at 56:24–57:3. The evidence, however, showed that Sinclair 1 (and Sinclair 3) both gave Seismic Wells actual notice and made numerous public filings that charged it with constructive notice.

### Form P-4s and P-5s

21.     Seismic Wells was required to provide Sinclair 3 with Form P-4s when it handed over operations of the Miller Ranch lease. *See* Ex. 2, Initial Participation Agreement, at § 9.5; *see also* Ex. A, Trial Transcript, at 62:–11–16. Form P-4s are certificates of compliance that a new operator is required to file with the RRC before it can begin operating a lease. The party filing the form must provide two key pieces of information: (1) the new "operator name ***exactly as shown*** on P-5 Organization Report"; and (2) the new operator's P-5 Operator Number. *See* Ex. 172, P-4 Forms for the Miller Ranch Lease (emphasis added). As a result, **a Form P-4 cannot be filled out without reviewing the new operator's Form P-5**.

22.     A Form P-5 is an organizational report that companies have to file in order to register their company with the RRC. This form requires companies to provide their RRC-issued operator number, a list of corporate officers, and, if the company exists as a result of a

8

reorganization, the previous company's name and RRC-issued operator number.  *See* Ex. 218,

Sinclair 3's P-5 Organization Report.

23.     In this case, Sinclair 3 filed its Form P-5 on February 13, 2006—eight months

before Seismic Wells signed the Replacement Participation Agreement.  *Id.*  The company's

Form P-5 notified the RRC that: (1) it is a different entity than Sinclair 1, and (2) the filing was

triggered by a reorganization.  *See id.* at §§ 3, 7 (excerpted below).



24.     In accordance with its obligations under the contract, Seismic Wells provided four

Form P-4s to Sinclair 3.  Those forms accurately reflect Sinclair 3's current operator name

"exactly as shown on [the] P-5 Organization Report" and its distinct "Operator P-5 no.":

9

25.     Seismic Wells was understandably recalcitrant to admit that it had anything to do with the Form P-4s.  After all, it conceded that if it had reviewed Sinclair 3's publically available Form P-5 in October 2006, it would have known that Sinclair 1 and Sinclair 3 were different entities.  *See* Ex. A, Trial Transcript, at 57:19–58:10.  As a result, Seismic Wells claimed it did not review the Form P-4s, and instead merely forwarded them in an email to Sinclair 3.  *See id.* at 62:17–66:13.

26.     But here again, Seismic Wells is missing the point.  While Seismic Wells claims it did not review the Form P-4s or the Form P-5, the fact remains that it *could and should have* reviewed them.  Further, Sinclair 3's Form P-5 was on file with the RRC eight months before Seismic Wells signed the Replacement Participation Agreement.  As such, Seismic Wells is charged with constructive knowledge of these publically available documents and the statute of limitations started running in 2006.  *See BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 66–69 (Tex. 2011).

### The Assignment and Bill of Sale

27.     Seismic Wells signed the Assignment and Bill of Sale on the same day it signed the Replacement Participation Agreement.  The Assignment contained a clarification provision that stated that "**Sinclair Oil Corporation, on or about March 1, 2006, assigned to Sinclair Oil and Gas Company**."  *See* Ex. 212, Assignment and Bill of Sale (Oct. 25, 2006) (emphasis added).  Seismic Wells claimed it subjectively believed that this clarification provision was merely notifying Seismic Wells that Sinclair 1 had decided to assign its interest in the Miller Ranch lease to *itself*—i.e., to its (expired) assumed name.    *See* Ex. A, Trial Transcript, at 61:17–62:1.

28.     Seismic Wells cannot hide behind its litigation-driven, ten years after-the-fact interpretation of the Assignment's clarification provision.  The Assignment clearly states that

10

Sinclair 1 previously assigned its interest to Sinclair 3.[4]  Seismic Wells had <u>actual</u> knowledge that these entities were distinct back in 2006.  If it was confused, it should asked for clarification back in 2006 rather than waiting nine years to file its lawsuit.  And as to the contract claims, the inescapable fact is that Seismic Wells was on notice of *an* assignment back in 2006, so the statute of limitations started running then.

29.     In short, Sinclair presented evidence that Seismic Wells received four forms of <u>actual notice</u> before it signed the Replacement Participation Agreement in 2006:

- The Assignment and Bill of Sale.  *See supra* ¶¶ 29–31.

- Sinclair 3's P-4 forms.  *See supra* ¶¶ 23–28.

- Sinclair 3's P-5 form.  *See id.*

- Sinclair 3's Notice of Reorganization Letter.  *See supra* ¶ 6.

30.     Moreover, Seismic Wells is also charged with <u>constructive notice</u> of publicly available documents that it could have reviewed prior to signing the Replacement Participation Agreement, such as:

- Sinclair 1's Expired Assumed Name Certificate.  *See* Ex. 86.

- Sinclair 2's Application for Registration of a For-Profit Corporation.  *See* Ex. 85.

- Sinclair 3's Application for Registration of a For-Profit Corporation.  *See* Ex. 92.

31.     In short, Seismic Wells's argument that it was "impossible" to determine that Sinclair 1 and Sinclair 3 were separate legal entities is factually wrong.  If it is true that Seismic Wells was confused, it could have easily determined that the two entities were different if it had merely conducted a minimal level of due diligence.  **In fact, it did not have to do anything**

---

[4]     Seismic Wells momentarily took issue with the fact that the Assignment and Bill of Sale only references Sinclair 1 and Sinclair 3, rather than explaining that Sinclair 1's Miller Ranch interests also passed through Sinclair 2.  *See* Ex. A, Trial Transcript, at 117:6–21. Seismic Wells cannot provide any credible explanation for why it needed to know about the pass-through entity or how that knowledge could have affected it.

more than read the P-4 forms that it was required to complete and send to Ms. Meehan

back in November 2006.

II.    **Seismic Wells Failed to Submit Sufficient Evidence to Support Its Breach-of-Contract Claims Relating to the Initial Participation Agreement.**

   A.    **Seismic Wells failed to submit sufficient evidence to support its claim that Sinclair 1 breached the Initial Participation Agreement by assigning its interest to Sinclair 3.**

   32.    Seismic Wells claimed that the confidentiality provision in the Initial Participation

Agreement had the practical effect of prohibiting assignments—even though the contract itself

does not expressly attempt to do so.  *See* Ex. 2, Initial Participation Agreement, at § 10.2.  But

Seismic Wells cannot point to a single case that suggests that a form confidentiality provision

can simultaneously act as a restriction on assignment.

   33.    Texas law is squarely opposed to Seismic Wells's position.  The general rule in

Texas is that "all contracts are assignable."[5]  *See Crim Truck & Tractor Co. v. Navistar Int'l*

*Transp. Corp.*, 823 S.W.2d 591, 596 (Tex. 1992), *superseded by statute on other grounds as*

*noted in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex.

2002); *see also Santa Fe Operating Partners, L.P. v. Universal Resources Corp.*, No. 07-95-

0342-CV, 1996 Tex. App. LEXIS 3540, at *7 (Tex. App.—Amarillo Aug. 14, 1996, writ denied)

("In general, contract rights are assignable . . . .").  In fact, Texas courts have repeatedly

recognized that the parties to a contract are not required to obtain each other's consent before

---

[5]     Texas law does permit parties agreeing to a personal services contract (e.g., commissioning a painter) to prohibit the parties' standard right to assign their contractual rights and duties.  In order to do so, however, the contract: (1) must expressly prohibit assignment; and (2) "rel[y] on the personal trust, confidence, skill, character or credit of the parties."  *Santa Fe Operating Partners, L.P.*, 1996 Tex. App. LEXIS 3540, at *7 (citing *Crim Truck*, 823 S.W.2d at 596); *In re FH Partners, LLC*, 335 S.W.3d 752, 762–66 (Tex. App.—Austin 2011, no pet.).  The Initial Participation Agreement clearly does not fall within this narrow category.  *See Santa Fe Operating Partners, L.P.*, 1996 Tex. App. LEXIS 3540, at *7–8 (holding that the right to operate is "not so unique in the oil and gas industry as to involve a degree of trust and confidence singularly personal to the contracting parties" and is therefore "assignable as a matter of law").

they can assign their interest—including contracts that grant a party the right to operate an oil and gas lease.  *See, e.g., Santa Fe Operating Partners, L.P.*, 1996 Tex. App. LEXIS 3540, at *7 (holding that the right to operate an oil and gas lease is freely assignable "as a matter of law" (citing *Crim Truck,* 823 S.W.2d at 596)).

34.    Second, Seismic Wells's <u>new</u> theory of non-assignability is disingenuous when considered in light of the parties' previous negotiations about this specific topic in the contract. In 2005, Sinclair 1 sent Seismic Wells the first draft of the Initial Participation Agreement.  That draft agreement included a clause entitled Restriction on Assignment:

ARTICLE 11

<u>RESTRICTION ON ASSIGNMENT</u>

> Section 11.1   Neither this Agreement, nor the rights and obligations created hereunder, nor the interests conveyed or reserved, shall be sold or assigned, in whole or in part, to any third party (excluding family member or affiliated entities), without the prior written consent of the other Party, which consent will not be unreasonably withheld.

*See* Ex. 4, Draft of Initial Participation Agreement, at § 11.1 (emphasis added).

35.    <u>Seismic Wells, however, asked Sinclair 1 to remove the provision.</u>  It stated that it had "never been in a deal with a restriction clause and do[es] not seek to restrict others rights to assign their property or be restricted.  It wouldn't apply to the remainder of the working interest and we are glad it doesn't apply to us now."  *See id.*

36.    When confronted at trial about this fact, Seismic Wells tried to draw a unique distinction.  Seismic Wells claimed that the Initial Participation Agreement allowed the parties to assign their "property," but that it prohibited the parties from assigning their contract rights.  *See* Ex. A, Trial Transcript, at 76:25–77:6.  Of course, Seismic Wells was not able to explain how it reached that conclusion when the proposed restriction expressly referenced "the rights and

13

obligations created" by "this Agreement." *See* Ex. 4, Draft of Initial Participation Agreement, at § 11.1.

37.     Regardless, Seismic Wells's disingenuous interpretation does not matter.  The fact is that the restriction-on-assignment clause was removed from the contract at Seismic Wells's request, and the final, signed draft of the contract does not contain any provision that prohibit the parties from assigning their interest.

38.     Given Texas's general rule permitting the free assignability of contract rights and Seismic Wells's request to remove the restriction-on-assignment clause from the contract, Seismic Wells cannot now claim—eleven years after signing the contract and four years after assigning its own interest to Bold Energy—that Sinclair 1 somehow violated this alleged one-way street.

39.     Seismic Wells's breach-of-contract claim is also time-barred because the Replacement Participation Agreement's Assignment and Bill of Sale clearly informed Seismic Wells that Sinclair 1 had assigned its interest back in 2006.  While Seismic Wells claims it subjectively believed the clarification provision was merely explaining that Sinclair 1 had assigned its interest to its assumed name, the fact remains that Seismic Wells knew back in 2006 that there was *an* assignment in 2006.

**B.      Seismic Wells failed to submit sufficient evidence to support its claim that Sinclair 1 breached the Initial Participation Agreement by "selling, trading, or licensing" the seismic data to a third party.**

40.     As an initial matter, Seismic Wells never pled a breach-of-contract theory for any alleged sale, trade, or license of seismic data.  *See* generally Pls.' First Am. Compl.  In its First Amended Complaint, Seismic Wells only alleged Sinclair 1 breached the Initial Participation Agreement by assigning its working interest in the Miller Ranch lease to Sinclair 2.  *See id.* Seismic Wells's Original Complaint was 106 pages and asserted nineteen separate causes of

14

action.  Its First Amended Complaint was 108 pages and asserted seventeen distinct causes of action.  In 214 pages of pleadings, Seismic Wells never articulated its belief that Sinclair 1 breached the Initial Participation Agreement by selling, trading, or licensing the seismic data to anyone.  The Court should not permit Seismic Wells to add this new claim.

41.     Regardless, Seismic Wells's claim fails for two more basic problems.  First, Seismic Wells did not present any evidence that it actually owns the seismic data at issue in this lawsuit.  Seismic Wells can hardly take the position that it owns seismic data allegedly worth millions without showing a <u>single document</u> supporting its contested ownership.  *See* Ex. A, Trial Transcript, at 80:15–81:4.

42.     Second, Seismic Wells did not present any evidence showing that Sinclair 1 actually "sold, traded, or licensed" any seismic data to a third party.[6]  *See* Ex. 2, Initial Participation Agreement, at § 2.3 (prohibiting Sinclair 1 from "sell[ing], trad[ing], or licens[ing]" the data to "third parties").  Seismic Wells only pointed to a single affidavit—taken out of context—that globally references licenses in general.  It does not specifically mention seismic data, and it does not specifically mention the Miller Ranch lease or Seismic Wells.  This out-of-context statement is hardly sufficient to prove Seismic Wells's claim.

III.   **Seismic Wells Failed to Submit Sufficient Evidence to Support Its Breach-of-Contract Claims Relating to the Replacement Participation Agreement.**

A.   **Seismic Wells failed to submit sufficient evidence to support its claim that Sinclair 3 repudiated the Replacement Participation Agreement by drilling less than nine wells.**

---

[6]     From a contract interpretation perspective, Sinclair notes that all three of these terms prohibit transfers <u>for money</u> to <u>third parties</u>.  They do not, of course, prohibit intra-company transfers where only one employee has ever viewed the data.  *See* Ex. A, Trial Transcript, at 80:6–14.

534854 v3

43.     Seismic Wells claims that Sinclair 3 repudiated its obligations under the Replacement Participation Agreement in 2014 when it informed Seismic Wells that it did not intend to drill the remaining two participation wells.  This claim fails for two independent reasons.

44.     First, Seismic Wells sold its interest in the Replacement Participation Agreement to Bold Energy in 2011.  If Sinclair 3 owes anybody an obligation to drill any wells on the Miller Ranch lease, it owes that obligation to Bold Energy—not Seismic Wells.  *See* Ex. 106, Assignment from Barry Tranckino and or M.R. Royalty (Sept. 14, 2011) (assigning "all rights" under the Replacement Participation Agreement to Bold Energy).

45.     Second, in 2009, Sinclair 3 proposed drilling the remaining two wells, but Seismic Wells resisted because it did not want to pay its proportionate share of the costs to drill wells that it did not believe would be profitable.  As a result, it agreed to waive the remaining two obligations wells:

> The concept that Sinclair 1s obligated to drill two more mandatory obligation wells and that these wells need to be in the unit is a misunderstanding.  The Participation Agreement obligated Sinclair to the drilling of its share of a maximum of nine wells, being located within three specific pods of 3 wells during a defined time period and on a success basis.  The Participation Agreement also requires the location and sequence of the obligation wells to be by mutual agreement.  It is our understanding that the 590 pod was condemned by the dry hole, voiding the need for drilling two additional wells in that pod.  The six wells drilled in the 527/528 pod have all been drilled at locations of mutual agreement as required by the Participation Agreement.  We are satisfied that Sinclair has fully met its obligation wells and will provide an acknowledgment and or release form upon request.

Ex. 22, Letter from Seismic Wells to Marilyn Meehan (Feb. 16, 2009) (emphasis added).

46.     Given Seismic Wells's position in 2009 that it was "satisfied that Sinclair has fully met its obligation wells," it can hardly bring a lawsuit seven years later claiming that Sinclair 3 failed to meet those same drilling obligations.  Seismic Wells waived any claim

16

requiring Sinclair 3 to drill the remaining wells, and now this Court should hold Seismic Wells to its word. *See Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008) ("Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right.").

47.     Finally, Seismic Wells did not present any evidence supporting damages for this claim.  In particular, Seismic Wells must show that had Sinclair drilled two additional wells, Seismic Wells would have produced more oil than its proportionate share of the drilling costs. Seismic Wells did not even attempt to present evidence on this critical issue.

> **B.     Seismic Wells failed to submit any evidence to support its claim that Sinclair 3 breached the Replacement Participation Agreement by not conveying the well with the leaking casing (the MSU #2) to Seismic Wells.**

48.     At trial, Seismic Wells only briefly addressed its claim that Sinclair 3 should have conveyed its interest in the leaking MSU #2 well, and it wholly failed to present any evidence to support a damages figure.  As an initial matter, Seismic Wells did not even testify that it had incurred any damages as a result of this claim—and for good reason.  Seismic Wells must show that it would have recovered more oil than it would cost to repair the leaking casing.  Seismic Wells, therefore, would have needed to hire a petroleum engineer to testify about the amount of recoverable reserves beneath the ground.  It did not do so, and it therefore failed to present evidence supporting damages for this claim.

> **C.     Seismic Wells failed to submit sufficient evidence to support its claim that Sinclair 3 repudiated the Replacement Participation Agreement by reminding Seismic Wells it had sold its subsequent right to operate to Bold Energy.**

49.     Seismic Wells claims that Sinclair 3 repudiated the Replacement Participation Agreement when Sinclair 3's lawyer reminded Seismic Wells that it sold its subsequent right to operate to Bold Energy.  But here again, Seismic Wells is demonstrating its short memory.

17

50.     In 2011, Seismic Wells assigned 99% of its interest in the Miller Ranch lease to Bold Energy.[7]   That assignment expressly included <u>all</u> of Seismic Wells's rights under the Replacement Participation Agreement—including its preferential right to operate:

> Barry Tranckino and or M.R. Royalty, L.L.C., successor to Seismic Wells, L.L.C., (herein referred to as "Assignor"), the present owner of said Oil and Gas Lease and <u>the rights thereunder or incident thereto including the Participation Agreement entered into November 1st 2006 with Sinclair Oil and Gas Company as Operator</u>, does hereby bargain, sell, transfer, assign, and convey an undivided Twenty One and Seven-eighth percent (21.875%) interest in and to the Miller Ranch Lease together with a proportionate part of <u>all rights</u> thereto, to [Bold Energy].

Ex. 106, Assignment from Barry Tranckino and or M.R. Royalty, L.L.C. to Bold Energy (Sept. 13, 2011) (emphasis added).

51.     At trial, Seismic Wells claimed that the words "all rights" do not include the preferential right to operate.  *See* Ex. A, Trial Transcript, at 95:18–21.  However, it certainly did not take that position when Bold Energy was purchasing Seismic Wells's interest in the Miller Ranch lease.  In fact, Seismic Wells told Bold Energy that it would include the preferential right to operate as part of the multi-million dollar sale.  *See* Ex. A, Trial Transcript, at 96:17–23.

52.     Seismic Wells may now regret its decision to sell its preferential right to Bold Energy, but that it hardly a justification for suing Sinclair 3.

---

[7]     Seismic Wells makes much of the fact that it still retains a preferential right to operate the 200-acre Miller Spraberry Unit (MSU).  But Seismic Wells is missing the point.  Sinclair 3 is not contending that Seismic Wells may be permitted to operate that area in the event Sinclair 3 sells that interest.  To date, Sinclair 3 still owns its interest in the MSU.  Sinclair's position is that Seismic Wells does not have a right to operate the 19,800-acre area that it sold to Bold Energy.

18

IV.     **Seismic Wells and Mr. Tranckino Failed to Submit Sufficient Evidence to Support Their Business Disparagement Claims.[8]**

53.     Plaintiffs did not submit any evidence supporting their business disparagement claims in two key respects.  First, Plaintiffs did not show that any specific person actually read the few sentences Plaintiffs take issue with in the 153-page Matter of Barry Tranckino file.  Moreover, Plaintiffs did not point to a single deal that fell through as a result of somebody reading the Matter of Barry Tranckino file.  Plaintiffs, therefore, have wholly failed to show that the alleged false representations proximately caused any damages.

54.     Second, Plaintiffs failed to submit sufficient evidence that Sinclair 3's attorney's letter: (1) was a statement of fact, rather than opinion, or (2) that it was false.  In fact, the only representations contained in the Decker Jones letter reaffirmed Seismic Wells's right to operate the Miller Spraberry Unit (the 200-acre unit contained in the 20,000 acre lease) and reminded Seismic Wells that it no longer owned a subsequent-right-to-operate on the remaining 19,800 acres.  *See* Ex. 187, Letter from R. Kelly to Barry Tranckino (June 20, 2014), at 1–2.

V.      **Plaintiffs Failed to Present Sufficient Evidence to Show They Experienced Any Non-Speculative Damages.**

A.      **Mr. Tranckino's Rule 701 testimony is speculative and should be stricken.**

55.     At trial, Mr. Tranckino offered Rule 701 testimony suggesting he was entitled to recover more than $10 million in damages.  He failed, however, to explain how he reached these grandiose figures.  As a result, the Court should disregard all of Mr. Tranckino's Rule 701 testimony.

---

[8]     Sinclair maintains that Mr. Tranckino cannot maintain a business disparagement claim in his individual capacity.  He originally asserted a defamation claim, and he chose to voluntarily dismiss it.

534854 v3

*1. Mr. Tranckino's $4,523,245 lost profits calculation*

56.    Mr. Tranckino testified Seismic Wells incurred $4,523,245 in lost profits.  He based this figure solely on his <u>personal tax returns</u>.  *See* Ex. A, Trial Transcript, at 6:21–7:8.  He did not explain why he did not use Seismic Wells's tax returns to make this calculation.  *Id.*  On cross-examination, however, Sinclair showed that Seismic Wells's tax returns revealed it incurred a net loss <u>every year it existed until 2014</u>—eight years after the alleged fraud.  *See* Ex. 264, Seismic Wells's Tax Returns from 2001–2014.

57.    Moreover, Mr. Tranckino used an improper method for calculating Seismic Wells's lost profits.  He testified that he personally averaged $308,333 per year for the years twelve years before Seismic Wells entered into the Replacement Participation Agreement.[9]  *See* Ex. A, Trial Transcript, at 6:21–7:8.  He then claimed he would anticipate making that same exact amount of money each year through the expiration of the lease in 2021.  *See id.* at 7:12–18.  Mr. Tranckino, however, did not offer any testimony explaining *why* he would expect to make that amount of money each year.  *See id.* at 6:21–8:1.  He also failed to account for the fact that he could only sell a finite amount of working interest (at most, 100%), and that by 2006, he only had 21.875% working interest remaining to sell.  In short, Mr. Tranckino's calculation is nothing more than rank speculation and cannot serve as the basis for damages in this lawsuit.

*2. Mr. Tranckino's $2,250,000 damage to real property calculation*

58.    Mr. Tranckino testified that Seismic Wells incurred $2,250,000 in damage to the value of Seismic Wells's 37.5% working interest because he allegedly could no longer sell the interest after Sinclair 3's alleged fraud in 2006.  *See id.* at 8:18–10:4.

---

[9]      Mr. Tranckino inexplicably failed to include several years in the 1990s in his calculation—despite claiming it was a twelve-year average.

59.     But Seismic Wells did sell its interest after 2006.   In fact, it sold 99% of its interest in the Miller Ranch lease to Bold Energy for millions of dollars.  *See id.* at 98:21–24.  As a result, Seismic Wells's claim that the value of its 37.5% interest was completely destroyed is simply false.  Furthermore, Mr. Tranckino failed to credit the millions of dollars Bold Energy paid him for its 21.875% interest in 2011 toward his calculation.  *See id.* at 8:18–10:4 (requesting damages for a 37.5% interest, despite the fact that Bold Energy paid millions for a 21.875% working interest).  In short, Mr. Tranckino's calculation is patently unreliable.

### *3.  Mr. Tranckino's $2,250,000 license value*

60.     Mr. Trankino testified that Seismic Wells lost the opportunity to sell a license to Sinclair 2 and a separate license to Sinclair 3 for $1,125,000 per license.  Mr. Tranckino testified that he reached these figures by multiplying $15,000 per square mile by the 74.5 square miles he allegedly owns.  But Mr. Tranckino did not offer any explanation for how he reached his $15,000 per square mile figure.  *See* Ex. A, Trial Transcript, at 5:5–6:14.  Nor can he.  After all, Mr. Tranckino has <u>never</u> sold a license for his seismic data in the past.

61.     Moreover, Seismic Wells did not present any evidence that Sinclair 2 or Sinclair 3 would have agreed to pay Seismic Wells for the two seismic data licenses—especially when Seismic Wells had given Sinclair 1 that data for free.[10]

### *4.  Mr. Tranckino's $2,235,000 destruction of value of seismic data*

62.     In addition to the two seismic data licenses, Mr. Tranckino inexplicably claims Sinclair completely destroyed all value of the seismic data and is requesting $2,235,000 as a

---

[10]     Interestingly, Mr. Tranckino's valuation for two licenses for the seismic data is almost as much as Sinclair 1 and Sinclair 3 paid Seismic Wells for a 53.125% interest in the Miller Ranch lease—including the free seismic data license.

534854 v3

result.[11]  *See id.* at 10:5–11:17.  Mr. Tranckino claims he based this figure on how much it cost to shoot the seismic data.  *Id.*

63.     But here again, Mr. Tranckino was sparse on details.  First, he did not present any evidence detailing how much it cost to shoot the seismic data in the 1990s.  *See id.*  Instead, he merely declared it was "in excess of $30,000 per square mile," without citing any supporting evidence.[12]  *See id.*

64.     Second, Mr. Tranckino did not offer any evidence showing that the cost of shooting seismic data is identical to the value of seismic data.  In fact, Mr. Duggan—who shot some of the seismic data with one of Mr. Tranckino's other companies (Col-Tex Petroleum)— testified that the cost of shooting seismic data is not identical to the data's value.  Third, Mr. Tranckino did not present any evidence that he would have been able to sell the seismic data to any company at any point between 2006–2021.  Finally, Mr. Tranckino testified that he still owns the seismic data.  Despite this fact, he did not credit the current value of the seismic data toward his $2,235,000 total destruction figure.

          *5.  Mr. Tranckino's $1,278,000 lease operating expenses*

65.     Mr. Tranckino also asked the jury to award him $1,278,000 in lease operating expenses that he claims he would not have paid had he not signed the Replacement Participation Agreement.  *See id.* at 13:9–14:25.  But here again, Mr. Tranckino failed to offer any evidence supporting how he reach this calculation.

---

[11]     Mr. Tranckino did not explain which Sinclair entity was allegedly responsible for this purported damage.

[12]     Mr. Tranckino also failed to present any evidence that it would cost the same amount of money to shoot the seismic data today as it did in the 1990s.

66.     Moreover, Mr. Tranckino testified that he did not subtract any oil revenue he received during the course of his participation in the Miller Ranch lease.  *See id.*  He did not explain, however, why he should be entitled to recover 100% of his proportionate share of the oil produced from the lease, while paying 0% of the operating costs necessary to produce the oil.

**B.      The Court should exclude all of Mr. Thompson's Rule 702 testimony.[13]**

67.     As Sinclair explained in its *Daubert* brief, Mr. Thompson is not qualified to provide opinion testimony of the value of the seismic data or working interest.  Plaintiffs tried to spin Mr. Thompson's testimony as a "business evaluation," but Mr. Thompson simply did not make that type of calculation.  Instead, he provided testimony about how much Seismic Wells's working interest in the Miller Ranch lease was worth (i.e., an appraisal) and how much the seismic data was worth (i.e., an appraisal).  He is not qualified to provide this type of testimony, and his opinions should be excluded.

68.     Furthermore, Mr. Thompson did not provide an adequate explanation for his methodology—nor can he.  Mr. Thompson conceded that numerous steps in his process were "arbitrary," and he did not offer a reliable explanation for how he reached his final conclusions.  Mr. Thompson's opinions should be excluded for the same reasons explained in Defendants' *Daubert* Motion.

**VI.     Seismic Wells and Mr. Tranckino Failed to Submit Sufficient Evidence to Support Their Claims Against Mr. Matthews.**

69.     As a general rule, a corporate officer's acts on a corporation's behalf are deemed to be acts of the corporation—not the individual.  *See Berry v. Lee*, 428 F. Supp. 2d 546, 561

---

[13]      Sinclair anticipates Seismic Wells will call Mr. Thompson to testify as an expert in its case-in-chief.  Sinclair hereby asks the Court to exclude all of Mr. Thompson's testimony on the same grounds as Sinclair argued in its *Daubert* motion, which it incorporates by reference into the present motion.  *See* Defendants' Br. in Support of Mot. to Exclude Opinion Testimony of Mr. Sydney Thompson Under *Daubert*, Dkt. No. 124 (Dec. 12, 2016).

(N.D. Tex. 2006).   A plaintiff can assert an individual action against a corporate officer, however, if the officer *actively* and *knowingly* participates in a fraud or other tortious conduct. *See Grierson v. Parker Energy Partners 1984-I*, 737 S.W.2d 375, 377 (Tex. App.—Houston [14th Dist.] 1987, no pet.).   Seismic Wells cannot meet this high standard.

70.     Seismic Wells presented no evidence even tangentially connecting Mr. Matthews to Sinclair 1 or Sinclair 3's dealings with the Miller Ranch lease.   Importantly, Seismic Wells did not present <u>any</u> evidence that Mr. Matthews made <u>any</u> direct representations to it. Seismic Wells nonetheless posits that Mr. Matthews *should* have known everything contained in the Initial Participation Agreement, the Replacement Participation Agreement, and their supporting documents because Mr. Matthews signed the contracts.   By doing so, Seismic Wells claims that Mr. Matthews *should* have realized the two contracts were with two separate Sinclair entities (Sinclair 1 and Sinclair 3) and *should* have known that Seismic Wells was not aware of that fact.

71.     These speculative assumptions are not enough.   Seismic Wells failed present affirmative evidence that Mr. Matthews *knowingly and actively* participated in the alleged fraudulent conspiracy.   *See* Court's Order, Dkt. No. 41, at 6 (Sept. 11, 2015).   This is not surprising.   First, Seismic Wells did not present any evidence that there was a fraudulent conspiracy or act of any sort.   Second, the fact is that Mr. Matthews—like many (if not all) high-ranking executives—relied on his employees to negotiate the details of the contracts he signed.

72.     Mr. Herndon testified that he was the landman tasked with negotiating the terms of the Initial Participation Agreement with Seismic Wells.   Mr. Herndon drafted the contract, reviewed it for accuracy, and signed his initials next to Mr. Matthews's signature line.   By doing so, Mr. Herndon indicated that Mr. Matthews could rely on his judgment that the contract was ready to be executed by a corporate officer.   But Mr. Matthews did not only rely on Mr.

Herndon.   Sinclair 1's legal department also reviewed the contract before it reached Mr. Matthews's hands.   And like Mr. Herndon, Sinclair 1's in-house legal counsel placed his initials next to Mr. Matthews's signature line.   Ms. Meehan testified that she performed a similar process when she negotiated and drafted the Replacement Participation Agreement.

73.   For his part, Mr. Matthews could not recall the details of these 10-year-old deals. But he explained he generally only paid attention to a contract's most important terms before binding the company.   Mr. Herndon and Ms. Meehan confirmed he had virtually no day-to-day involvement in contract negotiations.

74.   In short, Seismic Wells did not present any evidence disputing that Mr. Matthews played no role in drafting or negotiating the contracts.   Mr. Matthews relied on his employees to handle those details.   Seismic Wells, therefore, failed to present sufficient evidence to support its claims against Mr. Matthews.[14]

## VII.   Seismic Wells Failed to Submit Sufficient Evidence to Support Its Conspiracy Claim.

75.   To succeed on its conspiracy claim, Seismic Wells was required to show: (1) an agreement between two or more persons to commit a tort, and (2) an underlying tort.   Seismic Wells did not present any evidence in support of either of these requirements.   The Court should therefore dismiss its conspiracy claim.

---

[14]   In their proposed jury instructions, Plaintiffs suggested they were asserting their business disparagement claims against Mr. Matthews.   They did not, however, submit any evidence that Mr. Matthews even knew that the Matter of Barry Tranckino file was getting posted to the confidential Lantana data room—let alone that he reviewed or approved it.

Dated: March 9, 2017

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

*/s/ Peter M. Henk*
Peter M. Henk
Texas Bar No.: 00790861
P. Randall Crump
Texas Bar No.: 05186020
Benjamin Walther
Texas Bar No.: 24084041
600 Travis, Suite 3400
Houston, Texas 77002-2926
Telephone:  713.227.8008
Facsimile:   713.227.9508
E-mail: phenk@shb.com
E-mail: pcrump@shb.com
E-mail: bwalther@shb.com

J. Paul Manning
Texas Bar No. 24002521
FIELD, MANNING, STONE,
   HAWTHORNE & AYCOCK, P.C.
A Professional Corporation
2112 Indiana Avenue
Lubbock, Texas 79410-1444
806/792-0810 (Telephone)
806/792-9148 (Facsimile)
E-mail:  jpmanning@lubbocklawfirm.com

*Attorneys for Defendants*

26

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that I served a copy of the foregoing document by electronic filing notification to the attorneys/parties listed below this 9th day of March, 2017.

Gary R. Sorden
Aaron Davidson
Tim Craddock
Corey Weinstein
Mandi M. Phillips
KLEMCHUK LLP
8150 N. Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone: 214.367.6000
Facsimile: 214.367.6001
gary.sorden@klemchuk.com
aaron.davidson@klemchuk.com
tim.craddock@klemchuk.com
corey.weinstein@klemchuk.com
mandi.phillips@klemchuk.com

Christopher A. Robison
PASSMAN & JONES
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2500
Telephone: 214.742.2121
Facsimile: 214.748.7949
robisonc@passmanjones.com

*Attorneys for Plaintiffs*

*s/ Peter M. Henk*
Peter M. Henk

27

534854 v3